Jaren Wieland, ISB 8265
**MOONEY WIELAND WARREN**
512 W. Idaho Street, Suite 103
Boise, Idaho 83702
Tel.: (208) 401-9219
jaren.wieland@mooneywieland.com

Adam M. Apton*
**LEVI & KORSINSKY LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel.: (212) 363-7500
aapton@zlk.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FRANCISCO BARNES, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PERPETUA RESOURCES CORP., JONATHAN CHERRY, and JESSICA LARGENT,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Francisco Barnes ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his

own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Perpetua Resources Corp. ("Perpetua" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Perpetua's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Perpetua securities between April 17, 2024, to February 13, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Perpetua's expected initial capital expenditure for the Stibnite Gold Project. Defendants' statements included, among other things, minimization of the impact of inflation and other potential sources for increased capital expenditure costs for the project.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true cost of the Stibnite Gold Project; notably, the true impact of inflation and undisclosed decisions Defendants had made or were otherwise contemplating

which had resulted in a drastic increase in projected initial capital expense. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Perpetua's securities at artificially inflated prices.

4.    On February 13, 2025, Perpetua published an updated cash flow model for the Stibnite Gold Project, unveiling additional capital expenses of $952 million, a more than 75% increase from the original figures presented to investors and well beyond the suggested 10-20% increase contemplated by Defendants. The Company attributed these increased costs on inflation, indirect costs, higher mining costs, and direct decisions Defendants made with respect to the project, including the choice to change the design of the electrical poles from timber to steel and the decision to "buy-and-build instead of lease the oxygen plant."

5.    Investors and analysts reacted immediately to Perpetua's revelation. The price of Perpetua's common stock declined dramatically. From a closing market price of $11.97 per share on February 13, 2025, Perpetua's stock price fell to $9.29 per share on February 14, 2025, a decline of about 22.39% in the span of just a single day.

## JURISDICTION AND VENUE

6.    Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Perpetua is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased Perpetua common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Perpetua is attached hereto and incorporated herein by this reference.

12.     Perpetua Resources Corp. is an Idaho corporation with its principal executive offices located at 13181 Highway 55, Donnelly, Idaho 83615

13.     During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "PPTA."

14.     Defendant Jonathan Cherry ("Cherry") was, at all relevant times, the Chief Executive Officer, President, and Director of Perpetua.

15.     Defendant Jessica Largent ("Largent") was, at all relevant times, the Chief Financial Officer and Director of Perpetua.

16.    Defendants Cherry and Largent are sometimes referred to herein as the "Individual Defendants." Perpetua together with the Individual Defendants are referred to herein as the "Defendants."

17.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Perpetua's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.    Perpetua is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Perpetua under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

20.     Perpetua is a development-stage company engaged in acquiring mining properties to move them into production where warranted.

21.     The Company's principal prospect is the restoration and redevelopment of an Idaho mine, referred to as the Stibnite Gold Project.  The project's focus is to explore, evaluate, and potentially redevelop three deposits known as the Hangar Flats Deposit, the West End Deposit, and the Yellow Pine Deposit.

### *The Defendants Materially Misled Investors Concerning the Increase in Initial Capital Expense for the Stibnite Gold Project*

### *April 17, 2024*

22.     On April 17, 2024, Defendants conducted a "Special Call" to update its investors on the progress for the Stibnite Gold Project.  During the call, Defendants discussed the next steps for the project following the end of the public comment period, stating:

> The U.S. Forest Service is focused on wrapping up the final EIS and the Draft Record of Decision which we still anticipate by the end of the second quarter -- this quarter, Q2 and 2024. And a final run is anticipated by the end of the year. So at final stage of permitting ahead and various pathways to financing the project. We expect a construction decision as early as next year. We're also expecting a valuation re-rate. Perpetua continues to be significantly undervalued relative to our peer group.

> Permitted projects trade at a premium in our industry, and we expect our valuation to improve as we continue through this process. So there is an opportunity today for new investors. Perpetua offers excellent exposure to rising gold prices, and with 73 ounces of gold reserves per 1,000 Perpetua shares, we are currently a leader in reserves per share. So, finally, look, this is a very unique American opportunity. Perpetua Resources is unique because we bring solutions.

