Jaren Wieland, ISB 8265
MOONEY WIELAND WARREN
512 W. Idaho Street, Suite 103
Boise, Idaho 83702
Tel.: (208) 401-9219
jaren.wieland.service@mooneywieland.com

*Liaison Counsel for Plaintiff Carl Douglas Neale*

[*Additional counsel on signature page*]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| FRANCISCO BARNES, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PERPETUA RESOURCES CORP., JONATHAN CHERRY, and JESSICA LARGENT,<br><br>Defendants. | Case No. 1:25-cv-00160-DKG<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>Demand for Jury Trial |

Lead Plaintiffs Carl Douglas Neale and David Wallentine (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned attorneys, allege in this amended complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Perpetua Resources Corp. ("Perpetua" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Perpetua's

public documents, conference calls, press releases, presentations, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) industry reports and relevant guidance; and (e) other information readily obtainable on the internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the evidence supporting the allegations contained herein is known only to the defendants or is exclusively within their control.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of the Class consisting of all persons and entities other than Defendants (defined below) who purchased or otherwise acquired Perpetua securities between April 17, 2024 and February 13, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder.

2. Since the Company's inception in 2011, its sole focus has been on the exploration, redevelopment, restoration and operation of three abandoned underground and open pit mines located in Idaho's historic Stibnite Mining District. If successful, this development project, referred to as the Stibnite Gold Project, would become one of the largest and highest-grade open pit gold mines in the United States and the country's only primary producer of antimony.

3. Such endeavors, however, were met with significant challenges from the start. Mining operations and exploration activities in the United States are subject to extensive national, state, and local laws and regulations. Significantly, prior to conducting any redevelopment or mining operation, and in turn, generating revenue from its mineral sales, Perpetua was required to obtain various permits, licenses, and other forms of authorization from multiple local, state, and

national regulatory agencies. This critical permitting process for the Stibnite Gold Project was marked by years of controversy and delay, requiring expansive Project modifications and design changes to achieve approval, leading to significant cost increases and broad uncertainty.

4. Four years into this contentious permitting process, Perpetua released the results of an independent feasibility study and technical report (effective December 22, 2020) providing a comprehensive overview of the Stibnite Gold Project, in its then-current form, including operational improvements and Project modifications designed to address public and regulator concern relating to environmental, social and economic impacts, as well as capital and operating costs and an economic analysis for the Project, as required under specific disclosure requirements for public companies undertaking mineral exploration. As then-envisioned in this report, the Company defined the Stibnite Gold Project as an economically feasible, technically and environmentally sound Project that achieved redevelopment and restoration goals for the region.

5. After the Company's release of the 2020 feasibility study, including its projected capital costs for the Project, Perpetua, in consultation with governing regulatory authorities, conducted additional analyses and technical studies to identify more ways to reduce potential environmental impacts and improve reclamation and restoration design of the Project. Then, on October 15, 2021, unbeknownst to the public, Perpetua submitted an updated and further modified version of its proposed plan of operation for regulatory approval. These decisive design changes and Project modifications impacted every component of its capital expenditure estimates.

6. With no other development projects or alternative means of generating revenue, the Company's prolonged efforts to address public concerns with the Stibnite Gold Project, combat legal challenges, and provide sufficient responses to hundreds of requests for additional information from regulators had significantly depleted its cash and cash equivalents. Indeed, in

March 2024, Perpetua indicated in SEC filings that unless additional financing was secured before the fourth quarter of 2024, it would no longer be able to meet its ongoing obligations or move forward on critical permitting efforts for the Stibnite Gold Project.

7. Then, on April 8, 2024, the Company announced that it received a non-binding and conditional Letter of Interest from the Export-Import Bank of the United States for potential debt financing of up to $1.8 billion. Under the identified program, the Export-Import Bank could provide up to 85% of debt funding for project capital costs. To submit a formal application for access to such debt financing, however, Perpetua had to provide a financial update for the Project.

8. Despite known material capital cost increases due to decisive design changes and further Project modifications submitted for permitting approval in October 2021, throughout the Class Period, Perpetua and its management continued relying on the Project's antiquated 2020 feasibility study, lauding the same Net-Present-Value, minimal, if any, changes in capital expenditure estimates, and a significantly reduced financing risk with the outsized potential financial coverage afforded under new debt financing opportunities.

9. Maintaining the 2020 feasibility study's fiction of industry low projected cost expenditures and high economic viability, unadulterated by inflation or Project modifications, allowed the Company access to much needed capital through at-the-market offerings and a shelf offering affording it enough cash to sustain its operations long enough to receive a final decision of approval for Project implementation in January 2025 and through to the submission of a formal application to the Export-Import Bank in May 2025.

10. On February 13, 2025, Perpetua was forced to reveal a financial update for the Stibnite Gold Project, unveiling additional capital expenses of $952 million, a more than 75% increase from the original figures presented to investors and well beyond the suggested 10-20%

increase suggested by Defendants at the start of the Class Period. Relatedly, the Company indicated a $1.4 billion after-tax Net-Present-Value (5%) for the Project at consensus prices of $2,100 per ounce for gold, revealing a $1 billion decrease from the original figures presented and repeatedly touted by Defendants throughout the Class Period, due to the sizable capital expenditure increases. The Company attributed these increased costs to inflation, higher operational readiness costs to support transition from project to operations, higher mining costs, and direct decisions made with respect to the Project design not previously accounted for in the 2020 feasibility study.

11. Investors and analysts reacted immediately to these revelations. The price of Perpetua stock declined dramatically. From a closing market price of $11.97 per share on February 13, 2025, Perpetua's stock price fell to $9.29 per share on February 14, 2025, a decline of about 22.39% in the span of just a single day.

12. Plaintiffs bring this action seeking to recover the tens of millions of dollars of investment losses caused by Defendants' violations of the federal securities laws.

## II. JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Defendant Perpetua is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiffs and the Class, took place within this District.

16. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. THE PARTIES

17. Plaintiff Carl Douglas Neale purchased Perpetua common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Mr. Neale's certification evidencing his transaction(s) in Perpetua is incorporated herein by reference. *See* ECF No. 15-2.

18. Plaintiff David Wallentine purchased Perpetua common stock and options at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Mr. Wallentine's certification evidencing his transaction(s) in Perpetua is incorporated herein by reference and attached hereto as Exhibit A.[1]

19. Defendant Perpetua Resources Corp. is a British Columbia corporation with its principal executive offices located at 405 S. 8th Street, Suite 201, Boise, Idaho 83702. During the Class Period, the Company's securities traded on the National Association of Securities Dealers Automated Quotations (the "NASDAQ") under the symbol "PPTA."

20. Defendant Jonathan Cherry ("Cherry") has served as Perpetua's President and Chief Executive Officer ("CEO") and as a Director of Perpetua since March 14, 2024, and at all relevant times thereafter. Mr. Cherry joined Perpetua with over 33 years of mining industry

[1] Due to an inadvertent clerical error, some of Mr. Wallentine's earlier transactions in Perpetua were not included in his previously filed a certification. *See* ECF No. 16-4. Mr. Wallentine's certification filed herewith as Exhibit A provides a complete and correct record of his transactions in Perpetua during the Class Period.

experience including permitting, capital raising, project development, joint venture formation and operations.

21. Defendant Jessica Largent ("Largent") has served as Perpetua's Chief Financial Officer since April 1, 2022 and as a Director of Perpetua since March 14, 2024, and at all relevant times thereafter. Ms. Largent served as the Company's Vice President, Investor Relations and Finance from February 2021 to March 31, 2022, and in such role was responsible for the strategy and leadership of the Company's investor relations and finance efforts.

22. Defendants Cherry and Largent are sometimes collectively referred to herein as the "Individual Defendants," and together with Perpetua are referred to herein as the "Defendants."

23. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Perpetua's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

24. Perpetua is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

25. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Perpetua under *respondeat superior* and agency principles.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Perpetua and its Exclusive Development Project, the Stibnite Gold Project

26. Perpetua describes itself as a development-stage company engaged in acquiring mining properties with the intention of exploring, evaluating, and placing them into production.

27. Since its inception in February 2011, the Company's sole focus has been on the exploration, and, if warranted and subject to receipt of required permitting, redevelopment, restoration and operation of abandoned underground and open pit mining, mineral properties, and heap leaching operations located principally in the Stibnite Mining District, referred to as the Stibnite Gold Project ("Stibnite Gold Project," "SGP," or the "Project").

28. Located in the Salmon River Mountains of Valley County, Idaho, approximately 10 miles east of Yellow Pine and 38 miles east of McCall, the Stibnite Mining District is situated on National Forest System ("NFS") lands in the Payette and Boise National Forests, home to one of Idaho's most biologically diverse watersheds, abundant recreational opportunities, as well as deep cultural ties and treaty-reserved resources for the Nez Perce and Indigenous communities of the region. It is also one of the most historic mining districts in the country. Mining at Stibnite began in the 1890s and continued sporadically for the next century, with various owners, resulting in significant environmental damage, including multiple deposits on site and contaminated waste.

29. The Stibnite Gold Project consists of mining the Yellow Pine, Hangar Flats and West End deposits in Stibnite using open pit mining and ore processing methods to extract gold, silver and antimony, and on-site production of gold and silver doré and an antimony concentrate. According to the Company, the Project also entails an extensive reclamation and restoration program for historical impacts on site including the recovery and reprocessing of historical tailings (leftover materials from mining processes, consisting of crushed rock and water), restoration of fish passage during and after operations, relocation of historical mining wastes to engineered tailings storage facilities, stream restoration, and reforestation of impacted areas.

30. If successful, the Stibnite Gold Project would become one of the largest and highest-grade open pit gold mines in the U.S. and the country's only primary producer of antimony. Indeed, the Stibnite Gold Project boasts a Measured and Indicated (M&I) gold resource of 6.0 million ounces with an additional 1.2 million ounces of inferred resources, as well as 8.8 million ounces of M&I silver, and contains 148 million pounds of antimony reserves and 206 million pounds of M&I antimony, which is currently the largest known antimony resource in the U.S. Notably, antimony is categorized as a critical mineral for its ability to strengthen alloys and reduce corrosion for military applications such as munitions, affording Perpetua the potential opportunity for reduced operating costs through a by-product credit.

**B. Regulatory Background**

31. Mining operations and exploration activities in the United States are subject to extensive national, state, and local laws and regulations, which govern, *inter alia*, prospecting, development, mining, production, exports, occupational health, waste disposal, protection of the environment, mine safety, hazardous substances, and disclosure requirements.

32. Significantly, in accordance with the National Environmental Policy Act ("NEPA"), prior to authorizing the use or occupation of NFS lands for mine development and operation, and in turn, financial gain from mineral sales, the United States Forest Service ("USFS") must conduct a formal review of any proposed plan of operations.

33. The NEPA process begins with a proposal to take major federal action providing, *inter alia*, information sufficient to describe the type of operations proposed and how they would be conducted; a map or sketch showing sufficient information to locate the proposed area of operation on the ground; the type and standard of existing and/or proposed roads or access routes to be used in connection with the operation; the approximate location and size of areas where surface resources will be disturbed; the period during which the proposed activity will take place; and measures to be taken to meet the requirements for environmental protection.

34. Upon receipt of a proposed plan of action, USFS publishes a Notice of Intent ("NOI") in the Federal Register, initiating the public scoping process. This NOI informs the public of the upcoming environmental analysis and describes how the public can become involved in the preparation of the Environmental Impact Statement ("EIS"). The primary purpose of an EIS is to ensure that environmental factors are thoroughly considered during the agency's decision-making process for any proposed action, providing a detailed analysis of potential environmental impacts identified during the scoping process and outlining reasonable alternatives the mine plan.

35. A draft EIS is published for public review and comment for a minimum of 45 days, and upon close of the comment period, the agency must consider all substantive comments and, if necessary, conduct further analysis. A final EIS is then published, providing responses to all substantive comments received. Publication of the final EIS begins the minimum 30-day "wait

period," in which agencies are generally required to wait 30 days before making a final decision on a proposed action, allowing time for any administrative objections from cooperating agencies.

36. A supplemental to a draft or final EIS is required when an agency determines that: (1) changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or (2) new information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS. If deemed necessary, an agency prepares, publishes and files the supplemental EIS in the same fashion as a draft or final EIS, except that scoping is not required.

