UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

FRANCISCO BARNES, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

PERPETUA RESOURCES CORP., JONATHAN CHERRY, and JESSICA LARGENT,

Defendants.

Case No. 1:25-cv-00160-DKG

**MEMORANDUM DECISION AND ORDER**

## INTRODUCTION

Before the Court are Defendants' Motion to Dismiss and Motion for Judicial Notice. (Dkt. 34, 35). The motions are fully briefed and ripe for consideration. Having reviewed the submissions and entire record, the Court finds the facts and legal arguments are adequately presented and that oral argument would not significantly aid its decision-making process and, therefore, the motions will be decided on the record. Loc. Civ. R. 7.1(d)(1)(B); Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). For the reasons discussed below, the motion for judicial notice will be granted in part and denied in part, and the motion to dismiss will be granted without prejudice and with leave to amend.

MEMORANDUM DECISION AND ORDER - 1

## BACKGROUND

### 1. Procedural Background

This is a class action lawsuit alleging violations of federal Securities Laws by Defendants Perpetua Resources Corporation (Perpetua), a mining company; and two of its officers, Jonathan Cherry, Chief Executive Officer (CEO), and Jessica Largent, Chief Financial Officer (CFO). The co-lead plaintiffs – Carl Douglas Neale and David Wallentine – bring this action on behalf of themselves individually and on behalf of a class of similarly situated investors who purchased or otherwise acquired securities in Perpetua between April 17, 2024 and February 13, 2025 (the Class Period). (Dkt. 23, 24, 31). Generally speaking, Plaintiffs allege that Defendants made materially false and misleading statements or omissions about the valuation and associated financing risks of Perpetua's mining project in violation of Sections 10b-5 and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. (Dkt. 31).

### 2. Factual Background[1]

Since 2011, Perpetua has been engaged in efforts to develop a mining project in Valley County, Idaho named the Stibnite Gold Project (the Project). As part of the lengthy federal approval process under the National Environmental Policy Act (NEPA), Perpetua submitted a Plan of Restoration and Operations (PRO) to the United States Forest Service (USFS) in 2016. The PRO was subsequently modified three times: May

---

[1] The statement of the factual background is based on the allegations in the Amended Complaint (Dkt. 31), which are construed as true for purposes of this motion. Fed. R. Civ. P. 12(b)(6).

MEMORANDUM DECISION AND ORDER - 2

2019 (ModPRO), August 2020 (ModPRO2), and October 2021 (2021 ModPRO2). Plaintiffs allege the final modified plan - 2021 ModPRO2 - was submitted to the USFS on October 15, 2021 "unbeknownst to the public," and contained extensive and costly design changes, operational improvements, and modifications, that were needed to address concerns and obstacles to obtaining permitting and approval. (Dkt. 31 at ¶¶ 55, 79-105).[2] The 2021 ModPRO2 was identified as the selected alternative in the Final EIS and the draft Record of Decision (ROD) released September 2024, and was ultimately selected by the USFS as the approved plan for the Project in the final ROD issued January 2025. (Dkt. 31 at ¶ 59).

Prior to the 2021 ModPRO2, Perpetua released the results of an independent Feasibility Study and Technical Report, dated effective December 22, 2020 (2020 FS). (Dkt. 31 at ¶¶ 51, 67); (Dkt. 34-4, Ex. 2). The 2020 FS provided a comprehensive overview of the Project including operational improvements and modifications reportedly designed to reduce the Project's environmental, social, and economic impacts identified in the PRO, ModPRO, and the NEPA process. Importantly here, the 2020 FS provided capital and operational costs and economic analysis for the Project - estimating Net-Present-Value (NPV) as $1.3 billion for gold prices at $1,600/oz and as $2.4 billion at a

---

[2] The parties dispute whether and when the 2021 ModPRO2 was known to the public. (Dkt. 34 at 18); (Dkt. 36 at 13). For purposes of this motion, the Court assumes as true Plaintiffs' allegation that the public did not know the 2021 ModPRO2 was submitted to the USFS on October 15, 2021. (Dkt. 31 at ¶ 55). However, Plaintiffs further allege the Supplemental Draft EIS identifying the 2021 ModPRO2 as the preferred alternative was released for public comment on October 28, 2022. (Dkt. 31 at ¶ 57). Thus, the 2021 ModPRO2 was known to the public or publicly available by at least October 28, 2022.

MEMORANDUM DECISION AND ORDER - 3

$2,100/oz gold price, and capital expenditures or capital costs (CAPEX) estimated at $ 1.263 million. (Dkt. 31 at ¶¶ 71, 73).

Plaintiffs allege the Project valuation and cost estimates in the 2020 FS did not account for the increased costs of the subsequent changes and modifications to the Project contained in the 2021 ModPRO2. (Dkt. 31 at ¶¶ 79-105). Plaintiffs allege that Defendants continued to publicly rely on the 2020 FS's cost estimates in statements to investors and SEC filings, despite knowing the 2020 FS did not reflect the actual cost estimates and valuation for the Project given the changes in the 2021 ModPRO2. Specifically, Plaintiff's challenge statements made by Defendants during the Class Period (April 17, 2024 to February 13, 2025) in the following: a Special Call with investors on April 17, 2024; the Annual General Meeting on May 16, 2024; Quarterly Reports filed with the SEC on May 10, 2024, August 9, 2024, and November 13, 2024; and a Prospectus Statement filed with the SEC on November 20, 2024. (Dkt. 31 at ¶¶ 134-152). The statements, Plaintiffs allege, were knowingly or recklessly untrue statements of material facts and omissions of material facts, intended to mislead the investing public and to artificially inflate and maintain the market price of Perpetua's securities, and designed to influence the market and cause investors like Plaintiffs and the class members to purchase or otherwise acquire Perpetua securities at artificially inflated prices. (Dkt. 31 at ¶ 190).

After the market closed on February 13, 2025, the end of the Class Period, Perpetua filed a Current Report on Form 8-K with the SEC releasing an updated cash flow model for the Project (2025 Financial Update). (Dkt. 31 at ¶ 127). The 2025

MEMORANDUM DECISION AND ORDER - 4

Financial Update reported a NPV of $1.4 billion for gold prices at $2,100/oz (a $1 billion dollar reduction in value from the 2020 FS), and an increase in capital expenses from $1.263 million in the 2020 FS to $2.214 million in the 2025 Financial Update (approximately $1 million increase in costs). The following day, Perpetua's stock price declined approximately 22.39%.