We have a large, low-cost, high-grade open pit gold mine. We'll offer the only domestically mined source of the critical mineral antimony. And we'll use the mine development fund restoration and abandoned mine site that results in net environmental improvement. And just in conclusion, as I looked at joining this project, I've been here about a month now, I came here thinking that this project was really going to be a home run.

23.    During the question-and-answer portion that followed, Defendant Largent fielded

a direct question related to the capital costs for the project:

<Q: Chris Fogg – Perpetua Resources Corp – Manager of Investor Relations> We've had a number of questions here about capital costs for the projects and inflation-related questions. I'll try to group those together. This one might be a good one for you, Jess. So could you talk through what goes into -- what are some of the things that are included in our capital costs from our 2020 feasibility study? Are we planning to update that? And what does the timing look like on that? And just any general inflation trends that we're seeing?

<A: Jessica Largent> ***Sure. So the 2020 feasibility study, the good news with the timeline we've been under is that we've had plenty of time to study this project and do the engineering, and we're quite confident in the feasibility study itself*** in terms of the mine plan laid out and how -- and what we're getting permitted. ***It was a 2020 number and the 2020 number was $1.3 billion of capital. That included a decent contingency, but we all know we're not in 2020 times anymore.***

That said, for all the reasons Jon talked to earlier, our low-cost project. We believe on the operating cost side, we've got some insulation, right? So the driver of our low cost is access to hydropower, clean, low-cost hydropower. Low strip ratio. Again, this is an abandoned brownfield site, and we will be able to access the ore very early. And then the antimony byproduct credit. So just to touch on that.

First, in our feasibility study, we assumed $3.50 per pound antimony prices. They've been trading in the $5 to $6 per pound range now for well over a year, given global supply and demand fundamentals around antimony. So lots of upside on the antimony byproduct credit from where we were in that study from an operating cost perspective. Now if you step back and look at the capital, in that $1.3 billion, about $0.5 billion is the autoclave, so that's a big chunk of it in terms of the driver of why the number is what it is.

But even if ***-- our project is so great from an economics perspective, that even if you assume a 10% change in CapEx or a 20% change, you can run your numbers there. It's about a $100 million decrease in NPV. But again, we ran our base model at $1,600 gold prices, and we're encroaching on $2,400 gold prices today. So we know it's not 1.3, but we also know the project can sustain movements in the capital***.

And so in terms of what we're doing, part of the work this year is we're advancing basic engineering as we get ready for that construction decision next year and running a financial model update. So that's work we're progressing through 2024. But again, the project has been well studied. We're confident in the plan. ***So we have no plans on updating our feasibility study or technical report, but we will look at financial model updates to support project financing***. Hopefully, I captured all those questions, Chris.

(Emphasis added).

<u>*May 16, 2024*</u>

24.    On May 16, 2024, PPTA conducted what would be its most-recent to-date shareholder call. During the brief call, following some preliminary shareholder voting, Defendant Cherry provided some brief remarks related to the Stibnite Gold Project, stating in pertinent part:

Our project is in one of the best mining jurisdictions in the world, and we have strong community support. Today, with a letter of interest from the U.S. Export-Import Bank for up to $1.8 billion in project financing, we see multiple pathways to move the project forward, and our team is excited about the next chapter.

. . .

***On our costs, Stibnite will be powered by one of the lowest carbon emission grids in the nation. Costs are expected to be in the lowest quartile of the global cost curve, driven by clean low-cost hydro power, a low strip ratio and an antimony byproduct credit of $70 per ounce. Life-of-mine all-in sustaining costs will average less than $650 per ounce. And in the first 4 years, our all-in sustaining cost will be less than $450 per ounce.***

***Our production profile, low cost and robust cash flows, combined with our current valuation, present a compelling opportunity for new investors***. Using our base $1,600 per ounce gold price, the project has an NPV of greater than $1.3 billion using a 5% discount rate. We have good leverage to higher gold prices where the NPV increases to approximately $2.4 billion at $2,100 per ounce gold. ***Based on our current market cap, we are trading nearly the widest discount to NAV despite achieving significant milestones and having a clear path forward.***

. . .