37. The NEPA process ends with the agency's issuance of the final Record of Decision ("ROD") which explains the decision on the proposed action, describes the alternatives considered, and discusses the agency's plans for mitigation and monitoring, if necessary. The final ROD is a crucial step in the NEPA process, signifying completion of an EIS and the beginning of project implementation, in accordance with the authorized plan of action.

### C. The Stibnite Gold Project's Protracted and Controversial Permitting Process

38. From the start, Perpetua's critical permitting process under NEPA for the Stibnite Gold Project was marked by controversy and delay, requiring expansive Project modifications and design changes to achieve approval, leading to significant cost increases and broad uncertainty.

39. Perpetua initiated the NEPA process for the Stibnite Gold Project in September 2016 when it submitted a Plan of Restoration and Operations (the "PRO") to the USFS.

40. On March 28, 2017, Perpetua announced that USFS had begun its analysis of the PRO and anticipated issuing an EIS in 2018 and a final ROD in the first quarter of 2019.

41. In June 2017, the USFS published a NOI to prepare an EIS to evaluate and disclose the potential environmental effects from approval of the PRO, initiating the 30-day public scoping

period. Reaction to the Project design outlined in the PRO was highly contentious, eliciting strong objections from environmental conservation groups and the local Indigenous communities, and hundreds of requests for additional information from USFS.

42. Shortly thereafter, in September 2017, Perpetua informed the public that through the ongoing NEPA process, it had become "apparent" that "drafting multiple resource specific technical reports, reviewing and compiling the baseline information provided by [Perpetua] and its contractors, and providing additional information requested by the regulators will require more time than originally anticipated." As such, USFS was then advising that a draft EIS for public comment was expected in the third quarter of 2018 and a final ROD in the third quarter of 2019.

43. In January 2018, USFS issued a Scoping and Issues Summary Report for the PRO, identifying numerous issues raised during the public scoping process and developed a range of alternatives and design features that could be determined reasonable and necessary to meet USFS regulations for locatable minerals while meeting the Project purpose and need.

44. Then, in July 2018, Perpetua announced that USFS "now anticipates issuing a draft [EIS] for public comment in February 2019, with a Final EIS and Draft [ROD] by October 2019," and "Final ROD in March 2020." According to Perpetua, the schedule change "accommodate[d] the review and analysis of a considerable amount of additional information requested by the [USFS]." Perpetua reported that, to date, it had received 97 requests for additional information.

45. On October 1, 2018, Perpetua announced yet another delay in the permitting schedule with a draft EIS then expected in May 2019 and a final EIS and draft ROD in February 2020, allowing for a final ROD in May 2020. Again, it claimed the change was to accommodate for the review and analysis of additional information with 107 requests received to date.

46. Subsequently, on October 10, 2018, Perpetua announced that the Nez Perce Tribal Executive Committee had adopted a resolution formally opposing the Stibnite Gold Project. The Nez Perce Tribe is one of three tribes in the region consulted by USFS under the NEPA process. In the press release, the Company noted that the resolution was driven by "potential impacts on natural resources resulting from the redevelopment of the former Stibnite mining district and questions the benefits of the proposed restoration work that is an integral part of our Plan of Restoration and Operations," including "improving water quality and fish habitat" on site.

47. Following the Nez Perce Tribe's opposition, in January 2019, the Company announced yet another delay to the anticipated permitting schedule with a draft EIS then expected in the third quarter of 2019, a final EIS and draft ROD in the second quarter of 2020, and final ROD in the third quarter of 2020. The January 2019 press release provided, in pertinent part, that:

> Regulators want to ensure they meet the regulatory requirements to support a robust and defensible Record of Decision. They are requesting additional data, evaluating the thoroughness of the environmental impact analysis, while ensuring alternative development scenarios are carefully considered. [Perpetua] has received 115 requests for additional information ('RFAI') and provided the requested information to all 115 RFAIs issued to date. The updated schedule reflects a number of adjustments to both the baseline analysis, water modelling and alternatives development processes in order to accommodate thorough and comprehensive evaluations of the information provided in response to RFAIs, as well as conduct additional analysis and evaluation of alternatives.

48. Then, in May 2019, after purportedly considering agency and public scoping comments and agency evaluation criteria for the EIS, Perpetua submitted a Modified Plan of Restoration and Operations for the Project (the "ModPRO"), based on more detailed feasibility analyses completed, and the reevaluation of several planned components to further avoid and minimize environmental impacts. Subsequently, the Company announced yet another delay in the permitting schedule with the anticipated release of a draft EIS in January 2020, a final EIS and draft ROD in the fourth quarter of 2020, and final ROD in the first quarter of 2021.

49. The draft EIS for the Stibnite Gold Project (the "DEIS") was finally released for a public comment period in August 2020—more than two years after originally contemplated—with the PRO forming the basis for Alternative 1 and the ModPRO forming the basis for Alternative 2.

50. Before the year end 2020, roughly 10,000 public comments on the DEIS were submitted to USFS. While some emphasized the Project's potential economic benefits and contribution to the restoration efforts in the region, many raised significant concerns about water quality, wildlife preservation, and public health, with conservation groups, in particular, arguing each alternative presented in the DEIS inadequate for failing to properly and fully address the potential impacts of the Project.

51. According to Perpetua, in anticipation of the effects analysis in the DEIS, after considering comments received during stakeholder engagement discussions, and in response to the public comments submitted on the DEIS, it released the results of an independent feasibility study and technical report, effective date December 22, 2020 and issue date January 27, 2021 (the "2020 Feasibility Study" or "2020 FS"), providing a comprehensive overview of the Project including operational improvements and Project modifications that reduce environmental, social and economic impacts identified in the PRO, ModPRO or DEIS, as well as capital and operating costs and an economic analysis for the Project (described in detail below).

52. Around the same time (December 2020), Perpetua submitted to USFS a second modified proposed action referred to as the "Modified Plan of Restoration and Operations 2" or "ModPRO2," representing refinements to the ModPRO, included as Alternative 2 in the DEIS, and replacing the ModPRO in further analysis and assessment by USFS and cooperating agencies.

53. On July 1, 2021, Perpetua announced USFS's decision to advance the ModPRO2 in the NEPA process and update the permitting schedule to include the release of a supplement

draft EIS in the first quarter of 2022, with a final EIS and draft ROD in the fourth quarter of 2022 and a final ROD in the first half of 2023. The July 2021 press release stated, in pertinent part, that:

> The NEPA process is intended to ensure that federal agencies are informed of a proposed action's potential environmental impacts before making final decisions regarding the action. The rigorous scientific analysis during the preparation of the DEIS and the comments from the public and cooperating agencies provided during the extended 75-day public comment period brought forward concepts that could improve the environmental outcomes of the Project. Perpetua Resources listened to this feedback, evaluated the feasibility and potential benefits of these concepts, and submitted modifications of the proposed plan (Alternative 2 in the DEIS) to the USFS. The proposed improvements, which reduce the Project footprint and are predicted to improve water quality conditions at the site during and after Project operations, have been incorporated in Perpetua Resources' 2020 Feasibility Study. These refinements will now be analyzed further in the SDEIS.

54. As described in further detail below, after the release of the 2020 Feasibility Study purportedly incorporating the proposed improvements reflected in the ModPRO2, Perpetua further consulted with USFS and cooperating agencies, evaluated updated data, and conducted additional analyses and technical studies "used to refine ModPRO2" identifying more ways to reduce potential environmental impacts and improve reclamation and restoration design of the Project.

55. Then, on October 15, 2021, unbeknownst to the public, Perpetua submitted an updated version of the ModPRO2, referred to as the "2021 ModPRO2," or the "2021 MMP," further refining the Project by incorporating a suite of additional operational improvements and Project modifications to further reduce potential environmental impacts identified in the DEIS. The 2021 MMP explicitly states that: "[t]his version of the ModPRO2 supersedes that document [*i.e.*, the ModPRO2 submitted in December 2020] and should be considered as a final update to Perpetua Resources' proposed action, appropriate for analysis in forthcoming [EIS] documents."

56. Like many times before, Perpetua subsequently announced another delay in the permitting schedule on February 22, 2022, informing the public that USFS now anticipated the

release of a supplement draft EIS in the third quarter of 2022. The February 2022 press release went on to note, in pertinent part, that:

> In support of the USFS's preparation of the Supplemental DEIS, Perpetua has responded to more than 850 comments and numerous requests for additional information, including additional water modeling, sensitivity analyses, fisheries modeling, and habitat analysis. … Perpetua is confident that the additional evaluation contained within the SDEIS will directly address issues raised during the public review of the [DEIS] and believes the additional analysis and detailed review will lead to the USFS designating a preferred alternative in the SDEIS.

57. A supplemental draft EIS for the Stibnite Gold Project (the "SDEIS") was released for public comment on October 28, 2022—more than six months after originally contemplated—with the 2021 ModPRO2 replacing all prior mine plan alternatives submitted by Perpetua (*i.e.*, the PRO, ModPRO, and ModPRO2) and identified as USFS's "Preferred Alternative" for the Project.

58. When the extended 75-day public comment period for the SDEIS closed on January 10, 2023, more than 18,000 comments had been submitted to USFS. The following day, Perpetua issued a press release announcing the comment period closure and noting strong public support for the 2021 ModPRO2. In pertinent part, the Company's January 11, 2023 press release purported that there were "more than 15,000 letters submitted in support of the Project" concluding, "[t]he high level of participation in the comment period shows the interest in Perpetua Resources' improved Modified Mine Plan [*i.e.*, the 2021 ModPRO2], which the USFS identified as the Preferred Alternative because of its improved water quality, reduction in water temperature and ability to mitigate transportation impacts by utilizing the Burntlog access route to site."

59. After several additional permitting schedule delays by USFS, a final EIS and draft ROD for the Project were released in September 2024, and a final ROD was issued in January 2025—six years after originally contemplated. Importantly, the "Selected Alternative" was the plan of action laid out in the 2021 ModPRO2 submitted by Perpetua.

### D. Required Disclosure of the Economic Viability of the Stibnite Gold Project

60. At all relevant times, as a public company, Perpetua was subject to certain securities regulations imposing specific disclosure requirements on companies undertaking mineral exploration. These requirements include, *inter alia*, the preparation of preliminary feasibility (or pre-feasibility) studies and feasibility studies by independent experts evaluating the technical and economic viability of a mineral project that has advanced to a stage where a preferred mining method is established, and an effective method of mineral processing is determined.

61. The confidence level of a feasibility study will be higher than that of a pre-feasibility study and must include sufficient detail such that the results of a feasibility study may reasonably serve as the basis for a final decision by a proponent or financial institution to proceed with, or finance, the development of the project.

62. After several years of collecting technical and environmental baseline data on the Stibnite Gold District and purportedly understanding the legacy impacts from past mining activity, engaging with stakeholders, and developing an environmentally, socially and economically feasible path forward, Perpetua completed a preliminary feasibility study for the Stibnite Gold Project in 2014, led by Independent Qualified Persons at M3 Engineering & Technology Corp. ("M3"), and based thereon submitted the PRO to USFS in September 2016. The PRO formed the basis for Alternative 1 in the DEIS released for public comment in August 2020.

63. According to Perpetua, continued evolution of the Project following environmental modeling and analysis resulted in the amended preliminary feasibility study and technical report for the Stibnite Gold Project, led by M3, dated March 28, 2019, and in the Company's submission of the ModPRO in May 2019, which formed the basis of Alternative 2 in the DEIS.

64. Perpetua first announced the commencement of a feasibility study for the SGP on April 3, 2017, again to be led by M3, and in compliance with National Instrument 43-101, the Canadian Securities Administrators standards for reporting mineral properties.

65. Under National Instrument 43-101, the term "feasibility study" has the same meaning ascribed by the Canadian Institute of Mining, Metallurgy and Petroleum ("CIM") Definition Standards. Under CIM standards, a feasibility study is a comprehensive technical and economic study of the selected development option for a mineral project that includes appropriately detailed assessments of applicable modifying factors—including mining, processing, metallurgical, infrastructure, economic, marketing, legal, environmental, social and governmental factors—together with any other relevant operational factors and detailed financial analysis that are necessary to demonstrate, at the time of reporting, that extraction is reasonably justified (economically mineable). The demonstration of economic viability in a feasibility study requires estimation of after-tax annual cash flows and the project's Net-Present-Value ("NPV") and inclusion of all the parameters that have an economic effect on the project.