Consequently, Plaintiffs initiated this lawsuit on March 21, 2025. (Dkt. 1). Following appointment of the Lead Plaintiffs, an Amended Complaint was filed. (Dkt. 24, 31). In response, Defendants filed the motions presently before the Court seeking dismissal of the claims under Federal Rule of Civil Procedure 12(b)(6), and for judicial notice of certain materials. (Dkt. 34, 35).

### 3. The Challenged Statements

The allegedly false or misleading statements challenged in the Amended Complaint are as follows:

<u>**Special Call with Investors on April 17, 2024 and Annual General Meeting of Shareholders held on May 16, 2024.**</u>

On April 17, 2024, Perpetua held a Special Call with investors where Defendant Cherry offered prepared remarks, stating:

> The goal leveraged to NPV. Our production profile, low cost and robust cash flow, combined with our current valuation present a very compelling opportunity for new investors. ***Using our base $1,600 per ounce gold price, the NPV has -- the project has an NPV of greater than $1.3 billion using a 5% discount rate. We have good leverage to higher gold prices where the NPV increases to approximately $2.4 billion at a $2,100 gold price.*** And based on our current market cap, we're trading at nearly the widest discount to NAV despite achieving significant milestones and having a clear path forward.

MEMORANDUM DECISION AND ORDER - 5

(Dkt. 31 at ¶ 134).[3] Defendant Cherry made nearly identical remarks at the May 16, 2024

Annual General Meeting of Shareholders. (Dkt. 31 at ¶ 143).

During the April 17, 2024 Special Call, Defendant Largent responded to questions

related to the Project's CAPEX estimates, stating in relevant part:

> ***So the 2020 feasibility study, the good news with the timeline we've been under is that we've had plenty of time to study this project and do the engineering, and we're quite confident in the feasibility study itself in terms of the mine plan laid out and how -- and what we're getting permitted. It was a 2020 number and the 2020 number was $1.3 billion of capital. That included a decent contingency, but we all know we're not in 2020 times anymore.***
> …
> But even if -- ***our project is so great from an economics perspective, that even if you assume a 10% change in CapEx or a 20% change, you can run your numbers there. It's about a $100 million decrease in NPV. But again, we ran our base model at $1,600 gold prices, and we're encroaching on $2,400 gold prices today. So we know it's not 1.3, but we also know the project can sustain movements in the capital.***
>
> And so in terms of what we're doing, part of the work this year is we're advancing basic engineering as we get ready for that construction decision next year and running a financial model update. So that's work we're progressing through 2024. ***But again, the project has been well studied. We're confident in the plan. So we have no plans on updating our feasibility study or technical report, but we will look at financial model updates to support project financing.***

(Dkt. 31 at ¶ 136). Defendant Largent further responded to a question about plans for

financing the Project, stating in relevant part:

> Just last week, we announced an indication on the debt side from U.S. [EXIM] and to provide a little bit of context on that [EXIM] financing. ***The letter of interest was for up to $1.8 billion debt financing*** with an up to 15-year repayment tenure under the Make More in America initiative and the China and Transformational exports program. Just for a little more

---

[3] The emphasis that appears in the quotations of the challenged statements herein, replicates the emphasis given in the Amended Complaint. (Dkt. 31).

> background on those, Make More in America was designed to strengthen U.S. exports and American jobs. So Perpetua qualifies for Make More in America.
>
> …
>
> We also received notice that we could be eligible under [CTEP], which was designed to help equal the playing field for American production and manufacturing to be more competitive with China. So CTEP applicants must have direct China competition, and about 50% of the global supply of the antimony is dominated by China or be part of 10 transformational export areas in antimony is actually used in semiconductors and clean energy, which are both part of those transformational explore areas.
>
> What's most exciting is that under that CTEP program, they are able to be more flexible and offer benefits beyond the Make More in America initiative, including reduced fees, extended repayment tenors and other exceptions. So later this year, we plan to submit our formal application under this program, ***and CTEP can provide up to 85% of debt funding for project capital costs, which really opens up multiple pathways for our full financing package.***

(Dkt. 31 at ¶ 138).

### **Quarterly Reports Dated May 10, 2024, August 9, 2024, November 13, 2024**

Perpetua filed quarterly reports dated May 10, 2024, August 9, 2024, and November 13, 2024, all of which contained the following statement:

> Our long-term liquidity requirements will require project financing to fund the capital costs to develop the Project, which was estimated to be approximately $1,263 million as of the third quarter of 2020 according to the TRS.

(Dkt. 31 at ¶¶ 141, 146, 149).

### **Prospectus Supplement dated November 20, 2024**

On November 20, 2024, Perpetua filed with the SEC a Prospectus Supplement (Form S-3), that contained the following statement:

> We have limited financial resources. We will need external financing to develop and construct the Project and to complete the permitting process.

> Although the Company's current capital resources and liquidity include funding awarded under the Technology Investment Agreement ("TIA") pursuant to Title III of the Defense Production Act ("DPA"), such funding is available only for the specified costs related to permitting, early restoration activities and advancing construction readiness and is not available to fund certain corporate expenses, including under the Settlement Agreement. The Company's latest liquidity forecast indicates that available cash resources for expenses not eligible for reimbursement under the DPA funding are expected to be exhausted in the second quarter of 2025. Due to payment obligations under the Settlement Agreement and other corporate expenses, we do not expect the Company will have sufficient assets to discharge its liabilities as they become due for at least 12 months from the date hereof. Absent additional financing, the Company would no longer be able to meet its ongoing obligations or progress critical permitting efforts. The Company continues to explore various strategic and funding opportunities, which may include the issuance of additional equity, new debt, or project specific debt; government funding; and/or other financing or strategic opportunities. There can be no assurance of the amount, timing or nature of any such financing or strategic transaction, if any.

> In addition, ***according to the technical report summary as of December 31, 2020, the total initial capital cost estimate for the Project was approximately $1,263 million. Based on significant inflation and increased financing costs since 2020, we expect the actual cost estimates to be higher than the 2020 estimate. These cost estimates may change materially*** and our failure to obtain sufficient financing could result in the delay or indefinite postponement of exploration, permitting, development, construction, or production at the Project. The cost and terms of such financing may significantly reduce the expected benefits from development of the Project and/or render such development uneconomic. There can be no assurance that additional capital or other types of financing will be available when needed or that, if available, the terms of such financing will be favorable. Our failure to obtain financing could have a material adverse effect on our growth strategy and results of operations and financial condition.

(Dkt. 31 at ¶ 151).