***Looking forward, we have some very exciting milestones. We also expect the valuation re-rate. Despite all our recent achievements and near-term catalysts,***

*we continue to be significantly undervalued relative to our peer group with pre-permitting projects that are trading at a multiple above where we are trading. We expect a significant re-rating to occur as we advance through the permitting process,* but also believe there is an opportunity today with investors who recognize the strategic value of our asset for its antimony and who value companies with ESG principles that are the foundation to their business plans.

(Emphasis added).

<u>*November 18, 2024*</u>

25.    On November 18, 2024, PPTA announced a public offering of 3,439,465 common shares at $10.17 per share.  In pertinent part, the offering's prospectus supplement briefly discussed the potential increases to the Stibnite Gold Project's initial capital cost as follows:

We have limited financial resources. We will need external financing to develop and construct the Project and to complete the permitting process. Although the Company's current capital resources and liquidity include funding awarded under the Technology Investment Agreement ("TIA") pursuant to Title III of the Defense Production Act ("DPA"), such funding is available only for the specified costs related to permitting, early restoration activities and advancing construction readiness and is not available to fund certain corporate expenses, including under the Settlement Agreement. The Company's latest liquidity forecast indicates that available cash resources for expenses not eligible for reimbursement under the DPA funding are expected to be exhausted in the second quarter of 2025. Due to payment obligations under the Settlement Agreement and other corporate expenses, we do not expect the Company will have sufficient assets to discharge its liabilities as they become due for at least 12 months from the date hereof. Absent additional financing, the Company would no longer be able to meet its ongoing obligations or progress critical permitting efforts. The Company continues to explore various strategic and funding opportunities, which may include the issuance of additional equity, new debt, or project specific debt; government funding; and/or other financing or strategic opportunities. There can be no assurance of the amount, timing or nature of any such financing or strategic transaction, if any.

In addition, ***according to the technical report summary as of December 31, 2020, the total initial capital cost estimate for the Project was approximately $1,263 million. Based on significant inflation and increased financing costs since 2020, we expect the actual cost estimates to be higher than the 2020 estimate***. These cost estimates may change materially and our failure to obtain sufficient financing could result in the delay or indefinite postponement of exploration, permitting, development, construction, or production at the Project. The cost and terms of such financing may significantly reduce the expected benefits from development of the

Project and/or render such development uneconomic. There can be no assurance that additional capital or other types of financing will be available when needed or that, if available, the terms of such financing will be favorable. Our failure to obtain financing could have a material adverse effect on our growth strategy and results of operations and financial condition.

(Emphasis added).

26.     The above statements in Paragraphs 22 to 25 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the increase in initial capital expense for the Stibnite Gold Project while also minimizing the risk from the impact of inflation. In truth, Perpetua's suggestion of a mere 10% to 20% increase in cost fell well short of reality; the true impact of inflation, increased costs, and, most importantly, decisions management made resulted in a drastic increase in the initial capital expenditure required for the Stibnite Gold Project.

### The Truth Emerges during Perpetua's Updated Cash Flow Model
### for the Stibnite Gold Project

27.     On February 13, 2025, after the market closed, Defendants published a Form 8-K detailing the updated cash flow model for the Stibnite Gold Project.  In pertinent part, Defendants indicated significant increases in the overall initial capital expenses for the Stibnite Gold Project as follows:

The Financial Update was prepared by the Company and is based, in part, on the basic engineering work completed by Ausenco Engineering USA South Inc. ("Ausenco"), and with contributions from other mining engineers and consultants, utilities and financial advisors. *It is intended to be read as a supplemental financial update to the cash flow forecast included in the Company's technical report titled "Stibnite Gold Project, Feasibility Study Technical Report, Valley County, Idaho" dated effective December 22, 2020 and issued January 27, 2021* (the "2020 Feasibility Study"), which is summarized in the Company's Technical Report Summary, dated as of December 31, 2021, and amended as of June 6, 2022 (the "TRS"). *Using the scientific and technical information presented in the 2020 Feasibility Study, the Financial Update reflects the progression of the Project plan to a Basic Engineering level under our Basic and Value Engineering*

*contract with Ausenco, with some ancillary scopes achieving more advanced status. This advancement in the engineering planning resulted in minor improvements and adjustments to certain infrastructure designs, equipment selection and processing designs, none of which resulted in a material change to the scientific and technical information presented in the 2020 Feasibility Study and TRS.* Perpetua concurrently is advancing execution planning to prepare the Project to be construction-ready once all required permits are received.