66. When announced, the Company's target completion date for the feasibility study was to "parallel[] the advancement of the regulatory process for mine development." Indeed, prior to the study's release, when announcing the latest update on the anticipated permitting schedule for the Project, Perpetua would note, in pertinent part, that:

> The timing for completion of the feasibility study is tied to the completion of the Draft EIS since the feasibility study needs to reflect the design and layout of the Project as defined in the Draft EIS. While substantially all of the work related to mineral resource estimation, metallurgy, geotechnical, infrastructure (including road access, powerline, tunnel design) and other aspects of the Project needed to support a feasibility study is well advanced, finalization of the design and estimating of capital and operating costs and the actual feasibility study are awaiting decisions driven by the permitting process.

67. As detailed above, Perpetua's feasibility study for the Stibnite Gold Project was deemed effective December 22, 2020 (*i.e.*, the 2020 Feasibility Study), less than two months after the close of an extended 75-day public comment period on the DEIS.

68. The 2020 Feasibility Study provided a comprehensive overview of the Stibnite Gold Project including information about the Project's geology, mineralization, exploration potential, Mineral Resources, Mineral Reserves, mining method, process method, infrastructure, social and economic benefits, environmental protection, cleanup and repair of historical impacts, permitting, reclamation and closure concepts, capital and operating costs and an economic analysis for the Project. As currently envisioned in the 2020 Feasibility Study, the Stibnite Gold Project was defined as an economically feasible, technically and environmentally sound Project that achieved redevelopment and restoration goals for the Stibnite Mining District.

69. In pertinent part, the 2020 Feasibility Study included an estimation of capital and operating costs for the Project, considered "essential to the evaluation of the economic viability of a prospective project." According to the report, capital expenditures or capital costs ("CAPEX") for the SGP were estimated on the basis of the 2020 FS mine plan, plant design, estimates of materials and labor based on that design, analysis of the process flowsheet and predicted consumption of power and supplies, budgetary quotes for major equipment, labor requirements, and estimates from consultants and potential suppliers to the project.

70. The Project CAPEX estimate provided in the 2020 Feasibility Study includes four components: (1) the initial CAPEX to design, permit, pre-strip, construct, and commission the mine, plant facilities, ancillary facilities, utilities, operations camp, and pre-production on and off site restoration and environmental mitigation; (2) the sustaining CAPEX for facilities expansions, mining equipment replacements, expected replacements of process equipment and ongoing

concurrent restoration and environmental mitigation activities during the operating period; (3) working capital to cover delays in the receipts from sales and payments for accounts payable and financial resources tied up in inventory, and (4) closure CAPEX to cover post operations reclamation and restoration and water treatment costs.

71. The 2020 FS supplied the following table summarizing CAPEX for the Project:

**Table 1-8: Capital Cost Summary**

| Area | Detail | Initial CAPEX ($000s) | Sustaining CAPEX ($000s) | Closure CAPEX ($000s)[1] | Total CAPEX ($000s) |
|---|---|---|---|---|---|
| Direct Costs | Mine Costs | 84,019 | 118,968 | - | 202,987 |
| | Processing Plant | 433,464 | 49,041 | - | 482,505 |
| | On-Site Infrastructure | 190,910 | 83,892 | - | 274,802 |
| | Off-Site Infrastructure | 115,940 | - | - | 115,940 |
| Indirect Costs | | 232,684 | - | - | 232,684 |
| Owner's Costs, First Fills, & Light Vehicles | | 38,351 | - | - | 38,351 |
| Offsite Environmental Mitigation Costs | | 14,397 | - | - | 14,397 |
| Onsite Mitigation, Monitoring, and Closure Costs | | 3,474 | 23,484 | 98,052 | 125,010 |
| **Total CAPEX without Contingency** | | **1,113,239** | **275,385** | **98,052** | **1,486,677** |
| Contingency | | 149,708 | 20,354 | 1,244 | 171,306 |
| **Total CAPEX with Contingency** | | **1,262,948** | **295,739** | **99,296** | **1,657,982** |

*Notes:*
*(1) Closure assumes self-performed closure costs, which will differ for those assumed for financial assurance calculations required by regulators.*

72. Additionally, the 2020 FS described the economic analysis conducted. The first year of analysis began with the decision point of the Project, the completion of the EIS, and preliminary permit approval. Four cases were run in the economic model to present a range of economic outcomes using varying metal prices.

73. The following table was provided in the 2020 Feasibility Study showing the results of the Project's pre- and after-tax economic analysis:

Table 1-12: Pre- and After-Tax Economic Results by Case

| Parameter | Unit | Pre-tax Results | After-tax Results |
|---|---|---|---|
| **Case A ($1,350/oz Au, $16.00/oz Ag, $3.50/lb Sb)** | | | |
| $NPV_{0\%}$ | M$ | 1,637 | 1,434 |
| $NPV_{5\%}$ | M$ | 896 | 771 |
| Annual Average EBITDA | M$ | 223 | - |
| Annual Average After-Tax Free Cash Flow | M$ | - | 189 |
| IRR | % | 17.3 | 16.2 |
| Payback Period | Production Years | 3.4 | 3.4 |
| **Case B ($1,600/oz Au, $20.00/oz Ag, $3.50/lb Sb)** | | | |
| $NPV_{0\%}$ | M$ | 2,667 | 2,232 |
| $NPV_{5\%}$ | M$ | 1,599 | 1,320 |
| Annual Average EBITDA | M$ | 292 | - |
| Annual Average After-Tax Free Cash Flow | M$ | - | 242 |
| IRR | % | 24.3 | 22.3 |
| Payback Period | Production Years | 2.9 | 2.9 |
| **Case C ($1,850/oz Au, $24.00/oz Ag, $3.50/lb Sb)** | | | |
| $NPV_{0\%}$ | M$ | 3,697 | 3,026 |
| $NPV_{5\%}$ | M$ | 2,301 | 1,864 |
| Annual Average EBITDA | M$ | 360 | - |
| Annual Average After-Tax Free Cash Flow | M$ | - | 295 |
| IRR | % | 30.4 | 27.7 |
| Payback Period | Production Years | 2.4 | 2.5 |
| **Case D ($2,100/oz Au, $28.00/oz Ag, $3.50/lb Sb)** | | | |
| $NPV_{0\%}$ | M$ | 4,726 | 3,815 |
| $NPV_{5\%}$ | M$ | 3,002 | 2,404 |
| Annual Average EBITDA | M$ | 429 | - |
| Annual Average After-Tax Free Cash Flow | M$ | - | 348 |
| IRR | % | 35.9 | 32.4 |
| Payback Period | Production Years | 2.2 | 2.2 |
| **Case E ($2,350/oz Au, $32.00/oz Ag, $3.50/lb Sb)** | | | |
| $NPV_{0\%}$ | M$ | 5,755 | 4,603 |
| $NPV_{5\%}$ | M$ | 3,704 | 2,943 |
| Annual Average EBITDA | M$ | 498 | - |
| Annual Average After-Tax Free Cash Flow | M$ | - | 400 |
| IRR | % | 41.0 | 36.9 |
| Payback Period | Production Years | 1.9 | 1.9 |

74. Then, on January 3, 2022, having determined that it no longer qualifies as a "foreign private issuer" as such term is defined in Rule 405 under the Securities Act of 1933, Perpetua filed a Current Report on Form 8-K with the SEC providing its inaugural Technical Report Summary (the "2022 TRS" or "TRS"), dated December 31, 2021, in accordance with the mining property disclosure requirements specified under Item 1301 of Regulation S-K.

75. The Current Report provided, in pertinent part, "the following notable differences between the 2020 FS and the TRS:"

- The TRS Mineral Resource estimates were developed based on a gold price of $1,500/oz versus the $1,250/oz gold price assumed for the 2020 FS. The change in gold price results from higher trailing average gold prices at the date of preparation for the respective reports.
- The Measured Mineral Resources in the 2020 FS were reclassified to Indicated Mineral Resources in the TRS due to differences in Subpart 1300 versus NI 43-101 Mineral Resources classification guidelines.
- The Proven Mineral Reserves from the 2020 FS were reclassified as Probable Mineral Reserves for the TRS resulting from the reclassification of the Measured Mineral Resources to Indicated Mineral Resources due to differences in Subpart 1300 versus NI 43-101 Mineral Resources classification guidelines.
- The TRS is classified as a Preliminary Feasibility level study whereas the 2020 FS was classified as a Feasibility level study. This change was driven by the Subpart 1300 requirement that a compliant Feasibility level TRS include a capital cost contingency allowance no greater than 10%, whereas the initial capital cost estimate for the 2020 FS included a more conservative allowance at approximately 15%.

76. It went on to note that "all other technical analyses, design information, capital and operating cost information, economic analyses, permitting and legal assumptions, conclusions and recommendations are consistent between the TRS and the 2020 FS."

77. On June 8, 2022, Perpetua filed a Current Report on Form 8-K/A amending the January 3, 2022 Current Report to reflect the following revisions to the TRS, amended as of June 6, 2022: (i) addition of Appendix A "Detailed Annual Cash Flow Forecast"; (ii) addition of a new footnote (1) to Tables 1-4, 12-9 and 12-10 to include additional information regarding the metallurgical recovery factor and the specific point of reference with respect to the mineral reserves; and (iii) certain other corresponding references. Otherwise, it did not modify or update the information, analyses, assumptions, conclusions or recommendations presented in the TRS.

78. Like CIM standards, pursuant to Item 1300 of Regulation S-K promulgated by the SEC (17 C.F.R. § 229.1300), "[t]he confidence level in the results of a feasibility study is higher than the confidence level in the results of a pre-feasibility study" because a feasibility study is "more comprehensive, and with a higher degree of accuracy, than a pre-feasibility study. It must contain mining, infrastructure, and process designs completed with sufficient rigor to serve as the basis for an investment decision or to support project financing."

### E. Significant Project Modifications and Decisive Design Changes Rendered the 2020 Feasibility Study Unreliable

79. Starting well before the Class Period, it was clear to Perpetua and its management that in order to obtain necessary permitting for the Project it was going to require costly design changes, including expanded environmental protection measures, unaccounted for in the Project's CAPEX estimates provided in the 2020 Feasibility Study.

80. As previously noted, after the release of the 2020 FS, Perpetua further consulted with USFS and cooperating agencies, evaluated updated data, and conducted additional analyses and technical studies culminating in the Company's October 2021 submission of the 2021 ModPRO2 (or 2021 MMP), which reported to include expansive operational improvements and Project modifications that: (1) further reduce potential environmental impacts; (2) address persistent potential environmental impacts not sufficiently reduced by Project refinements included in the ModPRO; (3) consider public and agency comments on the DEIS; and (4) align with the NEPA, and all applicable federal, state, and local regulations and permit requirements.

81. The 2021 ModPRO2 merely states that it "is *aligned* with the project development approach in the SGP Feasibility Study" (emphasis added). Comparatively, when the Company announced USFS's decision to advance the ModPRO2 (submitted in December 2020), on July 1,

2021, Perpetua asserted that the "proposed improvements … have been incorporated in Perpetua Resources' 2020 Feasibility Study."

82. When discussing the "Updated Data and Analysis between the ModPRO and ModPRO2," the 2021 ModPRO2 provided that:

> To the degree practicable, the analyses conducted, and data collected through April 2020 were incorporated into the environmental impact analysis included in the DEIS. However, some studies and analyses results were not completed in time to be fully considered in the DEIS. It was anticipated that further refinements would be incorporated into the subsequent environmental analysis before a Record of Decision was signed. Refinements and updates to key technical studies completed since the DEIS used to refine ModPRO2 include:
>
> a. Updated geological and mineral resource modeling (M3 2021)
>
> b. Detailed mine planning, analysis of a smaller Hangar Flats pit, and resulting alternative development rock storage facility (DRSF) configurations (M3 2021)
>
> c. Aquifer testing in the Meadow Creek valley and subsequent hydrogeologic modeling changes with revised pit dewatering estimates ([Brown and Caldwell] BC 2020)
>
> d. Augmented geochemical characterization of development rock and ore, and additional metallurgical testing to confirm geochemical characteristics of tailings (SRK Consulting, Inc. [SRK] 2021)
>
> e. Updated site-wide geochemical modeling for life-of-mine and post-closure, including predictive modeling of mine features to evaluate potential surface water and groundwater quality impacts (SRK 2021)
>
> f. Updated site-wide, life-of-mine water balance modeling (Perpetua Resources 2021c, in progress)
>
> g. A detailed water management plan (BC 2021b)
>
> h. Life-of-mine and post-closure water temperature modeling (BC 2021)
>
> i. Updated air quality analysis (Air Sciences, Inc. [Air Sciences] 2021)
>
> j. Updated site-specific seismic hazard analysis (Golder 2021), resulting in minor improvements to TSF/buttress factors-of-safety
>
> k. Updated tailings tonnage and consolidation modeling to match updated ore processing schedules and include more detailed metallurgical calculations accounting for gypsum formation (M3 2021)

83. The report went on to summarize the "Project refinements that define the [2021] ModPRO2" preceded by "a brief description of the observed condition or analysis that prompted the proposed changes to the SGP."