The challenged statements can be generally categorized into the following five assertions: (1) misleading Project valuations using the 2020 FS when Defendants knew Project costs had increased based on the changes in the 2021 ModPRO2; (2)

MEMORANDUM DECISION AND ORDER - 8

misrepresenting Project cost increases of only 10-20% from the 2020 FS estimates; (3) misrepresenting the risk of Project cost increases as "potential" or "may change materially" when Defendants already knew the costs were materially different from the 2020 FS; (4) statements of confidence in the 2020 FS with no plans to update; and (5) misrepresenting that the potential debt financing would provide sufficient coverage for the Project.

## LEGAL STANDARD

Under Rule 12(b)(6), a party may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

"Securities fraud class actions must meet the higher, more exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Under Rule 9(b), plaintiffs alleging securities fraud must plead the

MEMORANDUM DECISION AND ORDER - 9

elements of a securities fraud claim with particularity, including the "circumstances constituting fraud or mistake." *Id*. at 605; Fed. R. Civ. P. 9(b). Under the PSLRA, plaintiffs are required to "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (citations omitted).

## DISCUSSION

### 1. Motion for Judicial Notice

Defendants request that the Court take judicial notice of Exhibits 1, 4, 6, 9-1, 9-2, 9-4, 10, 11, and 16 to the Declaration of B. Warren Pope, arguing these Exhibits are publicly-available SEC filings, documents, and presentations proper for judicial notice. (Dkt. 34-2, 35, 39).[4] Defendants further contend that the materials attached to the Pope Declaration may be considered when deciding the motion to dismiss because the materials are incorporated by reference in the Amended Complaint. (Dkt. 34-1 at 2, n. 1; Dkt. 39). Plaintiffs disagree, arguing Exhibits 1, 4, 6, 9-1, 9-2, 9-4, 10, 11, and 16 should not be considered as they contain improper argument, are not incorporated by reference, and are not proper subjects for judicial notice. (Dkt. 37). Plaintiffs further assert that any consideration of the extrinsic materials attached to the Pope Declaration be limited to their existence and contents, but not the truth of the matters asserted therein. (Dkt. 37).[5]

---

[4] Exhibits 9-1, 9-2, and 9-4 are the same documents as Exhibits 1, 10, and 11. (Dkt. 39 at 2, n. 3).

[5] Plaintiffs concede that the Amended Complaint refers to or relies on "some version" of Exhibits 2, 3, 5, 7, 9-3, 9-5, 9-6, 9-7, 12, 13, 14, 15, and 17. (Dkt. 37 at 17). Plaintiffs argue any consideration of these Exhibits must be limited to their existence, not the truth of the matters asserted therein. The Court will consider the existence and contents of these Exhibits when deciding the motion to dismiss, but not the truth of any disputed facts or matters stated therein.

MEMORANDUM DECISION AND ORDER - 10

As a general rule, when deciding a motion to dismiss, the Court "may not consider any material beyond the pleadings." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). However, the Court may consider relevant materials subject to judicial notice, materials that are submitted with and attached to the complaint, and unattached materials relied upon in the complaint, without converting a motion to dismiss into a summary judgment. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998-999 (9th Cir. 2018). The Court may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A complaint "necessarily relies" on unattached material "if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) (quoting *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)). The Ninth Circuit has cautioned against the "unscrupulous use of extrinsic documents" under these exceptions, which "risks premature dismissals of plausible claims." *Khoja*, 899 F.3d at 998–99. The Court finds as follows.[6]

Exhibits 1(Ex. 9-1), 4, and 6 are publicly filed documents with the SEC. Exhibit 1(Ex. 9-1) is Perpetua's 2023 Forum 10-K as filed with the SEC on March 26, 2024. (Dkt. 34-3, Ex. 1). Exhibit 4 is Perpetua's Form 8-K as filed with the SEC on September

---

[6] The Court's findings relevant to the motion for judicial notice are limited to its consideration of these Exhibits for purposes of deciding the motion to dismiss only.

MEMORANDUM DECISION AND ORDER - 11

22, 2025. (Dkt. 34-6, Ex. 4). Exhibit 6 is Perpetua's Form 8-K as filed with the SEC on May 2, 2024. (Dkt. 34-8, Ex. 6). Defendants argue these Exhibits are publicly filed documents proper for judicial notice. Plaintiffs do not dispute that the documents are SEC filings. (Dkt. 37).

However, Plaintiffs argue Exhibits 1(Ex. 9-1) and 4 are irrelevant as they were issued outside the Class Period. (Dkt. 37). As to Exhibit 6, Plaintiffs argue the document serves only to provide Defendants' competing presentation of the facts. (Dkt. 37 at 14-15). Defendants maintain that Exhibit 1(Ex. 9-1)'s cautionary language was incorporated into several of Perpetua's SEC filings – Exhibits 7, 13, 14, and 15 - and earning calls made during the Class Period, including SEC filings referenced in the Amended Complaint. (Dkt. 39 at 5) (citing Dkt. 31 at ¶¶ 140-141, 145-152). As to Exhibit 4, Defendants request limited judicial notice "to show that Perpetua disclosed that it had received conditional Notice to Proceed from the USFS" and the fact that "Defendants announced that the Project may begin construction," as those facts are clear from the document itself and not subject to reasonable dispute. (Dkt. 39 at 5-6). As to Exhibit 6, Defendants state it is offered to show Perpetua disclosed having received funding to advance construction readiness and permitting. (Dkt. 39 at 6).

The Court will take judicial notice of the existence and contents of Exhibits 1(Ex. 9-1), 4, and 6 to determine what information was available to investors during the Class Period, but not for their truth of the information contained therein or of facts subject to reasonable dispute. The Exhibits are publicly filed documents whose accuracy is not questioned and are relevant to the Court's determination on this motion. Fed. R. Evid.

MEMORANDUM DECISION AND ORDER - 12

201(b); *Sarcuni v. bZx DAO*, 664 F.Supp.3d 1100, 1110 n. 1 (S.D. Cal. 2023) (citing

*Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007)); *Steamfitters Loc. 449 Pension*

*& Retirmnt. Sec. Fnds. v. Extreme Networks, Inc.*, 2026 WL 817221, at *7 (N.D. Cal.

March 23, 2026) (Courts routinely take judicial notice of public SEC filings and publicly

available transcripts of earnings calls, not for their truth but to show what information

was available to the market.). Defendants' other requests related to these exhibits are

denied.

Exhibits 8 and 9 are charts created by Defendants of the statements and the

forward-looking statements relied on and challenged in the Amended Complaint. (Dkt.

34-10, Ex. 8; Dkt. 34-11, Ex. 9). Attached to Exhibit 9 are Perpetua's SEC filings

replicated in Exhibits 1, 10, and 11. (Dkt. 34-11, Ex. 9-1, 9-2, 9-4). In deciding the

motion to dismiss, the Court will not consider Exhibit 8 but will consider Exhibit 9 for

the reasons that follow.