The Financial Update also applies fourth quarter 2024 cost estimates for construction and operations, consistent with the Basic Engineering analysis, as well as current and consensus commodity pricing for sales. *While the Financial Model reflects an increase in initial and total capital expenditures and LOM AISC compared to the base model included in the 2020 Feasibility Study, the corresponding increase in commodity prices resulted in overall improvements to key economic metrics of Annual Average EBITDA and Annual Average Free Cash Flow while maintaining a similar after-tax NPV 5% at consensus pricing.* Lower IRR and a slightly extended payback period at consensus pricing in the Financial Model reflect significant upside potential at the higher commodity price sensitivities included in the Financial Update. As such, the Financial Update confirmed the financial viability of the Project at current costs and consensus commodity pricing. In keeping with its conservative approach to mineral reserve and resource estimation, the Company did not revise its mineral reserves or resources in connection with the Financial Update or Basic Engineering work, and did not modify any of the assumptions underlying the modifying factors, price estimates, and scientific and technical information underlying the mineral reserves and resource estimates.

. . .

Initial Capital Expenses increased *from $1,263 million* in the 2020 Feasibility Study *to $2,215 million* in the Financial Update, mainly driven by:

- $352 million related to cost inflation.
- $260 million in indirect cost related to overall project execution, including increases mainly driven by higher operational readiness costs to support transition from project to operations and mine ramp up prior to commercial production ($84 million), higher primary and temporary camp costs ($58 million), and a larger owners team ($27 million).
- $162 million in power line cost increase, mainly driven by electrical poles design changed from timber poles to steel poles and the addition of two Static Synchronous Compensators (STATCOMs) to the design of the main substation.
- $131 million due to the decision to buy-and-build instead of lease the oxygen plant. This resulted in a capital increase but reduced operating costs and resulted in a net-present-value benefit.

- $88 million due to higher offsite infrastructure, mainly driven by the water treatment plant addition of reverse osmosis for polishing and improvements to the Tailings Storage Facility to add a redundant secondary liner and leak collection and recovery system.
- $39 million due to higher mining costs.
- Offset by $46 million in savings driven by adjustments to certain infrastructure designs and pre-production revenue of $33.6 million using consensus pricing.

(Emphasis added).

28.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the April 17, 2024, and May 16, 2024, shareholder calls and during the November 18, 2024, public offering and prospectus supplement. In those publications, Defendants minimized the impact of inflation and other potential sources of increased initial capital expenses for the Stibnite Gold Project and/or otherwise failed to disclose to investors decisions the Company had made or was contemplating which might impact said costs.

29.     Investors and analysts reacted immediately to Perpetua's revelation. The price of Perpetua's common stock declined dramatically. From a closing market price of $11.97 per share on February 13, 2025, Perpetua's stock price fell to $9.29 per share on February 14, 2025, a decline of about 22.39% in the span of just a single day.

30.     A number of well-known analysts who had been following Perpetua predicted negative reactions from the market in response to Perpetua's disclosures. For example, the National Bank of Canada Financial Market Research highlighted the surprising increase in initial capex: "Overall, we expect the market to react negatively to the substantially higher capex figure than the prior estimate from the 2021 technical report and messaged range from management on how to consider the impact of inflation since then." The analyst went on to note that the increase

surpassed their own expectations as well, stating: "Initial capital is forecasted to be US$2,215 mln, which comes in +14% above our estimate of US$1,950 mln. The company previously received a US$1.8 bln letter of interest from the U.S. EXIM, which we expect to fund a large portion of the capex bill, with the remainder likely funded by an equity raise."