84. In pertinent part, the 2021 MMP identified "[g]eosynthetic covers on the [Tailings Storage Facility] TSF, TSF Buttress, Yellow Pine pit backfill, and Hangar Flats pit backfill" as a defining Project refinement, noting the "change/benefits" to the Project design, as follows:

> ModPRO2 incorporates synthetic covers over the full surface of the TSF and on the entire surface of the TSF Buttress, the Yellow Pine pit backfill, and the Hangar Flats pit backfill (changes in DRSF/backfill configurations are discussed later). Synthetic covers reduce infiltration, thus reducing interaction of water with development rock or tailings and reducing impacts on water quality. In the case of the Hangar Flats pit backfill, a synthetic cover also facilitates wetland construction, providing increased compensatory wetland mitigation.

85. These proposed changes in the 2021 ModPRO2 were prompted by the following observed condition or analysis:

> The DEIS effects analysis indicated that soil/rock covers without low permeability geosynthetic layers allowed water to infiltrate and interact with development rock or tailings, potentially affecting the quality of water which then would enter groundwater, seep, or otherwise discharge into surface water. The updated site-wide geochemical modeling report (SRK 2021) validated this analysis, and the protectiveness of the proposed geosynthetic covers.

86. When comparing alternatives analyzed in the DEIS and the 2021 ModPRO2, the report provided for the TSF component of the Project, under the ModPRO, as follows:

- TSF located in Meadow Creek drainage.
- Tailings liner system as follows:
    - Underdrain of geotextile-wrapped gravel with perforated HDPE pipe as needed.
    - Prepared subgrade of compacted materials or minimum 12-inch buffer/liner bedding fill.
    - Secondary GCL (or equivalent).
- Liner: 60-mil HDPE AGRU MicroDrain® Liner as a combined secondary liner and leakage collection layer.

- 60-mil HDPE geomembrane primary liner.

87. In comparison, the TSF component under the 2021 ModPRO2 included as follows:

- TSF location the same as ModPRO (Alt 2)
- Tailings liner system as follows:
  - Underdrain system, subgrade, and GCL the same as ModPRO (Alt 2).
  - Geomembrane liner layer(s) above GCL.
- Liners to be 60-mil LLPE single-sided textured geomembrane primary liner, as in Alternative 1 [the PRO].
- Overliner drains on TSF floor to reduce hydraulic head on the liner system and reduce excess pore pressure in the tailings.

88. In addition to the identified improvements to the TSF construction and operation, the 2021 ModPro2 also provided for further refinement to the Project's water treatment and disposal at closure. Specifically, the 2021 ModPRO2 proposed as follows:

> At closure, the closure water treatment plant would be constructed to accommodate treatment of water from the TSF which will include precipitation chemistry and the application of reverse osmosis membrane treatment. After mine closure and final reclamation of the TSF Buttress and pit backfill surfaces, contact water treatment will no longer be required; but process water treatment for the TSF [] will continue longer, through approximately year 40. The closure treatment plant would be located on the TSF Buttress as the TSF would ultimately be the only remaining water source requiring treatment. Treatment would be continued as needed on private land.

89. Comparatively, the 2020 FS stated only that "[a]s an emergency measure, package reverse osmosis units could be brought online to treat excess water."

90. As detailed below, the Company later attributed $88 million in increased Project cost estimates "due to higher offsite infrastructure, mainly driven by the water treatment plant addition of reverse osmosis for polishing and improvements to the Tailings Storage Facility to add a redundant secondary liner and leak collection and recovery system."

91. The 2021 ModPRO2 went on to describe several operational changes including, *inter alia*, expanding and changing the sequencing of the TSF Buttress (formerly referred to as the Hangar Flats development rock storage facility ("DRSF")) and backfilling Hangar Flats pit to the approximate pre-mining valley bottom elevation to the elimination of the Fiddle DRSF entirely. Such refinements were made to address public comments related to the reduction of overall Project footprint and provide accordant reductions in impacts to wetlands, water quality, vegetation resources, and wildlife and fisheries habitat.

92. The 2021 ModPRO2 also proposed additional environmental protection measures ("EPMs") to address stream temperature, including wider riparian planting widths on restored and enhanced stream reaches, increased proportion of taller and denser vegetation such as spruce trees, and creation of Stibnite Lake, a feature similar in size to the present Yellow Pine pit lake, within the restored Yellow Pine pit backfill, in addition to, further refined plans to rehabilitate, restore, and enhance upland wildlife habitats. The 2021 MMP noted that "[p]rotection of wildlife and habitat begins during construction, continues throughout mine operations, and into closure."

93. As detailed below, the Company later attributed $260 million in increased Project cost estimates to "indirect cost related to overall project execution, including increases mainly driven by higher operational readiness costs to support transition from project to operations" and $39 million to "higher mining costs."

94. These costly design changes, reflected in the 2021 ModPRO2, were endorsed by USFS in the SDEIS in October 2022 and received resounding public support during the public comment period closed January 10, 2023, solidifying their inclusion in the SGP implementation.

95. Furthermore, included in the 2020 Feasibility Study and the TRS was a list of detailed recommendations and work programs developed to move the project through to a

construction decision. Under the local discipline category of "Project optimization and Basic Engineering" was recommendation 15 ("R15") which read: "Consider undertaking a study to further evaluate the economics of leasing and/or contracting out certain equipment and infrastructure such as: oxygen plant, lime plant, truck fleet, worker housing facility, water treatment plant, evaporators, and other miscellaneous construction equipment including gensets."

96. For example, the 2020 FS and 2022 TRS provided that: "A cryogenic air separation unit (ASU) is planned to provide the supply of oxygen required in the pressure oxidation process []. The plant would be supplied and managed by an oxygen supply vendor in an 'over-the-fence' agreement. Site grading, concrete, and construction support would be provided by the [Engineering, Procurement, and Construction Management] EPCM contractors. … The oxygen plant would have its own electrical power substation adjacent to the plant."

97. During the Question-and-Answer portion of the Company's "Special Call" held on October 24, 2023, an attendee named Dan Horn inquired about Perpetua's previously proposed facilities to be leased for the Project asking, in pertinent part: "can you tell me is it the intent or strategy of Perpetua to purchase or lease these facilities?"

98. To which, Gene Bosley, a Senior Engineer at Perpetua responded:

> I think our basis, just again, our feasibility study basis and the feasibility study now is a number of years old as you also probably know, our basis was purchase, but that is open, that is an open question at this point as to whether it's purchase or lease. We had to have A basis, right, for the feasibility study. You've got to pick something and that was what made sense at the time, but that was pre-COVID, pre a lot of things in 2020. And so we will -- that is one of the open questions that we are in the process of revisiting.

99. As detailed below, the Company later attributed $131 million in increased Project cost estimates "due to the decision to buy-and-build instead of lease the oxygen plant."

100. In addition to the costly changes identified in the 2021 ModPRO2, Defendants knew, or at minimum recklessly disregarded, increased costs were inevitable due to Idaho Power

Company's ("IPCo") required steel poles for all new transmission lines constructed in the region for similar environmental protection reasons invoking other costly Project design changes.

101. In 2021, as part of Idaho Power Company's Wildfire Mitigation Plan ("WMP"), IPCo revised its transmission construction standards to utilize steel poles and structures for new line construction built to 138 kV and above, in an attempt to minimize wildfire damage and improve transmission line resiliency. At all relevant times, all transmission lines to be constructed for the Project were to be built to 138-kV service.

102. In pertinent part, the 2020 FS indicated that:

> Grid power was selected as the preferred primary power supply for the Project based on its low operating cost, low unit prices, and Idaho Power Company's existing clean energy portfolio. To provide the necessary power, the existing grid network would need to be upgraded to support the 50 to 60-megawatt (MW) load. This includes upgrading approximately 63 mi of existing powerlines to 138 kV, and approximately 9 miles of new 138 kV line. Additionally, new or upgraded 138 kV substations at Lake Fork, Cascade, Scott Valley, Warm Lake, Thunderbolt Drop, Johnson Creek, and Stibnite, as well as measures to strengthen the voltages on the IPCo system, are required. The 138-kV line would be routed to the Project's main electrical substation where transformers would step the voltage down to the distribution voltage of 34.5 kV.

103. With regards to the Project's "Power Transmission," the 2021 MMP indicated that: "improvements to the transmission line are the same as DEIS Alternative 2 [*i.e.*, the ModPRO] except for the addition of 3 miles of underground distribution power from the Johnson Creek substation south to Wapiti Meadows, on-site voltage changes from 24.5 kV to 34.5 kV, and the increase in electrical power from 50 megawatts to 60 megawatts required to run the SGP."

104. Moreover, Perpetua reported that, in the second quarter of 2023, it had begun "power line detailed scoping and engineering with Idaho Power." By the end of the fiscal year 2023, Perpetua purported that through its "[c]ontinued power line detailed scoping and engineering with Idaho Power" it had "identified long-lead items required for power line construction."

105. As detailed below, the Company later attributed $162 million in increased Project cost estimates to "power line cost increase, mainly driven by electrical poles design changed from timber poles to steel poles…."

**F. Defendants Continued to Publicly Rely on the Stale 2020 Feasibility Study**

106. Despite known added costs due to expansive Project modifications and necessary design changes, throughout the Class Period, Defendants continued to publicly rely on the stale 2020 Feasibility Study (reaffirmed by the 2022 TRS) to tout the economic viability of the Project, including an unchanged NPV benefit, while also minimizing any potential for increase to inflation.

107. For example, on April 17, 2024 (the first day of the Class Period), Perpetua held a "Special Call" to update its investors on the progress for the Stibnite Gold Project. During the Question-and-Answer portion of the call, Defendant Largent responded to direct inquiries about the Project's CAPEX estimates provided in the 2020 Feasibility and whether there were any changes to account for like inflation-related trends, stating, in relevant part:

> …It was a 2020 number and the 2020 number was $1.3 billion of capital. That included a decent contingency, but we all know we're not in 2020 times anymore.
>
> …
>
> But even if -- our project is so great from an economics perspective, that even if you assume a 10% change in CapEx or a 20% change, you can run your numbers there. It's about a $100 million decrease in NPV. But again, we ran our base model at $1,600 gold prices, and we're encroaching on $2,400 gold prices today. So we know it's not 1.3, but we also know the project can sustain movements in the capital.
>
> …So we have no plans on updating our feasibility study or technical report, but we will look at financial model updates to support project financing.

108. For context, most economists and policymakers believe a low and stable rate of inflation is beneficial for the economy. In fact, the Federal Open Market Committee seeks to achieve inflation that averages 2% over time. In 2020, the average U.S. inflation rate was relatively low at 1.2%, mainly attributed to the onset of the COVID-19 pandemic. However, factors linked

to the pandemic later pushed inflation to higher rates in 2021, with an average 12-month rate of 4.7%, before hitting record highs in 2022, with an average 12-month rate of 8%. By 2023, the U.S. inflation rate saw a steady decline throughout the year, with an average 12-month rate of 4.1%. Indeed, by December 2023, the U.S. inflation rate was down to 3.4%. The U.S. inflation rate continued its decline throughout 2024, with an average 12-month rate of 2.9%.[2]

109. During the same Special Call, Defendant Cherry also touted the Project's current valuation based on the 2020 FS economic model providing, in pertinent part, that "[u]sing our base $1,600 per ounce gold price, the NPV has -- the project has an NPV of greater than $1.3 billion using a 5% discount rate. We have good leverage to higher gold prices where the NPV increases to approximately $2.4 billion at a $2,100 gold price." Mr. Cherry repeated these same valuations during the Company's Annual General Meeting of Shareholders held on May 16, 2024.

110. Throughout the Class Period, Defendants continued to rely on the 2020 FS CAPEX estimates when reporting Perpetua's "long-term liquidity requirements" and when describing the prospect of potentially higher capital cost estimates and associated financing risks, again attributed any possible changes from the 2020 Feasibility Study to be "based on significant inflation and increased financing costs" while conspicuously failing to disclose the material cost increases related to the expansive Project modifications and decisive design changes.