The chart in Exhibit 8 compiles the challenged statements alleged in the Amended

Complaint by identifying the paragraph number of the Amended Complaint, speaker,

source document, challenged statement, and Defendants' asserted bases for dismissal.

(Dkt. 34-10, Ex. 8). The final collum – bases for dismissal – contains bullet points of

Defendants' arguments and reasons for dismissing the claims in the Amended Complaint

with pin citations to Defendants' briefing. Exhibit 8 is essentially an extension of

Defendants' briefing on the motion to dismiss, not a mere "summary aid[] intended to

assist the Court" as Defendants contend. (Dkt. 39 at 9). The chart cannot be judicially

noticed because it is subject to reasonable dispute and it is not relied on or incorporated in

MEMORANDUM DECISION AND ORDER - 13

the Amended Complaint but, rather, contains Defendants' assertions disputing the facts alleged in the Amended Complaint. As such, Exhibit 8 is improper for the Court's consideration in deciding the motion to dismiss. *See e.g., Luo v. Spectrum Pharms.*, 2024 WL 4443323, at * 6 (D. Nev. Oct. 7, 2024) (striking a similar exhibit as an improper end-run around page limitations and improper legal argument outside of the briefing itself).

In contrast, Exhibit 9 is a chart identifying the forward-looking statements contained in the Amended Complaint by paragraph number, source document, the statement as contained in the Amended Complaint, and the cautionary language contained in the attached supporting materials that Defendants assert is applicable to each statement. (Dkt. 34-11, Ex. 9). Three of the attachments to Exhibit 9 are duplicative of the materials that are judicially noticed in Exhibits 1, 10, 11. The Court finds Exhibit 9 is a useful chart and proper organization tool for its consideration in deciding the motion to dismiss because it restates the allegations as made in the Amended Complaint and identifies portions of publicly available documents without further argument. The Court will therefore consider Exhibit 9 as an organizational tool, but not for the truth of the matter asserted. *Luo*, 2024 WL 4443323, at *6 (finding a similar compilation of stock trades a useful and proper organizational tool).

Exhibit 10(Ex. 9-2) and Exhibit 11(Ex. 9-4) contain select slides from Perpetua's April 17, 2024 Investor Presentation and Perpetua's May 16, 2024 Annual Meeting Presentation. (Dkt. 34-12, Ex. 10; Dkt. 34-13, Ex. 11). The slides are labeled: as Perpetua's "Forward-Looking Statements" and "Cautionary Note & Technical Disclosure." Defendants maintain these exhibits are referenced in the Amended

MEMORANDUM DECISION AND ORDER - 14

Complaint and are relevant to the Court's consideration of the PSLRA safe harbor. (Dkt. 39 at 3-4 n. 5). Plaintiffs agree that these Exhibits contain publicly available materials, but argue the Exhibits should not be considered because they are not referenced or relied on in the Amended Complaint and are irrelevant to the decision on this motion. (Dkt. 37 at 14). The Court will take judicial notice of Exhibit 10(Ex. 9-2) and Exhibit 11(Ex. 9-4) as they are relevant publicly available documents and their contents are not subject to reasonable dispute, and will consider the Exhibits only to the extent that they show what representations Defendants made to the market during the Class Period. The Court will not consider the Exhibits for the truth of any of the facts asserted.

Exhibit 16 is a screenshot of the Technical Project Documents page of Perpetua's website as of January 23, 2022, that includes the 2021 ModPRO2. (Dkt. 34-18, Ex. 16). "Courts may take judicial notice of public-facing websites whose accuracy and authenticity are 'not subject to dispute.'" *Cement Masons and Plasters Local No. 502 Pension Fund v. InM* , 2025 WL 2658224, at *8 (C.D. Cal. Sept. 12, 2025) (quoting *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1023 (C.D. Cal. 2008); citing *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 145–46 (N.D. Cal. 2020) (taking judicial notice of "screenshots and printouts" of the parties' websites)). "Publicly available documents, including websites, are judicially noticeable 'for the fact that they exist' and not for the truth of the matter asserted therein." *Id.* (quoting *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 984 (N.D. Cal. 2010)). However, the Court may not consider materials that are subject to reasonable dispute when deciding a Rule 12(b)(6) motion. *Khoja*, 899 F.3d at 1000.

MEMORANDUM DECISION AND ORDER - 15

The Court finds Exhibit 16 is not properly considered in deciding the motion to dismiss here, as it is not referred to or relied on in the Amended Complaint and its contents are subject to reasonable dispute. *Khoja*, 899 F.3d at 1000. Further, Exhibit 16 is offered to present Defendants own version of the facts, which is irrelevant to deciding a Rule 12(b)(6) motion. *Id.* at 999. For these reasons, the Court will deny Defendants' motion for judicial notice as to Exhibit 16, and will not consider Exhibit 16 in deciding the motion to dismiss.

### 2. Motion to Dismiss

The Amended Complaint raises two claims: Count I alleging violations of Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b-5; and Count II alleging violations of Section 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78t(a). Defendants move for dismissal of both claims, arguing Plaintiffs have failed to adequately plead a violation of the federal securities laws. (Dkt. 34, 38).[7] Plaintiffs oppose the motion. (Dkt. 36).

To state a plausible claim for violations of section 10(b) and Rule 10b-5, a plaintiff must plead "(1) a material misrepresentation or omission by the defendant ['falsity']; (2) scienter; (3) a connection between the misrepresentation or omission and

---

[7] "Claims under § 20(a) of the Exchange Act—which establishes controlling-person liability—require pleading the same elements [as § 10(b) and Rule 10b-5]." *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025) (citing *Zucco*, 552 F.3d at 990; 15 U.S.C. § 78t). Thus, if Plaintiffs fail to adequately plead a claim under Count I, Plaintiffs will have also failed to adequately plead a claim under Count II. *Constr. Laborers Pens. Trst. of Grtr. St. Louis v. Funko, Inc.*, 166 F.4d 805, 821 (9th Cir. 2026) ("Section 20(a) claims are derivative and required an underlying violation of the statue."). The Court therefore does not need to address Count II separately to resolve the motion to dismiss.

the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citation and modifications omitted). On this motion, Defendants contest the first two elements and further argue that the challenged statements are protected by the PSLRA's safe harbor provision. (Dkt. 34, 38). Plaintiffs disagree with each of Defendants' arguments. (Dkt. 36). The Court finds as follows.