31.     Similarly, Roth also highlighted the increased costs, stating:

Most importantly, the Update revised initial capital costs (CAPEX) to $2.22 billion, up from $1.26 billion in the amended 2020 feasibility study … Spot metal prices offset a $352 million increase due to cost inflation but did not offset total CAPEX increases. Other increases included $260 million in indirect costs, $162 million for upgrading electrical poles to steel, $131 million to acquire an oxygen plant (rather than lease), $88 million for improvements to water treatment plant and tailings storage facilities, and $39 million for higher mining costs … the updated CAPEX in relation to Update economics may be less-than-robust for conventional projects

32.     The fact that these analysts, and others, discussed Perpetua's significant capital expenditure increase suggests the public placed significant weight on Perpetua's prior cost estimates and statements on the impact of inflation. The frequent, in-depth discussion of Perpetua's increased capital expenditure for the project confirms that Defendants' statements during the Class Period were material.

### *Loss Causation and Economic Loss*

33.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Perpetua's common stock and operated as a fraud or deceit on Class Period purchasers of Perpetua's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Perpetua's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Perpetua's common stock during the Class

Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

34.     Perpetua's stock price fell in response to the corrective event on February 13, 2025, as alleged *supra*. On February 13, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Perpetua's cost analyses and forecasting processes.

35.     In particular, on February 13, 2025, Perpetua announced significantly higher initial capital costs, increasing their prior estimates by more than 75%, well beyond the 10% to 20% increase due to inflation that management had suggested.

### Presumption of Reliance; Fraud-On-The-Market

36.     At all relevant times, the market for Perpetua's common stock was an efficient market for the following reasons, among others:

(a)     Perpetua's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     Perpetua communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Perpetua was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Perpetua was reflected in and incorporated into the Company's stock price during the Class Period.

37.    As a result of the foregoing, the market for Perpetua's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Perpetua's stock price. Under these circumstances, all purchasers of Perpetua's common stock during the Class Period suffered similar injury through their purchase of Perpetua's common stock at artificially inflated prices, and a presumption of reliance applies.

38.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

39.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with initial capital expense projections for Stibnite Gold Project while at the same time failing to maintain adequate forecasting processes or otherwise disclose additional expenses contemplated over time. Defendants provided the public with statements on the impact of inflation that failed to account for additional, undisclosed expenses and cost increases and/or failed to adequately disclose the fact that the Company at the current time did not have adequate forecasting processes to assess the cost increases.

40.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

41.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Perpetua who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Perpetua's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Perpetua's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Perpetua or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 1, 2024, there were 66.73 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

44.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Perpetua;

(c)    whether the Individual Defendants caused Perpetua to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Perpetua's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

47.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

48.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

50.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Perpetua common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Perpetua's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

51.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Perpetua's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

52.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

53.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Perpetua's internal affairs.

54.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Perpetua's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Perpetua's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Perpetua's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

55.     During the Class Period, Perpetua's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Perpetua's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Perpetua's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Perpetua's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

56.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

58.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Perpetua's misstatements.

60.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Perpetua which had become materially false or misleading.

61.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Perpetua disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Perpetua to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Perpetua's common stock.

62.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same

to cause Perpetua to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

63.     By reason of the above conduct, the Individual Defendants and/or Perpetua are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 21, 2025

Respectfully submitted,

**MOONEY WIELAND WARREN**

By:    *Jaren Wieland*
Jaren Wieland, ISB 8265
512 W. Idaho Street, Suite 103
Boise, Idaho 83702
Tel.: (208) 401-9219
jaren.wieland@mooneywieland.com

-and-

Adam M. Apton *(pro hac vice forthcoming)*
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*

# CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Francisco Barnes _____, duly certify and say, as to the claims asserted under the federal

Name

securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction(s) in Perpetua Resources Corp. which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury that the foregoing is true and correct. Executed this:

27/02/2025
_____
Date

Francisco Barnes
_____
Name

_____
Signature

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 01-31-2025 | P | 12 | $ 11.9200 |
| 02-03-2025 | P | 3 | $ 11.7800 |