111. As a result of Defendants' constant promotion of the stale 2020 Feasibility Study and its outdated economics, investors were left in the dark as to the true nature of the Project's materially overrun costs, diminished current valuation, and its associated financing risks.

---

[2] *See* https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202412.pdf.

### G. Securing Much Needed Capital Placed Perpetua in a Dilemma

112. With no ongoing mining operations, Perpetua has primarily funded its operations through the proceeds from the Company's initial public offering and additional capital raises including private placements, follow-on, shelf, and at-the-market offerings.

113. On May 12, 2023, the Company entered into a Controlled Equity Offering Sales Agreement ("Sales Agreement") with Cantor Fitzgerald & Co. as sales agent for an at-the-market program for the sale of Perpetua's common stock having an aggregate offering price of up to $20,000,000 (the "ATM Offering").[3] Sales under the Sales Agreement were subject to certain conditions, including market conditions.

114. That same day, May 12, 2023, the Company issued its quarterly report for the period ended March 31, 2023, which was prepared on a "going concern" basis, indicating that Perpetua's latest liquidity forecast showed that available cash resources were expected to be exhausted in the first quarter of 2024 without additional financing secured.

115. On August 11, 2023, the Company issued its quarterly report for the period ended June 30, 2023, again prepared on a "going concern" basis, maintaining that "the need for additional funding to further support the development of our planned operations, raise substantial doubt regarding our ability to continue as a going concern for a period of one year after the date that these unaudited condensed consolidated financial statements are issued." And on November 9, 2023, the Company issued its quarterly report for the period ended September 30, 2023, again prepared on a "going concern" basis, maintaining the need for additional funding to continue.

---

[3] At-the-market offerings are agreements by an issuer to sell at its discretion a certain number or dollar amount of shares each day to a sales firm at a slight discount to market price. The sales firm then resells the shares into the market. At-the-market offerings allow the issuer to "quickly raise capital by selling newly issued shares into the natural trading flow of the market, without having to market … the offering." *See* https://www.mayerbrown.com/-/media/files/perspectives-events/publications/2020/06/wtd--atm-offerings.pdf.

116. As of September 30, 2023, all $20 million remained available under the ATM Offering. Between October 27, and December 31, 2023, Perpetua sold 894,882 common shares, under the Sales Agreement, in exchange for net proceeds of approximately $2.1 million.

117. As of the fiscal year ended December 31, 2023 ("FY23"), Perpetua had an accumulated deficit of approximately $580.7 million, cash and cash equivalents totaling approximately $3.2 million and net negative working capital of approximately $0.9 million.

118. Accordingly, Perpetua still needed tens of millions of dollars it was unable to raise. Indeed, when reporting its financial results for FY23 on March 24, 2024, again prepared on a "going concern" basis, the Company indicated that unless additional financing was secured before the fourth quarter of 2024, it would no longer be able to meet its ongoing obligations or progress critical permitting efforts. With limited prospects for obtaining much needed capital, Perpetua found itself in a quintessential catch-22 situation.

119. On April 8, 2024, the Company announced that it received a non-binding and conditional Letter of Interest from the Export-Import Bank of the United States ("EXIM") for potential debt financing of up to $1.8 billion through EXIM's "Make More in America" and "China and Transformational Exports Program" ("CTEP") initiatives. The Letter of Interest indicated the transaction may also be eligible for special consideration under Section 402 of EXIM's 2019 reauthorization (P.L. 116-94), which directs EXIM to take steps to mitigate the competitive impact of export support provided by the People's Republic of China and other covered countries for opportunities such as this one under EXIM's CTEP initiative.

120. Analysts and investors alike treated this news as the achievement Perpetua management claimed it to be, valuing the Company on this basis. For example, that same day, Mike Kozak of Cantor Fitzgerald issued a report calling the "bottom line" of this announcement a

"positive" highlighting that "[a]ccording to PPTA, potential financing of up to $1.8 BB could fund 'a substantial portion' of the Stibnite [Gold] [P]roject[.]"

121. On April 9, 2024, Richard Michael Neihuser of Roth Capital Partners issued a report maintaining its "Buy" rating for Perpetua and increasing its target price to $10.00 per share (from $7.25) following the Company's announced indication of debt financing under EXIM. The report, in pertinent part, that:

> The amount was derived from a formula estimating the project's potential to create jobs. … The Stibnite Gold Project's 2020 Feasibility Study projected total capex with contingency of ~$1.658 billion. EXIM is expected to complete its due diligence in 12 months. This should include updating metal price assumptions and cost estimates. The potential for financing through the EXIM significantly reduces the financing risk associated with the project, increasing PPTA's bargaining position with potential strategic investors and partners.

122. Perpetua took advantage of the positive receipt of its announced Letter of Interest and the potential access to a substantial portion of the Company's maintained CAPEX estimates provided in the 2020 Feasibility Study to access capital necessary to sustain its operations through the preparation of a formal application and until the NEPA permitting process was complete.

123. Indeed, during the nine months ended September 30, 2024, Perpetua sold 1,834,104 common shares, through the ATM Offering, in exchange for net proceeds of roughly $10.4 million.

124. Then, on November 18, 2024, Perpetua entered into an underwriting agreement with BMO Capital Markets Corp., as representative of several other underwriters named therein, for a shelf offering providing for the sale by the Company of 3,439,465 of its common shares to the underwriters at a price of $10.17 per share.[4] The Shelf Offering closed on November 20, 2024,

---

[4] Shelf offerings allow an issuer to register multiple securities with the SEC for future sale at its discretion, without needing to register each offering separately. This allows the issuer to "access the capital markets quickly when necessary or when market conditions are optimal." *See* https://www.mayerbrown.com/-/media/files/perspectives-events/publications/2020/07/whats-the-deal--shelf-registrations-statements--shelf-takedowns.pdf.

with the Company receiving net proceeds of approximately $33.2 million. Perpetua reported that such proceeds were, or would be, used for down payments on long lead time materials, detailed engineering for the Project, and general corporate purposes.

125. Submission of a formal application under EXIM, however, required Perpetua to provide a financial update for the Project. At no point during these ATM Offerings or Shelf Offering did Defendants disclose the materially overrun capital expenditure estimates for the Stibnite Gold Project, leading to a significantly lower NPV benefit and increased financing risks.

126. Due to the proceeds raised through the Company's ATM Offerings and its Shelf Offering, Perpetua raised enough cash to extend its cash runway, necessary to meet its ongoing obligations and advance construction readiness activities, through to the third quarter of 2025. Without these aggressive capital raises, Perpetua would not have been able to sustain its operations.

**H. The Truth Emerges**

127. On February 13, 2025, after the market closed, Perpetua filed a Current Report on Form 8-K with SEC releasing an updated cash flow model for the Project (the "Financial Update").

128. In pertinent part, the Financial Update indicated a $1.4 billion after-tax Net Present Value (NPV) 5% and 15.4% after-tax Internal Rate of Return (IRR) at consensus prices of $2,100/oz for gold, $10.00/lb for antimony, and $27.00/oz for silver, and a $3.7 billion after-tax NPV 5% and 27% after-tax IRR at current spot prices of $2,900/oz for gold, $21.00/lb for antimony, and $31.50/oz for silver. Additionally, it was revealed that initial capital expenses for the Project had increased from $1,262.9 million in the 2020 Feasibility Study to $2,214.8 million in the Financial Update, net of $33.6 million of pre-production revenue, mainly driven by:

- $352 million related to cost inflation.
- $260 million in indirect cost related to overall project execution, including increases mainly driven by higher operational readiness costs to support transition from project to operations and mine ramp up prior to commercial

production ($84 million), higher primary and temporary camp costs ($58 million), and a larger owners team ($27 million).

- $162 million in power line cost increase, mainly driven by electrical poles design changed from timber poles to steel poles and the addition of two Static Synchronous Compensators (STATCOMs) to the design of the main substation.
- $131 million due to the decision to buy-and-build instead of lease the oxygen plant. This resulted in a capital increase but reduced operating costs and resulted in a net-present-value benefit.
- $88 million due to higher offsite infrastructure, mainly driven by the water treatment plant addition of reverse osmosis for polishing and improvements to the Tailings Storage Facility to add a redundant secondary liner and leak collection and recovery system.
- $39 million due to higher mining costs.
- Offset by $46 million in savings driven by adjustments to certain infrastructure designs and pre-production revenue of $33.6 million using consensus pricing.

129. The chart below depicts the Company's capital expense estimates, by category component and phase of the Project, provided in the 2020 FS and the Financial Update:

| **CAPEX Component** | | **Phase of Stibnite Gold Project** | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | **Initial** | | **Sustaining** | | **Closure** | | **Total** | |
| | | **(US$M)** | | | | | | | |
| | | Original | Update | Original | Update | Original | Update | Original | Update |
| Direct Costs | Mine Costs | 84.0 | 183.6 | 119.0 | 215.4 | -- | -- | 203.0 | 399.0 |
| | Processing Plant | 433.5 | 643.7 | 49.0 | 88.1 | -- | -- | 482.5 | 731.8 |
| | On-Site Infrastructure | 190.9 | 336.3 | 83.9 | 287.8 | -- | -- | 274.8 | 624.1 |
| | Off-Site Infrastructure | 115.9 | 295.5 | -- | 0.4 | -- | -- | 115.9 | 295.9 |
| Indirect Costs | | 232.7 | 348.8 | -- | -- | -- | -- | 232.7 | 348.8 |
| Mitigation, Monitoring and Closure Costs | | 17.9 | 11.5 | 23.5 | 106.0 | 98.1 | 118.1 | | 235.5 |
| Owner's Costs | | 38.4 | 227.9 | -- | -- | -- | -- | 38.4 | 227.9 |
| **Total CAPEX without Contingency** | | **1,113.2** | **2,047.4** | **275.4** | **697.7** | **98.1** | **118.1** | **1,486.7** | **2,863.1** |
| Contingency & Sales Tax | | 149.7 | 201.1 | 20.4 | 25.8 | 1.2 | -- | 171.3 | 226.9 |
| **Total CAPEX with Contingency** | | **1,262.9** | **2,248.5** | **295.7** | **723.5** | **99.3** | **118.1** | **1,658.0** | **3,090.0** |
| Pre-Production Revenue | | -- | (33.6) | -- | -- | -- | -- | -- | (33.6) |
| **NET CAPEX** | | **--** | **2,214.8** | **--** | **723.5** | **--** | **118.1** | **--** | **3,056.4** |

130. Investors and analysts reacted immediately to Perpetua's revelation. The price of Perpetua stock declined dramatically. From a closing market price of $11.97 per share on February 13, 2025, Perpetua's stock price fell to $9.29 per share on February 14, 2025, a decline of about 22.39% in the span of a single trading day.

131. A number of well-known analysts who had been following Perpetua predicted negative reactions from the market in response to the Financial Update. For example, analysts with the National Bank of Canada, Financial Markets, Research Division issued a report highlighting "the substantially higher capex figure" and "lower-than-expected NPV [] largely due to the sizable capex increase." Referring to the Company's announcement of an NPV (5%) of $3.7 billion at spot prices, the analysts reported their current discounted cash flow for the project "yields an NPV (5%) of US $4.1 bln, resulting in today's update proving ~11% below our current estimates." The report went on to note that the capex increase surpassed their own expectations as well stating, "[i]nitial capital is forecasted to be US $2,215 mln, which comes in +14% above our estimate of US $1,950 mln. The company previously received a US $1.8 bln letter of interest from the U.S. EXIM, which we expect to fund a large portion of the capex bill, with the remainder likely funded by an equity raise." The analysts concluded, "[o]verall, we expect the market to react negatively to the substantially higher capex figure than the prior estimate from the 2021 technical report and messaged range from management on how to consider the impact of inflation since then."

132. Similarly, Roth also highlighted the increased costs, stating:

> Most importantly, the Update revised initial capital costs (CAPEX) to $2.22 billion, up from $1.26 billion in the amended 2020 feasibility study … Spot metal prices offset a $352 million increase due to cost inflation but did not offset total CAPEX increases. Other increases included $260 million in indirect costs, $162 million for upgrading electrical poles to steel, $131 million to acquire an oxygen plant (rather than lease), $88 million for improvements to water treatment plant and tailings storage facilities, and $39 million for higher mining costs … the updated CAPEX in relation to Update economics may be less-than-robust for conventional projects.