### A.    Falsity

Defendants argue the Amended Complaint fails to plead falsity with the requisite particularity showing the challenged statements were materially false or misleading at the time they were made. (Dkt. 34). Specifically, Defendants maintain there are no allegations showing Defendants' made material misrepresentations or omissions regarding the Project's capital cost estimates or valuations because Defendants did not know the actual or true amounts of the estimates in the 2025 Financial Update at the time the challenged statements were made. (Dkt. 34 at 12-19; Dkt. 38). Plaintiffs disagree, arguing Defendants made materially misleading statements and omissions regarding the Project's costs, valuation, and financing risks using the 2020 FS, despite knowing the modifications to the Project in the 2021 ModPRO2 would increase costs and diminish valuation. (Dkt. 36 at 10-16). The Court finds as follows.

"To properly plead fraud with particularity under Rule 9(b), 'a pleading must identify the who, what, when, where, and how of the misconduct charged.'" *In re Cloudera, Inc.,* 121 F.4th 1180, 1187 (9th Cir. 2024) (quoting *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018) (citation omitted)). "Most importantly,

MEMORANDUM DECISION AND ORDER - 17

the complaint must explain 'what is false or misleading about the purportedly fraudulent statement, and why it is false.'" *Id*. In doing so, the complaint "cannot rely on hindsight; rather, it must explain 'why the statements were false or misleading at the time they were made.'" *Id.* (quoting *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012)). Additionally, to plead falsity under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

"Section 10(b) and Rule 10b–5 bar false or misleading statements and omissions." *Sneed*, 147 F.4th at 1131 (citing *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021)); *Constr. Laborers Pens. Trst.*, 166 F.4th at 821 ("To establish falsity, 'securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory.'") (quoting *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021)). "A statement is false or misleading if it 'directly contradict[s] what the defendant knew at that time' or 'omits material information.'" *Glazer Cap. Mgmt., LP v. Forescout Tech., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) (quoting *Khoja*, 899 F.3d at 1008–1009). To determine whether a statement or omission is misleading, courts apply the objective standard of a "'reasonable investor.'" *Id.* (quoting *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021)). In making this determination, the Court considers "'the context surrounding the statement[ ].'" *Sneed*, 147 F.4th at 1131 (quoting *Weston Fam. P'ship. LLLP v. Twitter, Inc.*, 29 F.4th 611, 622 (9th Cir. 2022)).

MEMORANDUM DECISION AND ORDER - 18

"An omission of information can mislead by affirmatively giving a reasonable investor 'an impression of a state of affairs that differs in a material way from the one that actually exists.'" *Sneed*, 147 F.4th at 1131 (quoting *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014)) (citation omitted). "When defendants 'tout positive information to the market,' they must 'do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.'" *Glazer*, 63 F.4th at 764 (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016) (quotation marks and citation omitted)). However, Section 10(b) and Rule 10b-5(b) "'do not create an affirmative duty to disclose any and all material information. [Rather,] [d]isclosure is required under these provisions only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b))); *see also Sneed*, 147 F.4th at 1131.

Here, Plaintiffs' assertion of falsity is that Defendants made material misrepresentations or omissions about the Project's costs, valuation, and associated financing risks by relying on the "stale economics" of the 2020 FS while knowing of and failing to "tell the whole story: that the protracted regulatory process had forced Project modifications and skyrocketing costs and altered the financial viability of the Project as a whole." (Dkt. 36 at 10-16). Boiled down, Plaintiffs' claim Defendants knew, at the time they made the challenged statements, that the Project costs would be substantially higher and that the valuation would be lower than the 2020 FS estimates, due to the changes to

MEMORANDUM DECISION AND ORDER - 19

the Project plan. The evidence Plaintiffs rely on to establish that Defendants knew of the increased Project costs are the modifications proposed in the 2021 ModPRO2 that was submitted to the USFS in October of 2021, circumstances during the NEPA process, and the difference between the estimates and figures in the 2020 FS and the 2025 Financial Update. (Dkt. 36).

While the allegations in the Amended Complaint plausibly show that Defendants knew proposed modifications and changes to the Project had been submitted to the USFS in the 2021 ModPRO2 and were being considered by USFS, the Court finds that there are no facts alleged that show at the time the challenged statements were made that Defendants knew: (1) which of the proposed Project plans, or which portions of the proposed plans, the USFS would approve, if any; and (2) the capital expenditure estimates and valuation figures contained in the subsequent 2025 Financial Update. Those facts became known to Defendants after the challenged statements were made. This is fatal to Plaintiffs' claim that Defendants made materially false statements about the Project's costs, valuation, and financing risks.

Until the final plan for the Project was approved by the USFS in January 2025, there are no facts alleged that show the Project's "actual" or "true" costs, valuation, and financing – including the estimates and figures in the 2025 Financial Update - were known to Defendants. (Dkt. 31). The 2024 challenged statements about the Project costs, valuation, and financing using the 2020 FS were therefore not false or misleading, because the statements were based on the only estimates and figures available at the time – those contained in the 2020 FS. The challenged statements therefore reflected the then-

MEMORANDUM DECISION AND ORDER - 20

existing estimates of the Project's costs, valuation, and financing. Importantly, investors were informed that the Defendants' statements about the Project's costs, valuation, and financing were based on the 2020 FS. (Dkt. 31 at ¶¶ 136, 141, 146, 149, 151). When read in context, the challenged statements included acknowledgments that the estimates and valuations contained in the 2020 FS were "2020 number[s]" or from 2020, "may change materially," and were "expect[ed]" to change given inflation and increased financing costs. (Dkt. 31 at ¶¶ 136, 141, 146, 149, 151). And, while expressing confidence in the plan and the feasibility study/technical report, Defendants indicated there would be financial updates, stating: "we will look at financial model updates to support project financing." (Dkt. 31 at ¶ 136). Thus, Plaintiffs have not alleged facts establishing or from which one can infer that the challenged statements were false or misleading, or that Defendants knew their statements were false or misleading, at the time they were made.

Plaintiffs argue that Defendants misrepresented the Project's "current valuation" and "current economic viability" by presenting the risk of increased cost estimates as hypothetical or merely possible when Defendants knew the Project's costs were substantially higher. However, again, the are no facts alleged that show Defendants knew the Project's "actual" or "true" costs, valuation, and financing at the time the challenged statements were made. (Dkt. 31). The allegations demonstrate that Defendants knew proposed changes to the Project had been submitted to the USFS and that the 2021 ModPRO2 was the USFS's preferred alternative. It is reasonable to infer that Defendants anticipated that the Project costs were likely to increase from the 2020 FS estimates due to the amount of time that had passed and the proposed modifications to the plan, which

MEMORANDUM DECISION AND ORDER - 21

would in turn likely impact the Project's valuation and financing. Still, the allegations do not show that the increased costs were a certainty or had already been brought to fruition, as the final Project plan had not been adopted at the time of the statements.[8] Nor do the facts alleged demonstrate that Defendants knew at the time of the challenged statements what the costs, valuation, and financing figures would be once a Project plan was approved – let alone that Defendants knew the Project's costs were "skyrocketing" or the amounts in the 2025 Financial Update.