133. The fact that these analysts, and others, discussed Perpetua's significant capital expenditure increase and lowered NPV benefit suggests the public placed significant weight on Defendants' Class Period affirmations of the Company's prior cost estimates and dismissal of any significant impact on the Project's economic benefit due to mitigating changes, such as inflation, and confirms that such statements were material.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

*April 17, 2024*

134. On April 17, 2024, Perpetua conducted a "Special Call" to update its investors on the progress for the Stibnite Gold Project. During his prepared remarks, Defendant Cherry recapped the Project's status stating, in pertinent part:

> The goal leveraged to NPV. Our production profile, low cost and robust cash flow, combined with our current valuation present a very compelling opportunity for new investors. ***Using our base $1,600 per ounce gold price, the NPV has -- the project has an NPV of greater than $1.3 billion using a 5% discount rate. We have good leverage to higher gold prices where the NPV increases to approximately $2.4 billion at a $2,100 gold price***. And based on our current market cap, we're trading at nearly the widest discount to NAV despite achieving significant milestones and having a clear path forward.[5]

135. The statements identified in ¶134 above were materially false and misleading when made because they materially misrepresented the current valuation of the Project due to significantly overrun capital expenditures. As detailed above, at the time these statements were made, the actual cost estimates for the Stibnite Gold Project were materially greater than those accounted for in the 2020 Feasibility Study due to expansive Project modifications and direct design changes made by Perpetua and its management, significantly diminishing the Project's NPV to, for example, approximately $1.4 billion at $2,100 per ounce gold—a $1 billion decrease.

---

[5] Unless otherwise indicated, all emphasis in quoted material is added.

136. During the Question-and-Answer portion of the call, Defendant Largent fielded direct questions related to the Project's CAPEX estimates:

> <Q: Chris Fogg, Manager of Investor Relations> We've had a number of questions here about capital costs for the projects and inflation-related questions. I'll try to group those together. This one might be a good one for you, Jess [Largent]. So could you talk through what goes into -- what are some of the things that are included in our capital costs from our 2020 feasibility study? Are we planning to update that? And what does the timing look like on that? And just any general inflation trends that we're seeing?
>
> <A: Defendant Largent> ***Sure. So the 2020 feasibility study, the good news with the timeline we've been under is that we've had plenty of time to study this project and do the engineering, and we're quite confident in the feasibility study itself in terms of the mine plan laid out and how -- and what we're getting permitted. It was a 2020 number and the 2020 number was $1.3 billion of capital. That included a decent contingency, but we all know we're not in 2020 times anymore.***
>
> That said, for all the reasons Jon [Cherry] talked to earlier, our low-cost project. We believe on the operating cost side, we've got some insulation, right? So the driver of our low cost is access to hydropower, clean, low-cost hydropower. Low strip ratio. Again, this is an abandoned brownfield site, and we will be able to access the ore very early. And then the antimony byproduct credit. So just to touch on that.
>
> First, in our feasibility study, we assumed $3.50 per pound antimony prices. They've been trading in the $5 to $6 per pound range now for well over a year, given global supply and demand fundamentals around antimony. So lots of upside on the antimony byproduct credit from where we were in that study from an operating cost perspective. Now if you step back and look at the capital, in that $1.3 billion, about $0.5 billion is the autoclave, so that's a big chunk of it in terms of the driver of why the number is what it is.
>
> But even if ***-- our project is so great from an economics perspective, that even if you assume a 10% change in CapEx or a 20% change, you can run your numbers there. It's about a $100 million decrease in NPV. But again, we ran our base model at $1,600 gold prices, and we're encroaching on $2,400 gold prices today. So we know it's not 1.3, but we also know the project can sustain movements in the capital***.
>
> And so in terms of what we're doing, part of the work this year is we're advancing basic engineering as we get ready for that construction decision next year and running a financial model update. So that's work we're progressing through 2024. ***But again, the project has been well studied. We're confident in the plan. So we have no plans on updating our feasibility study or technical report, but we will***

> ***look at financial model updates to support project financing***. Hopefully, I captured all those questions, Chris.

137. The statements identified in ¶136 above were materially false and misleading when made because they failed to disclose the true capital cost estimates for the Stibnite Gold Project and materially mispresented the Project's current economic viability and related financing risks. As detailed above, at the time these statements were made, the actual cost estimates for the Stibnite Gold Project were materially greater than those accounted for in the 2020 Feasibility Study due to expansive Project modifications and direct design changes made by Perpetua and its management. As such, Defendant Largent materially misled investors when discussing a mere 10% to 20% change in cost estimates because the Project's true capital expenditures had already increased by more than 75%. By providing investors with a significantly lower estimate for projected capital cost increases, Defendant Largent created a materially misleading and false impression that the Project had greater economic viability and lower financial risks than it truly did.

138. During the same call, Defendant Largent responded to a question about the Company's plans for financing the Project:

> <Q: Chris Fogg, Manager of Investor Relations> Question … is about project financing and reads, how do you expect to finance the project? So Jon [Cherry] touched on this, but Jess [Largent], maybe you could get into a little more details on how we're thinking about that.
>
> <A: Defendant Largent> Sure thing, and hi, everyone. Thanks for joining. Really, the good news for our project is that we have many options and we plan to pursue the best deal for our shareholders. And we are going to be laser-focused on putting together the most value-accretive and non-dilutive options possible. Our first priority is going to be pursuing the EX[IM] claim that Jon [Cherry] mentioned earlier.
>
> Just last week, we announced an indication on the debt side from U.S. [ EXIM ] and to provide a little bit of context on that [ EXIM ] financing. ***The letter of interest was for up to $1.8 billion debt financing*** with an up to 15-year repayment tenure under the Make More in America initiative and the China and Transformational exports program. Just for a little more background on those, Make More in America

> was designed to strengthen U.S. exports and American jobs. So Perpetua qualifies for Make More in America.
>
> It's a requirement to export products, in our case, gold, and then create American jobs. So, on average, over the 15-year life, we're going to create 550 to 650 jobs, and those jobs we will create when developing and operating the Stibnite Gold Project to support the up to $1.8 billion number based on the program's funding formula.
>
> We also received notice that we could be eligible under [ CTEP ], which was designed to help equal the playing field for American production and manufacturing to be more competitive with China. So CTEP applicants must have direct China competition, and about 50% of the global supply of the antimony is dominated by China or be part of 10 transformational export areas in antimony is actually used in semiconductors and clean energy, which are both part of those transformational explore areas.
>
> What's most exciting is that under that CTEP program, they are able to be more flexible and offer benefits beyond the Make More in America initiative, including reduced fees, extended repayment tenors and other exceptions. So later this year, we plan to submit our formal application under this program, ***and CTEP can provide up to 85% of debt funding for project capital costs, which really opens up multiple pathways for our full financing package.***
>
> And then for the remainder of the funding, we have numerous options, and we're keeping the doors open on all of them, so we can pull together the best package for our shareholders. So if we look at some of those tools in our tool belt, we have -- obviously, as our stock continues to re-rate as we advance through permitting, we could look at raising a portion through equity if it was accretive to our shareholders.
>
> We also expect there to be increasing interest from the mining industry in general as we continue to derisk the project and it could make sense to bring on a partner at the right time and right price, and there's other potential funding sources like royalties, offtake agreements and other things like that. But again, we're very unique in that we have multiple options and the whole of government approach is really supporting our path there.

139. The above statements in ¶138 were materially false and misleading when made because they materially misrepresented the Stibnite Gold Project's current economic viability and related financing risks and failed to disclose the true capital cost estimates for the Project. These statements created the materially false impression that "[t]he letter of interest [] for up to $1.8 billion in debt financing" and the CTEP program's ability to "provide up to 85% of debt funding

for project capital costs" was more than sufficient coverage for the projected total CAPEX with contingency of the Project, previously reported as ~$1.658 billion in the 2020 Feasibility Study. As detailed above, at the time these statements were made, the actual cost estimates for the Stibnite Gold Project were materially higher than those accounted for in the 2020 Feasibility Study due to expansive Project modifications and direct design changes made by Perpetua and its management. As such, Defendant Largent's suggestion that potential debt funding from the U.S. Export-Import Bank would cover most the Project's total capital costs fell well short of reality.

*May 10, 2024*

140. On May 10, 2024, Perpetua filed its quarterly report for the period ended March 31, 2024 on a Form 10-Q with the SEC signed by Defendants Cherry and Largent ("1Q24 10-Q").

141. When discussing the Company's "Liquidity and Capital Resources," the 1Q24 10-Q provided, in pertinent part: "Our long-term liquidity requirements will require project financing to fund the capital costs to develop the Project, which was estimated to be approximately $1,263 million as of the third quarter of 2020 according to the TRS."

142. The above statements in ¶141 were materially false and misleading when made because they materially mispresented and/or omitted material information concerning the Stibnite Gold Project's current economic viability and related financing risks and failed to disclose the true capital cost estimates for the Project. As detailed above, at the time these statements were made, the actual cost estimates for the Stibnite Gold Project were materially greater than those accounted for in the 2020 Feasibility Study (and reaffirmed in the 2022 TRS) due to expansive Project modifications and direct design changes made by Perpetua and its management. As such, Defendants materially misled investors when discussing long-term liquidity requirements because the Project's initial costs estimate had already increased to approximately $2,214.8 million.

*<u>May 16, 2024</u>*

143. On May 16, 2024, Perpetua held its Annual General Meeting of Shareholders (the "2024 Annual Meeting"). During the 2024 Annual Meeting, Defendant Cherry provided some brief remarks related to the Stibnite Gold Project stating, in pertinent part:

> Our production profile, low cost and robust cash flows, combined with our current valuation, present a compelling opportunity for new investors. ***Using our base $1,600 per ounce gold price, the project has an NPV of greater than $1.3 billion using a 5% discount rate. We have good leverage to higher gold prices where the NPV increases to approximately $2.4 billion at $2,100 per ounce gold.*** Based on our current market cap, we are trading nearly the widest discount to NAV despite achieving significant milestones and having a clear path forward.

144. The statements identified in ¶143 above were materially false and misleading when made because they materially misrepresented the current valuation of the Project due to significantly overrun capital expenditures. As detailed above, at the time these statements were made, the actual cost estimates for the Stibnite Gold Project were materially greater than those accounted for in the 2020 Feasibility Study due to expansive Project modifications and direct design changes made by Perpetua and its management, significantly diminishing the Project's NPV to, for example, approximately $1.4 billion at $2,100 per ounce gold—a $1 billion decrease.

*<u>August 9, 2024</u>*

145. On August 9, 2024, Perpetua filed its quarterly report for the period ended June 30, 2024 on a Form 10-Q with the SEC signed by Defendants Cherry and Largent ("2Q24 10-Q").

146. When discussing the Company's "Liquidity and Capital Resources," the 2Q24 10-Q provided, in pertinent part: "Our long-term liquidity requirements will require project financing to fund the capital costs to develop the Project, which was estimated to be approximately $1,263 million as of the third quarter of 2020 according to the TRS."

147. The above statements in ¶146 were materially false and misleading when made because they materially mispresented and/or omitted material information concerning the Stibnite

Gold Project's current economic viability and related financing risks and failed to disclose the true capital cost estimates for the Project. As detailed above, at the time these statements were made, the actual cost estimates for the Stibnite Gold Project were materially greater than those accounted for in the 2020 Feasibility Study (and reaffirmed in the 2022 TRS) due to expansive Project modifications and direct design changes made by Perpetua and its management. As such, Defendants materially misled investors when discussing long-term liquidity requirements because the Project's initial costs estimate had already increased to approximately $2,214.8 million.

*November 13, 2024*

148. On November 13, 2024, Perpetua filed its quarterly report for the period ended September 30, 2024 on a Form 10-Q with the SEC signed by Defendants Cherry and Largent ("3Q24 10-Q").

149. When discussing the Company's "Liquidity and Capital Resources," the 3Q24 10-Q provided, in pertinent part: "Our long-term liquidity requirements will require project financing to fund the capital costs to develop the Project, which was estimated to be approximately $1,263 million as of the third quarter of 2020 according to the TRS."

150. The above statements in ¶149 were materially false and misleading when made because they materially mispresented and/or omitted material information concerning the Stibnite Gold Project's current economic viability and related financing risks and failed to disclose the true capital cost estimates for the Project. As detailed above, at the time these statements were made, the actual cost estimates for the Stibnite Gold Project were materially greater than those accounted for in the 2020 Feasibility Study (and reaffirmed in the 2022 TRS) due to expansive Project modifications and direct design changes made by Perpetua and its management. As such,

Defendants materially misled investors when discussing long-term liquidity requirements because the Project's initial costs estimate had already increased to approximately $2,214.8 million.