While Plaintiffs fault Defendants for relying on the "stale economics" of the 2020 FS, their claims are not based on Defendants' failure to update the 2020 FS or failure to complete a new financial/feasibility study sooner. Moreover, Defendants expressly identified the 2020 FS as the source of the challenged statements and, notably, cautioned investors that the numbers were dated and that they "expect the actual cost estimate to be higher than the 2020 estimate." (Dkt. 31 at ¶¶ 136, 151). Thus, Plaintiffs' contentions that they were "left in the dark" or mislead by Defendants' statements and promotion of the 2020 FS are without support. (Dkt. 31 at 111). When read in context and their entirety, the challenged statements did not misrepresent or water-down the risks to investors, nor

---

[8] During the Special Call and Annual General Meeting, Defendant Cherry directed the audience's attention to the "cautionary language" and "disclaimer" on Slides 2 and 3 of his presentation. (Dkt. 34, Ex. 5, 10, 11, 12). Notably, the cautionary language in the Special Call presentation advised that the USFS's identification of the "Modified Mine Plan as the Preferred Alternative in the SDEIS does not indicate any commitments on the part of the USFS with regard to the content or timing of a final decision," and cautioned that "the USFS may select various actions based on the Modified Mine Plan or each of the alternatives analyzed in the SDEIS." (Dkt. 34, Ex. 10). This language cautioned investors that the final plan for the Project was not yet determined, and indicates that Defendants did not know at the time of the April 17, 2024 Special Call whether the USFS would approve the modifications for the Project submitted in the 2021 ModPRO2.

MEMORANDUM DECISION AND ORDER - 22

materially misstate or overstate the Project's cost and valuation estimates given what Defendants knew at the time the statements were made.

Plaintiffs argue that Defendants knew the Project would cost more at the time the statements were made and they failed to disclose that the significant modifications and design changes to the Project and the protracted regulatory process would increase the cost estimates and alter the Project's financial viability. (Dkt. 36 at 10-16). However, the facts alleged do not support that inference and Plaintiffs' conclusory assertions to the contrary do not meet the heightened pleading standards for the claim. The facts alleged here show that Defendants knew the proposed changes had been submitted to the USFS and the USFS had selected the proposed changes as the preferred alternative, but the facts do not indicate that it was certain the USFS would approve the 2021 ModPRO2 or that Defendants knew what the final cost estimates and valuation figures for the Project would be. It is reasonable to infer that Defendants understood it was likely the USFS would approve the 2021 ModPRO2 plan for the Project after the SDEIS was issued. But, there is no indication that Defendants knew at the time of the challenged statements what plan for the Project would be approved, as that decision was not made until January 2025. And, there are no facts alleged showing Defendants knew at the time of the challenged statements what the Project's final cost estimates and figures would be or the amount of the difference between the estimates and figures in the 2020 FS and the 2025 Financial Update. Plaintiffs' reliance on the 2025 Financial Update estimates and figures to establish that Defendants knew in 2024 that the Project's costs and financial valuation would be materially different, is insufficient to show falsity. *City of Roseville Employees'*

MEMORANDUM DECISION AND ORDER - 23

*Ret. Sys. v. Sterling Fin. Corp.*, 963 F.Supp.2d 1092, 1109 (E.D. Wash. 2013) ("Without evidence of contemporaneous falsity, an allegation of a misleading representation, which entirely rests on later contradictory statements, constitutes an impermissible attempt to plead fraud by hindsight.).

The circumstances in this case are distinct from the cases cited by Plaintiffs where the defendants failed to disclose to investors that they had affirmatively changed the plans or knew of existing cost overruns. (Dkt. 36 at 11). Here, at the time of the challenged statements, the proposed modifications to the Project plan had been submitted to the USFS but were not yet approved, and the present allegations do not show that Defendants knew the cost estimates and valuation figures for the final approved Project plan or that their statements were misleading or misrepresented the then-existing Project estimates and figures.

For these reasons, the Court finds the Amended Complaint fails to allege facts showing Defendants knew the challenged statements were materially false or misleading at the time they were made.

### B.    Scienter

In a securities fraud action, scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In the Ninth Circuit, scienter includes deliberate recklessness of a known or "'obvious danger of misleading investors.'" *Constr. Laborers Pens. Trst.*, 166 F.4th at 829-830 (quoting *Glazer*, 63 F.4th at 765). Deliberate recklessness is a "higher standard than mere recklessness" and "only satisfies scienter under § 10(b) to the extent that it reflects some

MEMORANDUM DECISION AND ORDER - 24

degree of intentional or conscious misconduct." *Glazer*, 63 F.4th at 765 (quoting *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004)) (cleaned up); *see also In re NVIDIA Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) ("[D]eliberate recklessness is 'an extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'").

To properly plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u– 4(b)(2). A "strong inference" of scienter is plead when, taking all of the facts alleged collectively and considering the competing inferences, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323-324 (2007). Though the factual allegations in the complaint are accepted as true at the motion to dismiss stage, "the court must take into account plausible opposing inferences." *Id.* at 323. The inference of scienter need not be "irrefutable" or even the "most plausible," but it must be more than merely "reasonable" or "permissible." *Id.* at 324. "Assessing whether a plaintiff meets the PSLRA's strong inference requirement is a 'dual inquiry': first, this court determines whether any of the allegations, alone, are sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, this court conducts a 'holistic' review to see if the allegations, when considered together, give rise to a strong inference of scienter." *Constr.*

*Laborers Pens. Trst.*, 166 F.4th at 830 (quoting *Glazer*, 63 F.4th at 766 (citing *Zucco*, 552 F.3d at 992)).

Here, Plaintiffs argue the Amended Complaint pleads a strong inference of scienter based on allegations showing Defendants knew of or recklessly disregarded the Project's "vast cost overruns" and the Project's "true capital cost estimates." (Dkt. 36 at 20-21). Further, Plaintiffs contend that scienter is properly pled based on the core operations doctrine, Perpetua's need for working capital, and the overall circumstances. (Dkt. 36 at 21-25). Defendants maintain the allegations in the Amended Complaint fail to demonstrate a strong inference of scienter under any of the theories argued by Plaintiffs. (Dkt. 34, 38).