<u>*November 20, 2024*</u>

151. On November 20, 2024, pursuant to Rule 424(b)(5), Perpetua filed with the SEC a prospectus supplement as part of a previously filed shelf registration statement on Form S-3 (File No. 333-266071). The prospectus supplement misleadingly characterized certain financing risks associated with the Project, including the prospect of higher capital cost estimates, as potential risks, which "may" change materially from the 2020 Feasibility Study capital cost estimates, conspicuously failing to disclose the actual events and trends or uncertainties that had already manifested, stating, in pertinent part, as follows:

> We have limited financial resources. We will need external financing to develop and construct the Project and to complete the permitting process. Although the Company's current capital resources and liquidity include funding awarded under the Technology Investment Agreement ("TIA") pursuant to Title III of the Defense Production Act ("DPA"), such funding is available only for the specified costs related to permitting, early restoration activities and advancing construction readiness and is not available to fund certain corporate expenses, including under the Settlement Agreement. The Company's latest liquidity forecast indicates that available cash resources for expenses not eligible for reimbursement under the DPA funding are expected to be exhausted in the second quarter of 2025. Due to payment obligations under the Settlement Agreement and other corporate expenses, we do not expect the Company will have sufficient assets to discharge its liabilities as they become due for at least 12 months from the date hereof. Absent additional financing, the Company would no longer be able to meet its ongoing obligations or progress critical permitting efforts. The Company continues to explore various strategic and funding opportunities, which may include the issuance of additional equity, new debt, or project specific debt; government funding; and/or other financing or strategic opportunities. There can be no assurance of the amount, timing or nature of any such financing or strategic transaction, if any.
>
> In addition, ***according to the technical report summary as of December 31, 2020, the total initial capital cost estimate for the Project was approximately $1,263 million. Based on significant inflation and increased financing costs since 2020, we expect the actual cost estimates to be higher than the 2020 estimate. These cost estimates may change materially*** and our failure to obtain sufficient financing could result in the delay or indefinite postponement of exploration, permitting,

> development, construction, or production at the Project. The cost and terms of such financing may significantly reduce the expected benefits from development of the Project and/or render such development uneconomic. There can be no assurance that additional capital or other types of financing will be available when needed or that, if available, the terms of such financing will be favorable. Our failure to obtain financing could have a material adverse effect on our growth strategy and results of operations and financial condition.

152. The above statements in ¶151 were materially false and misleading when made because they materially misrepresented the Stibnite Gold Project's current economic viability and related financing risks and failed to disclose the true capital cost estimates for the Project. As detailed above, at the time these statements were made, the actual cost estimates for the Stibnite Gold Project were already materially greater than those considered in the 2020 Feasibility Study due to expansive Project modifications and direct design changes made by Perpetua and its management, impacting every component of the Project's capital expenditures, and as a result, the risk of a material change in capital costs estimates from the 2020 FS, significantly increasing the financing risks associated with the Project, had already materialized.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

153. Numerous facts alleged above, viewed collectively and holistically, raise a strong inference that the Individual Defendants knew or, at minimum, were reckless in disregarding adverse facts regarding the current economic viability of the Stibnite Gold Project, the reliability of the economic model and capital cost estimates provided in the 2020 Feasibility, and the significant financing risks associated with the Project, and that each of the statements alleged herein were materially false and misleading and/or omitted material facts when made. In addition to the allegations set forth above, the following facts further support a strong inference of scienter.

### A. The Individual Defendants Had Access to Material Adverse Information

154. Defendants Cherry and Largent acted with the requisite state of mind in that they knew and/or had access to material adverse information that contradicted the materially false and misleading statements alleged herein, at the time these public statements were made.

155. As executive officers and Directors of Perpetua, Defendants Cherry and Largent had access to non-public information about the Company's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers, employees, consultants, auditors, independent contractors, and regulatory agencies, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

156. For example, during the fiscal year ended December 31, 2024, Perpetua held six (6) meetings of the Board of Directors (including one meeting of independent directors only) of which Defendants Cherry and Largent were in attendance for all five (5) applicable Board meetings. The Company also held five (5) Technical Committee meetings (including one meeting of independent directors only) during the fiscal year 2024 of which Defendants Cherry and Largent were in attendance for all four (4) applicable Technical Committee meetings.

157. According the Perpetua, the Technical Committee reviews environmental, occupational health, safety and sustainable development reports of the Company; oversees the Company's environmental and safety performance; the technical activities of the Company including permitting, studies, projects, operations and exploration; and monitors and reviews current and future regulatory issues relating to the environment, health, safety and sustainable development (including other sustainability matters such as those relating to the environment, permitting and Indigenous relations) and makes recommendations on significant matters to the

Board of Directors. It also (i) oversees the establishment and implementation of the Company's strategies, policies and programs with respect to the Stibnite Gold Project and exploration; (ii) oversees the establishment and implementation of the Company's strategies, policies and programs with respect to sustainability matters; and (iii) reviews proposed operational and sustainability objectives for inclusion in the Company's incentive compensation programs, making recommendations to the Compensation Committee on such corporate objectives and monitoring performance against such objectives throughout the year.

158. In their positions at Perpetua, at all relevant times, Defendants Cherry and Largent had access to various technical studies, updated analyses, monitoring and mitigation plans, and other reports submitted to USFS in connection with the 2021 ModPRO2, forming the basis for the expansive Project modifications and design changes not accounted for in the 2020 Feasibility Study. Such detailed information outlining the current Project design and the Company's modified plan of execution resulting in the 75% increase in projected capital costs for the Project was not available to the investing public at the time of Defendants' materially false and misleading statements as alleged herein. Defendants' willingness to provide contradictory information to different parties gives rise to a strong inference of scienter.

159. Additionally, on April 25, 2024, analysts at Cantor Fitzgerald issued a report following a "two-day in-person non-deal roadshow" with "Perpetua Resources' management team" noting "key takeaways" to include, *inter alia*, the following:

- In the 2020 Feasibility Study (FS), initial CAPEX was estimated at $1.3 BB. PPTA will update this number prior to formally applying for EXIM project financing.
- After PPTA files an application with EXIM, targeted for Q3/24, EXIM will then undertake a due diligence process likely spanning 3-12 months. EXIM does not need to wait for the ROD at the project to move forward with processing PPTA's application for funding.

- PPTA has 'weekly' calls with DOD and 'daily' correspondence with USFS.

160. Moreover, Perpetua has a relatively small staff and it "depends on key personnel for critical management decisions and industry contacts." As of December 31, 2023, the Company had 33 full-time employees and 2 part-time employees, with 32 employees directly related to the mineral development activities of the Stibnite Gold Project, and the remaining 3 focused on executive management, investor relations and administrative support of the Company. As of December 31, 2024, the Company had 36 full-time employees and 1 part-time employee, with 34 employees directly related to the mineral development activities of the Stibnite Gold Project, and the remaining 3 focused on executive management, investor relations and administrative support.

161. Accordingly, Defendants Cherry and Largent, by virtue of their high-level positions within Perpetua, were directly involved in the day-to-day operations and management of the Company at the highest levels and were privy to material confidential information. Because of their possession of such material information, these Defendants knew, or recklessly disregarded, that the adverse facts specified herein were misrepresented and/or concealed from the investing public during the Class Period.

162. Furthermore, Perpetua's business plan is "solely dependent" on the success of the Stibnite Gold Project. The Company's only material mineral property is the interest that it holds in the Project. Since its inception in 2011, the SGP has been Perpetua's exclusive development project. As such, at all relevant times, Perpetua and its management's sole "focus [wa]s to explore, evaluate and potentially redevelop three of the deposits known as the Hangar Flats Deposit, West End Deposit and Yellow Pine Deposit, all of which are located within the Stibnite Gold Project as well as reprocess certain historical tailings located on the Project … in conjunction with a major restoration program designed to address legacy impacts related to historical mining activities in the Project area."

163. Given the significance of the Stibnite Gold Project, it is appropriate to presume that the Individual Defendants were apprised of, had access to, or had actual knowledge of all material information related to Perpetua's business, operations, financial condition, and future prospects during the Class Period, including the material adverse information that was materially misrepresented and/or concealed from the investing public.

**B. The Individual Defendants Held Themselves Out as Knowledgeable**

164. The Individual Defendants knew investors and analysts were acutely interested in the Company's projected capital costs for the Project, the financing needed for the Project, and any design changes or other intervening events during the permitting process that might impact the continued viability of the 2020 Feasibility Study's economic model and capital expenditure estimates because they were repeatedly asked about and/or volunteered information about such key business metrics and operations leading up to and throughout the Class Period. The Individual Defendants consistently spoke to these subjects with authority, indicating that they either had actual knowledge of the relevant subject matters discussed (and thus the material adverse information omitted) or were reckless to the likelihood of misleading investors by speaking with authority as to those subjects about which they were uninformed.

165. For example, in addition to the statements identified in Section V, *supra*, during a "Special Call" held on December 12, 2022, to provide investors with an update on the Project following USFS's release of the SDEIS, Defendant Largent stated, in pertinent part, that:

> We are excited that the Forest Service has released our Supplemental Draft EIS in October and identified our modified project design as the preferred alternative. This signals strong momentum for the project, and we couldn't be more proud of the work we've done over the last 6 years to refine our project based on stakeholder feedback.
>
> …

> This is an exciting time for Perpetua. After 6 years of regulatory review and public feedback, we are proud of our improved project and we are ready to move forward. The project will provide a net benefit to this historic site, leaving water quality, habitat and rivers better than they are today. It is more critical than ever that we regain control of the critical minerals like antimony that are urgently needed to support the clean energy transition and national defense.
>
> …
>
> We have always known that if modern mineral redevelopment were going to happen at Stibnite, we would need to design a project that addresses the abandoned environmental legacies and brings value to our communities. And over the last 12 years, we've been diligently moving this vision forward.
>
> So now I'll provide a quick overview on how our project has been refined and developed through the NEPA permitting process. Our project design includes reconnecting fish migration routes that have been blocked for 80 years and picking up reprocessing and safely storing legacy tailings and waste to help improve water quality. We also designed the project with community feedback on everything from site access routes to doing our part to reduce light pollution.
>
> We submitted our plan of operations and restoration to the Forest Service in 2016, kicking off the NEPA review process. We are now in our sixth year of a joint review process under NEPA.
>
> …
>
> After all of this time, we can honestly say the process has improved the environmental and social aspects of our project. The Draft EIS in 2020 had over 10,000 comments from key stakeholders. We listened and we made modifications to our project, all geared at improving the environmental outcomes. Some of these changes included reducing the Hanger Flip -- Hanger Flats pit by 70% and completely backfilling it. We added geosynthetic covers to pits, backfills, the tailings storage facility buttress and the tailings storage facility to improve water quality. And we replaced a lake feature to cool water and recover more bull trout habitat. Our modified plan has been identified as the preferred alternative in the Supplemental Draft EIS, which includes the Burntlog Route. And then there's an alternative access route using existing roads to travel to Stibnite.
>
> The U.S. Forest Service states that our modified mine plan meets the purpose and need required under the regulatory framework and is expected to improve water quality, eliminate the need for permanent water treatment, improve water temperature, and our modified plan offers the safest route for people and the environment.

166. Similarly, during the 2024 Annual Meeting, Defendant Cherry briefly discussed the next steps of the permitting process for the Stibnite Gold Project stating, in pertinent part, that "[a]

significant milestone was reached when the Supplemental Draft Environmental Impact Statement was released for public comment in October of 2022. Importantly, our proposed mine plan was identified as the preferred alternative, which is a term used by agencies to let the public know which action they are leaning towards selecting as final."