The Court finds scienter has not been adequately plead. The allegations in the Amended Complaint, both individually and collectively, do not show a strong inference that Defendants acted with the intent to deceive, manipulate, or defraud. Plaintiffs' arguments that Defendants' knew or recklessly disregarded the Project's cost overruns and true capital cost estimates, and assertions about the core operations doctrine fail for the same reasons discussed above relevant to falsity. As to Plaintiffs' arguments that Perpetua needed to raise capital and the overall circumstances of the events, the Court has carefully considered the contents and timing of the disclosures and statements to investors relevant to the ongoing NEPA process. The Court finds the facts alleged do not give rise to a strong inference that Defendants acted with intent to deceive or deliberate recklessness. As discussed above, the allegations do not show that Defendants knew the challenged statements were false given the information known at the time they were

MEMORANDUM DECISION AND ORDER - 26

made. Further, Defendants did not delay releasing the costs estimates and valuation figures contained in the 2025 Financial Update. The USFS approved the final Project plan in January 2025 and, approximately a month later on February 13, 2025, Perpetua released the 2025 Financial Update. (Dkt. 34-5, Ex. 3).

The general allegations concerning the size of the company and Defendants' roles in the company are insufficient to plead scienter under the "core operations doctrine." *See Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018) (citing cases that hold the proof required under the core operations doctrine is "not easy," and requires "either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations…or witness accounts demonstrating that executives had actual involvement in creating false reports."). "The core operations doctrine is 'a scienter theory that infers that facts critical to a business's 'core operations' or an important transaction are known to a company's key officers.'" *Constr. Laborers Pens. Trst.*, 166 F.4th at 830–31 (quoting *NVIDIA*, 768 F.3d at 1063 (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008))). "Core operations allegations support a strong inference of scienter in three circumstances: '(1) when they, along with other allegations, support a cogent and compelling inference of scienter' as part of a court's holistic review of a plaintiff's allegation; '(2) when [the allegations] are themselves particular and suggest that the defendants had actual access to the disputed information; and (3) in the 'rare circumstances' when [the allegations] are not particularized, but 'the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.'" *Id.* (quoting *Prodanova v. H.C.*

MEMORANDUM DECISION AND ORDER - 27

*Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021) (quoting *Intuitive Surgical*, 759 F.3d at 1062)).

Here, taking the allegations in the complaint as true, the facts show that at the time the challenged statements were made, Defendants knew modifications and changes to the Project plan had been proposed to the USFS in the 2021 ModPRO2, which had been selected as the preferred alternative. It is reasonable to infer that Defendants anticipated the cost estimates and valuations would be different and, given the proposed changes and the length of time that had passed, that the costs would be higher. Indeed, as discussed above, Defendants recognized the 2020 FS figures were dated and told investors that costs and expenses would likely be higher due to inflation and financing costs. However, the allegations do not show that Defendants knew the "actual" or "true" Project costs or valuation, or the estimates in the 2025 Financial Update, at the time the challenged statements were made. (Dkt. 31). Plaintiffs' general conclusory allegations and arguments are insufficient to meet the heighted pleading standard and do not give rise to a strong inference that Defendants intended to deceive or were deliberately reckless.

### C.    Safe Harbor

The PSLRA's "safe harbor" provision protects securities defendants from liability for certain forward-looking statements. *Glazer*, 63 F.4th at 767. The safe-harbor provision is "designed to protect companies and their officials when they merely fall short of their optimistic projections." *Wochos*, 985 F.3d at 1189 (citation and quotations omitted). A forward-looking statement qualifies for the safe harbor and is not actionable under the PSLRA under either of the following conditions: (1) the statement was

MEMORANDUM DECISION AND ORDER - 28

identified as forward-looking and was "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (2) the plaintiff fails to prove the forward-looking statement was made with "actual knowledge" that it was false or misleading." *Weston v. DocuSign, Inc.*, 669 F.Supp.3d 849, 873 (N.D. Cal. 2023) (quoting 15 U.S.C. §§ 78u-5(c)(1)(A)-(B)); *see also Glazer*, 63 F.4th at 767.

Defendants contend that all of the challenged statements fall within the first prong of the safe harbor provision as they were forward-looking statements related to estimated capital costs for the project, estimated valuation of the project, and estimated projected future cash flows; were identified as forward-looking; and were accompanied by meaningful cautionary language. (Dkt. 43 at 8-11).[9] Plaintiffs maintain the statements were not forward-looking, as they related to past or current facts rather than future forecasts, and that they were not accompanied by meaningful cautionary language. (Dkt. 36 at 16-18).

### 1.  Forward-Looking Statements

As applicable here, a forward-looking statement is "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial

---

[9] Defendants argue in a footnote that even if the first prong is not found, they are still protected under the second prong of the safe harbor. (Dkt. 34 at 11, n. 11). Plaintiffs disagree, arguing Defendants had actual knowledge that the statements were false when made and, therefore, the safe harbor's second prong does not apply. (Dkt. 36 at 10-16, 18, n. 5). Which Defendants in turn dispute. (Dkt. 38). The parties address these arguments more substantively in the context of falsity and scienter. The Court has considered the arguments in the same manner as presented by the parties.

MEMORANDUM DECISION AND ORDER - 29

items." 15 U.S.C. § 78u–5(i)(1)(A); (Dkt. 34 at 8). Non-actionable forward-looking statements may be mixed with separable actionable non-forward-looking statements. *In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017); *Weston*, 669 F.Supp.3d at 874. Where mixed statements are at issue, only the forward-looking portion of the statement is protected by the safe harbor provision. *In re Quality Sys.*, 865 F.3d at 1141-1142. "Whether a statement is forward-looking and protected by the PSLRA's safe harbor 'turns on particular language' and therefore requires an individualized analysis of each statement." *Weston*, 669 F.Supp.3d at 874 (quoting *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 736 (N.D. Cal. 2022)). For the reasons that follow, the Court finds the challenged statements were forward-looking statements.