167. During a "Special Call" held on March 2, 2023, to provide investors with an update on the Stibnite Gold Project, Defendant Largent responded to questions about the next steps in preparing for Project implementation:

> <Chris Fogg, Manager of Investor Relations> And this next one, I'm going to combine 2 of these questions. It's both related to the details of the process from here. So the first part … is what exactly more work is involved to get to a final permit? What exactly is involved from here in terms of sampling and study work?
>
> And then the second part is related to the period after if we get the permit. So this one reads, 'It appears that final approval may be received in approximately 1 year, and production will start in 2027. What tasks will be done during the period from approval to production?'…
>
> <Defendant Largent> … [T]he good news is, given the amount of time we've had getting feedback on the project, perfecting the project and doing all of the environmental and engineering work, we do have a solid feasibility study out. We have a known flow sheet and mine plan that's in the process of getting final approval. So to answer the question around if you assume final permits about a year from now, then we'd be looking to start building and constructing the summer of '24.
>
> And so there's work that actually has to take place prior to that, like final detailed engineering design work, and [ not -- some ] of the funding through the Defense Production Act, what's so cool about it is we would have held off on spending those dollars until we had permits in hands, given we're a junior company and historically have had to look at the equity markets to help fund the project.
>
> What they've done through this funding is said, 'You know what, we want you to be construction ready once you receive those permits, so we're going to start funding that work now.' So we're actually getting to bring forward that detailed engineering work for year 1 of construction. Year 1 of construction is really focused around building the road and power line to site to then unlock the next sort of 1.5 years to 2 years of construction work to build the on-site infrastructure and get the processing plant up and running.

> So big picture, it's a 2.5- to 3-year construction time frame. But to get ready for that, we have to start all the final detailed engineering work for each of those chunks of construction, which we get to do now with this DPA funding. So that's a big chunk of work.
>
> Then we also touched on in the presentation, we'll start to look to get project financing set up, reaching out to lenders and the traditional debt groups that help with project financing to make sure we're financed to actually build and spend those dollars over the 3 years. So lots of work coming our way. A really exciting time to know we're on the downhill side of permitting, and now we're getting to start to be prepared to construct this project that we're all quite proud of.

168. During the April 17, 2024 Special Call, Defendant Cherry was asked: "[w]hat got you so excited about that project and why did you join?" To which he responded, in pertinent part:

> [A]s I looked at Perpetua and kind of got into more of the details, dove into the feasibility study and just kind of looked at what was going on, I got more and more excited about it. Basically, it's a great project with great economics and the gold obviously drives the economics for this project.
>
> And again, with my background as an environmental engineer, the mine plan and design where you can design a mine, conduct your business and then clean up historic brownfield and legacy issues as part of your mine plan and incorporated in your mine plan, [indiscernible] company is doing things right, going to the right direction. But to be honest with you, it's really the antimony angle on this. The fact that this project will have the antimony as byproduct. It will be the only antimony producer in the U.S. and, very importantly, the ongoing support from the Department of Defense, putting multimillions of dollars into this project for engineering and permitting and evaluation of creating that antimony product.
>
> That told me that this is a really important project for the U.S., and it really kind of demonstrated that whole government approach and then knowing that the [EI]XM was kind of in the works a little bit, that -- just really, I'm excited about it. This is a really good project. It's kind of on the door step for big success here.

169. Such statements of authority were intended to (and did) indicate to investors and analysts that the Individual Defendants were plugged into the details of these topics related to the design, economics, and funding of the Project, its permitting process and pathway to Project implementation and related risks, and the Company's continued reliance on the 2020 Feasibility Study. Either they were knowledgeable of such subject matters and should have disclosed the

adverse information concealed during the Class Period, or they were reckless in holding themselves out as knowledgeable without having reasonably investigated such topics discussed.

**C. The Project's Economic Viability was Integral to Perpetua's Access to Capital**

170. Perpetua's need for working capital and, in turn, the need to maintain a successful image with investors provided Defendants with motive and opportunity to commit the fraud alleged herein. Given Perpetua's precarious financial position as a development-stage mining company heavily dependent on equity markets to fund the Project and with no other means of generating revenue, this motive surpassed any ordinary or generic corporate motive to raise funds.

**D. The Individual Defendants Falsely Certified Perpetua's Quarterly Reports**

171. As Perpetua's CEO and CFO, Defendants Cherry and Largent, respectively, signed each of the Company's quarterly reports filed with the SEC during the Class Period, including those containing the false and misleading statements identified above.

172. Included as Exhibits 31 and 32 to the Form 10-Qs filed with the SEC, during the Class Period, were management certifications, pursuant to Rule 13a-14 and 15d-14 of the Exchange Act ("Exchange Act Certification") and Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C § 1350 ("SOX Certification"), signed by Defendants Cherry and Largent. Such certifications are required by Congress and the SEC "to facilitate full disclosure and ensure the accuracy of financial reports by requiring corporate executives' personal stamp of approval." 149 Cong. Rec. S5325, S5329 (daily ed. Apr. 11, 2003).

173. In each applicable instance, Defendant Cherry and Largent certified, *inter alia*, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." In each applicable instance, these certifications were knowingly false. As detailed above, members of Perpetua's executive

leadership received reports from Independent Qualified Persons providing appropriately detailed assessments of each applicable modifying mine design and other operational factors and related financial analysis necessary to determine economic feasibility for the Stibnite Gold Project. Defendant Cherry and Largent each received these reports through the internal disclosure controls each Defendant certified in the above-referenced certifications. Thus, Cherry and Largent knew or deliberately disregarded the falsity of the alleged statements in the Company's SEC filings but certified their accuracy notwithstanding.

## VII. LOSS CAUSATION

174. The market for Perpetua's securities was open, well-developed, and efficient at all relevant times. Relying upon the integrity of the market and market information related to the Company, Plaintiffs and other members of the Class purchased or otherwise acquired Perpetua securities during the Class Period and were damaged thereby.

175. As detailed herein, Defendants made materially false and misleading statements and engaged in a course of conduct that artificially inflated the price of Perpetua's securities and operated as a fraud or deceit on Class Period purchasers and acquirers of Perpetua securities by materially misleading the investing public. Later, when Defendants' prior misrepresentations and omissions and fraudulent conduct became apparent to the market, the price of Perpetua's securities materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases and/or acquisitions of Perpetua securities during the Class Period, Plaintiffs and other Class members suffered losses compensable under the federal securities laws.

176. On February 13, 2025, Defendants released a Financial Update for the Stibnite Gold Project revealing that projected capital expenditures had nearly doubled since previously reported in the 2020 Feasibility Study, resulting in a $1 billion decrease in the NPV benefit for the Project.

177. The revelations made in the Financial Update are in direct contrast to Defendants' prior misrepresentations and omissions alleged herein. In those publications, Defendants continued to rely on the economic model and capital cost estimates provided in the 2020 Feasibility Study, touting the current valuation of the Project and associated financing risks based on these metrics, while also minimizing any potential for increased costs to inflation and financing costs for the Stibnite Gold Project. For example, the Financial Update revealed significantly higher initial capital costs, increasing the Company's prior estimates by more than 75%, well beyond the 10% to 20% increase that management had suggested at the start of the Class Period.

178. The market reacted immediately to these revelations. The price of Perpetua's common stock fell precipitously from a closing market price of $11.97 per share on February 13, 2025, to a closing market price of $9.29 per share on February 14, 2025, a decline of about 22.39% in the span of a single trading day.

179. The timing and magnitude of the decline in Perpetua's stock price following the Financial Update negate any inference that the loss suffered by Plaintiffs and other members of the Class was caused by market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent or deceptive conduct.

## VIII. <u>CLASS ACTION ALLEGATIONS</u>

180. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Perpetua securities during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are Perpetua, its current and former officers and directors, each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the foregoing individuals and/or entities have or had a controlling interest.

181. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Perpetua's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Perpetua or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 1, 2024, there were 66.73 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

182. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws complained of herein.

183. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

184. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business, operations and management of Perpetua;

(c) whether the Individual Defendants acted as control persons of Perpetua;

(d) whether Defendants acted knowingly or with deliberate recklessness;

(e) whether the price of Perpetua securities during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

185. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

186. At all relevant times, the market for Perpetua's securities was an efficient market for the following reasons, among others:

(a) Perpetua's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) Perpetua communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services;

(c) Perpetua was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Perpetua was reflected in and incorporated into the Company's stock price during the Class Period.

187. As a result of the foregoing, the market for Perpetua's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in Perpetua's stock price. Under these circumstances, all purchasers and acquirers of Perpetua securities during the Class Period suffered similar injury through their purchase or otherwise acquisition of Perpetua securities at artificially inflated prices. As such, Plaintiffs and the other members of the Class are entitled to a presumption of reliance under the fraud-on-the market doctrine established by the United States Supreme Court in *Basic v. Levinson*, 485 U.S. 224 (1998).

188. Furthermore, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## COUNT I

*For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5*
(*Against all Defendants*)

189. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

190. During the Class Period, Defendants knowingly or recklessly made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Such statements were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Perpetua's securities; and (iii) cause Plaintiffs and other Class members to purchase or otherwise acquire Perpetua securities at artificially inflated prices. In furtherance of this unlawful course of conduct, Defendants, and each of them, took the actions set forth herein.

191. Pursuant to the above course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Perpetua's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

192. By virtue of their day-to-day responsibilities, participation in the senior management of Perpetua, and positions held at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative,

Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to each Defendant. At all relevant times, Defendants had access to information contradicting their public statements to investors. Their misrepresentations and omissions were committed willfully or with reckless disregard for the truth.

193. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Perpetua's internal affairs.

194. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Perpetua's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, press releases and public statements, the market price of Perpetua's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Perpetua's securities at artificially inflated prices and relied upon the price of the security, the integrity of the market for the security and/or upon statements disseminated by Defendants and were damaged thereby.

195. During the Class Period, Perpetua's securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Perpetua's securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Perpetua's securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Perpetua's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and other members of the Class.

196. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and/or sales of Perpetua's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

197. By reason of the conduct alleged herein, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. This action was filed within two years of discovery of fraud or deceit and within five years of each Plaintiff's purchases or acquisitions of Perpetua securities giving rise to the cause of action.

## COUNT II

*For Violations of Section 20(a) of the Exchange Act*
(*Against the Individual Defendants*)

198. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein. This Count is asserted against each Individual Defendant and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

199. During the Class Period, the Individual Defendants controlled the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the material adverse non-public information misrepresented and/or omitted from Perpetua's statements and had access to truthful information contradicting their public statements to investors.

200. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control over the general operations of the Company and possessed the power to control the contents of the various reports, press releases and public filings which Perpetua disseminated in the marketplace during the Class Period, including those containing the misrepresentations and/or omissions alleged herein. Throughout the Class Period, the Individual Defendants had the power to direct the actions of Perpetua and exercised their said power and authority to cause Perpetua to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Perpetua's securities.

201. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the primary violations committed by the Company. This

action was filed within two years of discovery of fraud or deceit and within five years of each Plaintiff's purchases or acquisitions of Perpetua securities giving rise to the cause of action.

## IX. NO STATUTORTY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

202. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with capital expenditure projections for the Stibnite Gold Project while at the same time failing to maintain adequate forecasting processes or otherwise failing to disclose additional expenses contemplated over time. For example, Defendants provided the public with statements relating to the potential impact of inflation that failed to account for additional, undisclosed expenses and cost increases stemming from direct decisions made by Perpetua and its management concerning the Project and/or failed to adequately disclose the fact that the Company at the current time did not have adequate forecasting processes to assess the cost increases.

203. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

204. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Perpetua who knew that the "forward-

looking statement" was false. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

205. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## X. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XI. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

*[Signature block on following page]*

Dated: August 15, 2025

Respectfully submitted,

MOONEY WIELAND WARREN

By: _*Jaren Wieland*_______________
Jaren Wieland, ISB 8265
512 W. Idaho Street, Suite 103
Boise, Idaho 83702
Tel.: (208) 401-9219
Jaren.wieland@mooneywieland.com

*Liaison Counsel for Plaintiff Carl Douglas Neale*

-and-

LEVI & KORSINSKY, LLP
Adam M. Apton
(*pro hac vice* application forthcoming)
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Co-Lead Counsel for Plaintiffs and the Class*

-and-

POMERANTZ LLP
Michael Grunfeld
(admitted *pro hac vice*)
Rupita Chakraborty
(admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
mgrunfeld@pomlaw.com
rchakraborty@pomlaw.com

*Co-Lead Counsel for Plaintiffs and the Class*

-and-

RAMSDEN, MARFICE, EALY & DE SMET, LLP
Marcus E. Johnson, ISB 10350
700 Northwest Blvd.
P.O. Box 1336
Coeur d'Alene, ID 83816-1336
Tel.: (208) 664-5818
Facsimile: (208) 664-5884
mjohnson@rmedlaw.com

*Liaison Counsel for Plaintiff David Wallentine*

-and-

THE SCHALL LAW FIRM
Brian Schall
(*pro hac vice* application forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Plaintiff David Wallentine*