The majority of the challenged statements were made during the April 17, 2024 Special Call and May 16, 2024 Annual General Meeting. (Dkt. 31 at ¶¶ 134, 136, 138, 143). These challenged statements related to future projections, estimations, or predictions about the Project's valuation, capital expenditures, and financing based on the 2020 FS. As such, the statements plainly meet the statutory definition of forward-looking. 15 U.S.C. § 78u-5(i)(1)(A) (defining forward-looking to include projection of revenues, income, earnings, capital expenditures, capital structure, or other financial items). The challenged statements in the Quarterly Reports – "Our long-term liquidity requirements will require project financing to fund the capital costs to develop the Project, which was estimated to be approximately $1.263 million according to the 2020 TRS" – were also forward-looking, as the statements concerned future estimated capital costs and Project financing. 15 U.S.C. § 78u-5(i)(1)(A). Likewise, the challenged statements in the

MEMORANDUM DECISION AND ORDER - 30

November 20, 2024 Prospectus Supplement were forward-looking statements about the Project's estimated future capital costs and financing. (Dkt. 31 at ¶ 151).

### 2. Cautionary Language

The Court next considers whether the challenged statements were identified as forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" as required to fall within the first prong of the safe harbor provision. 15 U.S.C. § 78u-5(c)(1)(A)(i). Having carefully reviewed the parties' submissions, the Court finds that the challenged statements qualify for the safe harbor.

First, the challenged statements were identified as forward-looking in the Special Call, the Annual General Meeting, Quarterly Reports, and SEC filings. (Dkt. 34, Ex. 5 (Transcript of Special Call); Ex. 10 (Presentation at Special Call); Ex. 11 (Presentation at Annual Meeting); Ex. 12. (Transcript of Annual Meeting); Ex. 7, 13, 14, 15 (SEC filings)). The SEC filings cautioned investors that "[a]ll statements, other than statements of historical or present facts, contained [herein and in the accompanying/incorporated materials] regarding our strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects, plans and objectives of management are forward-looking statements." (Dkt. 34, Ex. 7, 13, 14, 15). The presentations during the Special Call and Annual Meeting advised that information and statements that are not historical facts are forward-looking and included statements and information concerning: the business of Perpetua; the Project; statements and assumptions in the 2020 FS; possible events, conditions, or financial performance based on assumptions about future economic

MEMORANDUM DECISION AND ORDER - 31

conditions and courses of action; securing financing; permitting; actions taken by the USFS and other agencies and regulatory bodies; ability to successfully implement and fund the Project; estimates used in budgeting and financial statements; and risks related to increased or unexpected costs and additional capital. (Dkt. 34 at Ex. 10, 11).

Second, the challenged statements were accompanied by meaningful cautionary language. (Dkt. 34, Ex. 10-15). The SEC filings cautioned investors that there were unknown risks and uncertainties that could cause actual results or outcomes to differ materially from forward-looking statements and information about: planned expenditures and budgets; access to capital and suitable financing sources; permitting timelines and requirements; applying for and securing financing from EXIM or other sources; regulatory and legal changes, requirements for additional capital; possible events, conditions, or financial performance based on assumptions about future economic conditions and courses of action; and assumptions about operating costs. (Dkt. 34, Ex. 13, 14, 15). In particular as to the challenged statements relying on the 2020 FS estimates, the Prospectus Supplemental Form S-3, dated November 20, 2024, advised investors that Perpetua "expected the actual cost estimates to be higher than the 2020 estimate" of $1.263 million dollars, based on "significant inflation and increased financing costs since 2020." (Dkt. 34, Ex. 15 at S-4). This was consistent with Defendants' statements recognizing that the 2020 FS estimates were "2020 number[s]," that actual cost estimates were expected to be higher than the 2020 estimate due to significant inflation and increased financing costs, and that the "cost estimates may change materially." (Dkt. 31 at ¶¶ 136, 151). The cautionary language further advised investors that the letter of

MEMORANDUM DECISION AND ORDER - 32

interest from US EXIM was "non-binding and conditional, and does not represent a financing commitment." (Dkt. 34, Ex. 10).

The Court finds the cautionary language accompanying the challenged statements meaningfully warned investors of the risks and uncertainties of the Project. As discussed above relevant to falsity, the facts alleged in the Amended Complaint do not show that Defendants knew the increased costs of the Project at the time of the statements because they did not yet know which plan the USFS would approve. The cautionary note reflected as much, stating: "Investors should be aware that the publication of the SDEIS and the permitting schedule, and the identification by the USFS of the Modified Mine Plan as the Preferred Alternative in the SDEIS, does not indicate any commitments on the part of the USFS with regard to the content or timing of the final decision…the USFS may select various actions based on the Modified Mine Plan or each of the alternative analyzed in the SDEIS." (Dkt. 34, Ex. 10, 11).

Further, the allegations do not show that Defendants mislead or failed to meaningfully caution investors by not disclosing that they were already aware of significant Project modifications that would "definitively increase costs" and that increased costs were a "certainty." (Dkt. 36 at 17). While cost increases may have been anticipated or expected at the time of the challenged statements, the increased costs of the Project became known and a certainty when the USFS approved the final plan and the 2025 Financial Update was completed. Unlike the cases Plaintiffs cite, the Defendants here did not misrepresent then-existing circumstances or facts that had already come to fruition. (Dkt. 36 at 17-18). Rather, the increased costs of the Project were not certain

MEMORANDUM DECISION AND ORDER - 33

until the final plan for the Project was approved by the USFS. Defendants therefore did not misrepresent or mislead investors by not attributing possible cost increases to the proposed modifications, because it was unknown at the time of the challenged statements whether and which plan would be approved. For these reasons, the Court finds the challenged statements were accompanied by meaningfully cautionary language.

### 3. Leave to Amend

Under Rule 15, Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. Proc. 15(a)(2). Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). Courts have discretion to deny leave to amend based on "'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment.'" *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The Court will grant Plaintiffs leave to amend as doing so will not cause undue delay, and there is no evidence of bad faith, dilatory motive, or undue prejudice to Defendants. Mainly, leave to amend will be granted because the Court does not know whether and, thus, cannot conclude at this time that there are no facts that may exist which Plaintiffs could allege that could cure the pleading deficiencies found herein. For

MEMORANDUM DECISION AND ORDER - 34

these reasons, the Court will allow Plaintiffs to file a second amended complaint as stated below.

## ORDER

NOW, THEREFORE IT IS HEREBY ORDERED as follows:

1)      Defendants' Motion to Take Judicial Notice (Dkt. 35) is **GRANTED IN PART AND DENIED IN PART**.

2)      Defendants' Motion to Dismiss (Dkt. 34) is **GRANTED** and Counts One and Two of the Amended Complaint are dismissed without prejudice and with leave to amend.

3)      Plaintiffs may file a Second Amended Complaint on or before **July 3, 2026**.[10]

DATED: June 3, 2026

Honorable Debora K. Grasham
United States Magistrate Judge

---

[10] Plaintiffs may request an extension of this deadline if needed.