Jaren Wieland, ISB 8265
MOONEY WIELAND WARREN
512 W. Idaho Street, Suite 103
Boise, Idaho 83702
Tel.: (208) 401-9219
Jaren.wieland.service@mooenywieland.com

*Liaison Counsel for Plaintiff Carl Douglas Neale*

[*Additional counsel on signature page*]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

FRANCISCO BARNES, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

PERPETUA RESOURCES CORP., JONATHAN CHERRY, and JESSICA LARGENT,

Defendants.

Case No. 1:25-cv-00160-DKG

**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**CLASS ACTION**

Demand for Jury Trial

Co-Lead Plaintiffs Carl Douglas Neale and David Wallentine (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned attorneys, bring this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and United States Securities and Exchange Commission ("SEC") Rule 10b-5, promulgated thereunder, against Defendant Perpetua Resources Corp. ("Perpetua" or the "Company") and its key executive officers, Defendants Jonathan Cherry ("Cherry") and Jessica Largent ("Largent", collectively, the "Individual Defendants", and together with Perpetua, "Defendants"), on behalf of all persons and entities, other than Defendants, who purchased or otherwise acquired Perpetua securities between April 17, 2024 and February 13, 2025, inclusive (the "Class Period"), and were damaged thereby (the "Class").

Plaintiffs allege in this Second Amended Complaint for Violations of the Federal Securities Laws the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, among other things, review and analysis of: (a) public filings made by Perpetua with the SEC; (b) Perpetua's public documents, transcripts of the Company's investor conference calls, press releases, presentations, and stock chart; (c) securities analysts' reports and advisories concerning the Company; (d) industry reports and relevant guidance; and (e) other information readily obtainable on the internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the evidence supporting the allegations contained herein is known only to the defendants or is exclusively within their control.

# I. INTRODUCTION

## A. Overview of the Fraud

1. Perpetua and its top executives grossly downplayed the amount of money it would cost to launch their Stibnite Gold Project. Instead of giving investors accurate information about their current budget and plans for construction, they told the public that stale figures from a "2020 Feasibility Study" were still valid and could be relied upon for revenue and expense projections. In truth, the figures from the 2020 Feasibility Study were pertinently obsolete to current designs and had little-to-no bearing on reality. Defendants might not have known the exact amount of money the Stibnite Gold Project was going to cost to construct or operate, but they certainly knew that the 2020 Feasibility Study estimate was materially inaccurate and should not have been relied upon when discussing their plans with investors.

2. By the start of the Class Period in April 2024, Defendants knew their *current* plans for the Project included costly, expansive design modifications added *after* the 2020 Feasibility Study. These design modifications were not amorphous possibilities but instead *already* accepted and adopted by the United States Forest Service ("USFS") in 2022. Consequently, by 2024, it was certain that the estimated capital costs for construction and operation of the Stibnite Gold Project would not only be higher because of inflation and increased financing costs but would also be materially greater because of the affirmative design changes.

3. Notwithstanding the current state of the Project, Defendants relied on the outdated figures contained within the 2020 Feasibility Study when discussing cost and revenue estimates with investors. For example, Defendants misled investors about the Project's financials when stating that the "***project is so great from an economics perspective*** [ ] ***even if you assume a 10% change in CapEx or a 20% change***" for inflation and increased financing costs since 2020. Based

on the Project plans at the time of this statement, a 10%-20% increase in costs still fell woefully short of the total capital expenditures necessary to complete the Project. Indeed, in February 2025, Perpetua released its updated feasibility level financials for the Stibnite Gold Project disclosing that estimated capital expenditures had ballooned by $1 billion from $1.2 billion (as stated in the 2020 Feasibility Study) to $2.2 billion (as stated in the 2024 Financial Update).

**B. Procedural History of this Action**

4. On June 16, 2025, the Court appointed Carl Douglas Neale and David Wallentine as Co-Lead Plaintiffs and Levi & Korsinsky, LLP and Pomerantz LLP as Co-Lead Counsel (ECF No. 24). On August 15, 2025, Plaintiffs filed an Amended Complaint for Violations of the Federal Securities Laws ("Amended Complaint") (ECF No. 31). On September 30, 2025, Defendants filed a Motion to Dismiss the Amended Complaint (ECF No. 34), which Plaintiffs opposed (ECF No. 36). On June 3, 2026, the Court issued an Order granting the motion to dismiss without prejudice and with leave to amend (the "Order") (ECF No. 40).

5. In the Order, the Court addressed whether the Amended Complaint adequately alleged the falsity of the challenged misrepresentations and omissions and a strong inference that Defendants acted with the required state of mind (*i.e.*, scienter). While the Court determined that the Amended Complaint's factual allegations "demonstrate that Defendants knew proposed changes to the Project had been submitted to the USFS and that the 2021 ModPRO2 was the USFS's preferred alternative" and found it "reasonable to infer that Defendants understood it was likely the USFS would approve the 2021 ModPRO2 plan for the Project after the SDEIS was issued" on October 28, 2022, and "reasonable to infer that Defendants anticipated that the Project costs were likely to increase from the 2020 FS estimates due to the amount of time that had passed and the proposed modifications to the plan, which would in turn likely impact the Project's

valuation and financing," it concluded that, as alleged, there was no indication that Defendants knew at the time of the challenged statements: (1) "which of the proposed Project plans, or which portions of the proposed plans, the USFS would approve, if any" and therefore, "the allegations do not show that that the increased costs were a certainty or had already been brought to fruition;" and (2) "that the Project's costs and financial valuation would be materially different" from the 2020 FS estimates based on "then-existing Project estimates and figures." *See id.* at 19-28.

6. Plaintiffs respectfully submit that the additional information contained herein addresses the pleading deficiencies identified in the Court's Order. *First*, as described in detail below, Defendants knew the only action plans subject to approval by the USFS in 2024 included the expansive design modifications outlined in the 2021 ModPRO2.

7. Specifically, the October 2022 SDEIS analyzed just *two* action alternatives for the Project: (1) the 2021 ModPRO2 Alternative developed by Perpetua; and (2) the Johnson Creek Route Alternative developed by USFS and cooperating agencies. The SDEIS explicitly stated that, based on further analysis, all other action plans previously analyzed under the August 2020 DEIS "were eliminated from further consideration."

8. Importantly, unlike previous agency-proposed action alternatives analyzed in the DEIS which incorporated several independent component options to the underlying proposed plan of action submitted by Perpetua, the SDEIS indicated that the mining portion of the Johnson Creek Route Alternative would be the same as the 2021 ModPRO2 Alternative. Accordingly, the 2021 ModPRO2 mine plan and all included environmental protection measures and design features were applicable to both action alternatives. Such common mining components, like TSF construction and operation, electrical transmission lines, mining and backfilling methods, and pit dewatering,

surface water management, and water treatment, were the primary components modified in the 2021 ModPRO2 which resulted in the materially higher initial capital costs to develop the Project.

9. Furthermore, had the Johnson Creek Route Alternative been selected as the approved action plan for the Stibnite Gold Project, it only would have cost the Company more in capital expenditure and added an additional two years to the Project's construction timeline. Indeed, the difference between the two remaining action alternatives was the route to be used for mine access during operations and reclamation of the Stibnite Gold Project. In 2019, Perpetua estimated the net additional construction cost of the access route advanced under the Johnson Creek Route Alternative would total $62.5 million.

10. These additional and more particularized allegations indicate Defendants' knowledge at the time of the challenged statements that the only existing action plans for the Project included the expansive plan modifications outlined in the 2021 ModPRO2, and therefore, show that that the increased costs for the Project plan were a certainty.

11. Moreover, following Perpetua's receipt of $59.2 million pursuant to a Technology Investment Agreement with the Department of Defense (executed on December 16, 2022 and modified on May 2, 2024) to advance construction readiness in parallel with the ongoing permitting process, Defendants engaged in qualifying activities that supported the development of the Project plan outlined in the 2021 ModPRO2 Alternative, including more detailed engineering design work for Perpetua's proposed access route and powerlines. These additional particularized allegations make clear that, at the time of the challenged statements, Defendants knew or at least expected that the approved plan of action for the Project would be the 2021 ModPRO2 Alternative, as they were actively taking steps to advance the construction readiness of this Project plan *before* the agency's final decision.

12. *Second*, as described in detail below, Defendants knew the then-existing Project's initial capital cost estimates and cash flow model (or NPV) would be materially different from the 2020 Feasibility Study figures based on the technical and economic feasibility analysis completed prior to Perpetua's submission of the 2021 ModPRO2, supporting each plan modification made.

13. As alleged in the Amended Complaint, the Project plan modifications outlined in the Company's 2021 ModPRO2 action alternative were based on refinements and updates to key technical studies and environmental models conducted after the release of the DEIS.

14. As explained in further detail below, such technical studies and environmental models are developed as predictive tools for use in environmental evaluation and feasibility level engineering studies. The modeling process involves, among other things, development of predictive technical and economic feasibility models for the proposed action and alternatives to the proposed action to facilitate environmental analysis, evaluate alternate design scenarios, and design trade-offs, such as the economic costs for the project developer (like Perpetua).

15. Such environmental modeling was identified in Perpetua's 2020 Feasibility Study as a key tool utilized by the Company for advanced engineering and identification of Project modifications and appropriate mitigation measures to reduce cost and environmental impact.

16. These additional factual allegations provide more particularized allegations that Defendants knew the potential costs associated with each plan modification advanced under the 2021 ModPRO2 and that they had affirmatively changed the plans after weighing the design trade-offs between added costs and the minimized environmental impact as required for federal approval.

17. Moreover, as of December 31, 2023, as part of its construction readiness activities, Perpetua reported the completion of the project execution planning and scheduling for the Stibnite Gold Project. Critically, project execution planning and scheduling is the formation of the plan

that the project team will execute, including the planning, coordination, and timing of necessary tasks and activities, according to the developed design and scope of the project, to ensure it is completed on time, according to standards, and within budget. This process includes the creation of the construction schedule which defines, in writing, what activities and tasks need to happen, when or how long those activities should take, as well as the sequence or workflow, and who is required to complete those activities, including the equipment and materials they will need to do so. As such, a precursor to establishing a construction schedule is procurement planning – *i.e.*, finalizing the list of materials and equipment needed for project execution and identifying long lead items through obtained preliminary bids or budgetary quotes from key manufacturers and/or strategic vendors to ensure timelines and costs are met.

18. These additional factual allegations provide more particularized allegations that, at the time of the challenged statements, Defendants knew or recklessly disregarded that the initial capital cost estimates and cash flow model for the then-existing Project plan would be materially different from the 2020 Feasibility Study figures based on then-existing models and prior analysis.

19. In sum, taken together, these additional factual allegations show that, in 2024, Defendants knew the 2020 Feasibility Study initial capital cost estimates and corresponding cash flow model (or NPV) were calculated based on a cheaper, eliminated action plan alternative and that for the Project to proceed to development, the plan would certainly include the expansive design modifications resulting in material added costs, with such costly changes weighed and deemed necessary by Perpetua in October 2021, and adopted by the USFS in October 2022. Indeed, in the year leading up to the start of the Class Period, Defendants were already taking active steps to advance construction readiness activities for the Project plan outlined in the 2021 ModPRO2.

20. The present allegations show that the challenged statements were inconsistent with undisclosed internal information known, or at minimum, recklessly disregarded by Defendants at the time and/or omitted material facts that would have been viewed by the reasonable investor as having significantly altered the total mix of information made available by Defendants.

21. Accordingly, the additional allegations contained in the Second Amended Complaint, together with the previously alleged facts, unequivocally and overwhelmingly demonstrate, with the requisite particularity, Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5, promulgated thereunder.

## II. JURISDICTION AND VENUE

22. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

24. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Defendant Perpetua is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiffs and the Class, took place within this District.

25. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. THE PARTIES

26. Plaintiff Carl Douglas Neale purchased Perpetua common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Mr. Neale's certification evidencing his transaction(s) in Perpetua is incorporated herein by reference. *See* ECF No. 15-2.

27. Plaintiff David Wallentine purchased Perpetua common stock and options at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Mr. Wallentine's certification evidencing his transaction(s) in Perpetua is incorporated herein by reference. *See* ECF No. 31-1.

28. Defendant Perpetua Resources Corp. is a British Columbia corporation with its principal executive offices located at 405 S. 8th Street, Suite 201, Boise, Idaho 83702. During the Class Period, the Company's securities traded on the National Association of Securities Dealers Automated Quotations (the "NASDAQ") under the symbol "PPTA."

29. Defendant Jonathan Cherry has served as Perpetua's President and Chief Executive Officer ("CEO") and as a Director of Perpetua since March 14, 2024, and at all relevant times thereafter. Mr. Cherry joined Perpetua with over 33 years of mining industry experience including permitting, capital raising, project development, joint venture formation and operations.

30. Defendant Jessica Largent has served as Perpetua's Chief Financial Officer since April 1, 2022 and as a Director of Perpetua since March 14, 2024, and at all relevant times thereafter. Mr. Largent served as the Company's Vice President, Investor Relations and Finance from February 2021 to March 31, 2022, and in such role was responsible for the strategy and leadership of the Company's investor relations and finance efforts.

31. Defendants Cherry and Largent are sometimes collectively referred to herein as the "Individual Defendants," and together with Perpetua are referred to herein as the "Defendants."

32. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Perpetua's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

33. Perpetua is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

34. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Perpetua under *respondeat superior* and agency principles.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Perpetua and its Exclusive Development Project, the Stibnite Gold Project

35. Perpetua describes itself as a development-stage company engaged in acquiring mining properties with the intention of exploring, evaluating, and placing them into production.

36. Since its inception in February 2011, the Company's sole focus has been on the exploration, and, if warranted and subject to receipt of required permitting, redevelopment, restoration and operation of abandoned underground and open pit mining, mineral properties, and heap leaching operations located principally in the Stibnite Mining District, referred to as the Stibnite Gold Project ("Stibnite Gold Project," "SGP," or the "Project").

37. The Stibnite Gold Project consists of mining the Yellow Pine, Hangar Flats and West End deposits in Stibnite using open pit mining and ore processing methods to extract gold, silver and antimony, and on-site production of gold and silver doré and an antimony concentrate. According to the Company, the Project also entails an extensive reclamation and restoration program for historical impacts on site including the recovery and reprocessing of historical tailings (leftover materials from mining processes, consisting of crushed rock and water), restoration of fish passage during and after operations, relocation of historical mining wastes to engineered tailings storage facilities, stream restoration, and reforestation of impacted areas.

38. If successful, the Stibnite Gold Project would become one of the largest and highest-grade open pit gold mines in the U.S. and the country's only primary producer of antimony. Indeed, the Stibnite Gold Project boasts a Measured and Indicated (M&I) gold resource of 6.0 million ounces with an additional 1.2 million ounces of inferred resources, as well as 8.8 million ounces of M&I silver, and contains 148 million pounds of antimony reserves and 206 million pounds of M&I antimony, which is currently the largest known antimony resource in the U.S. Notably, antimony is categorized as a critical mineral for its ability to strengthen alloys and reduce corrosion for military applications such as munitions, affording Perpetua the potential opportunity for reduced operating costs through a by-product credit.

**B. Relevant National Regulatory Permitting Process**

39. Mining operations and exploration activities in the United States are subject to extensive national, state, and local laws and regulations, which govern, *inter alia*, prospecting, development, mining, production, exports, occupational health, waste disposal, protection of the environment, mine safety, hazardous substances, and disclosure requirements.

40. Significantly, in accordance with the National Environmental Policy Act ("NEPA"), prior to authorizing the use or occupation of National Forest System ("NFS") lands for mine development and operation, and in turn, financial gain from mineral sales, the USFS must conduct a formal review of any proposed plan of operations to ensure such actions are conducted so as to minimize adverse environmental impacts on NFS surface resources.

41. The NEPA process begins with a proposal to take major federal action providing, *inter alia*, information sufficient to describe the type of operations proposed and how they would be conducted; a map or sketch showing sufficient information to locate the proposed area of operation on the ground; the type and standard of existing and/or proposed roads or access routes to be used in connection with the operation; the approximate location and size of areas where surface resources will be disturbed; the period during which the proposed activity will take place; and measures to be taken to meet the requirements for environmental protection.

42. Upon receipt of a proposed plan of action, USFS publishes a Notice of Intent ("NOI") in the Federal Register, initiating the public scoping process. This NOI informs the public of the upcoming environmental analysis of the proposed action and describes how the public can become involved in the preparation of the Environmental Impact Statement ("EIS").

43. Pursuant to NEPA, the lead agency (like USFS) must prepare an EIS for each proposed major Federal action significantly affecting the quality of the human environment before making a decision on whether to proceed with the proposed action. 43 CFR § 46.400.

44. The Council of Environmental Quality's ("CEQ") NEPA regulations provide that the NEPA process should be used to identify at an early stage the significant environmental issues deserving of detailed study in an EIS. 40 CFR § 1501.1(d). The identified significant issues are then used to inform federal agency decisions and public notice and comment by both guiding the development of action alternatives to the proposal, and by serving as the focus of the detailed comparative analysis of environmental impacts among the proposal, action alternatives, and the no action alternative in the EIS (36 CFR § 220.5(e); 40 CFR § 1501.7(a)).

45. Specifically, NEPA requires that federal agencies rigorously explore and objectively evaluate a reasonable range of alternatives that can both accomplish the purpose of and need for the proposed action and address one or more significant issues related to the proposed action, identified during the scoping process. 43 CFR § 46.420(b)-(c).

46. NEPA also requires that the EIS include the no action alternative. 40 CFR § 1502.14. "No action" typically means the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward.

47. An action "alternative" is a complete package of operations, activities, and facilities that comprise a functioning mine project. A complete mining plan has several "component" parts, each necessary to allow production. In many instances, operational components may be further comprised of "subcomponents."

48. Informed by the NEPA scoping process, the lead agency screens potential alternatives and component/subcomponent options based using four basic screening criteria: (1) does the alternative, including a combination of component options, meet the purpose and need of the project; (2) could the alternative or component option potentially reduce environmental effects to at least one resource; (3) is the alternative or component option technically feasible; and (4) is the alternative or component option economically feasible?

49. The lead agency may also collaborate with those persons or organization that may be interested or affected to modify a proposed action and alternative(s) under consideration prior to issuing a draft EIS. In such cases the lead agency may consider these modifications as alternatives considered. Since an alternative may be developed to address more than one significant issue, no specific number of alternatives is required or prescribed. 43 CFR § 46.415(b).

50. This iterative process leads to the agency's selection of a reasonable range of action alternatives in addition to the proposed plan of operations. The selected action alternatives, along with the no action alternative, are fully described and analyzed in the EIS. Any alternatives that were considered but eliminated from further study are also identified and addressed in the EIS.

51. An EIS is necessary to: (1) respond to the proposed action of operations; (2) ensure that the selected alternative, where feasible, would minimize adverse environmental impacts on NFS resources; (3) ensure that, prior to approval, measures are included that provide for mitigation of environmental impacts and reclamation of the NFS surface disturbance; and (4) ensure that the selected alternative would comply with other applicable federal and state laws and regulations.

52. A draft EIS is published for public review and comment for a minimum of 45 days, and upon close of the comment period, the agency must consider all substantive comments and, if necessary, conduct further analysis. A final EIS is then published, providing responses to all

substantive comments received. Publication of the final EIS begins the minimum 30-day "wait period," in which agencies are generally required to wait 30 days before making a final decision on a proposed action, allowing time for any administrative objections from cooperating agencies.

53. A supplemental to a draft or final EIS is required when an agency determines that: (1) changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or (2) new information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS. If deemed necessary, an agency prepares, publishes and files the supplemental EIS in the same fashion as a draft or final EIS, except that scoping is not required.

54. A "Preferred Alternative" is the action alternative that the leading agency determines "would best accomplish the purpose and need of the proposed action while fulfilling its statutory mission and responsibilities, giving consideration to economic, environmental, technical, and other factors." 43 CFR § 46.420(d).

55. Pursuant to 43 CFR § 46.425, a draft EIS *should* identify a preferred alternative, if one exists, while a final EIS *must* identify a preferred alternative, unless some law prohibits the expression of a preference.

56. The NEPA process ends with the agency's issuance of the final Record of Decision ("ROD") which explains the decision on the proposed action, describes the alternatives considered, and discusses the agency's plans for mitigation and monitoring, if necessary. The final ROD is a crucial step in the NEPA process, signifying completion of an EIS and the beginning of project implementation, in accordance with the authorized plan of action.

### C. The Protracted and Controversial Start to the Project's NEPA Process

57. From the start, Perpetua's critical permitting process under NEPA for the Stibnite Gold Project was marked by controversy and met with public dismay, requiring expansive design modifications to the proposed plan of operations to mitigate probable environmental impact and support regulatory approval, leading to significant cost increases and delayed Project development.

58. Located in the Salmon River Mountains of Valley County, Idaho, approximately 10 miles east of Yello Pine and 38 miles east of McCall, the Stibnite Mining District is situated on NFS lands in the Payette and Boise National Forests, home to one of Idaho's most biologically diverse watersheds, abundant recreational opportunities, as well as deep cultural ties and treaty-reserved resources for the Nez Perce and Indigenous communities of the region. It is also one of the most historic mining districts in the country. Mining at Stibnite began in the 1890s and continued sporadically for the next century, with various owners, resulting in significant environmental damage, including multiple deposits on site and contaminated waste.

59. After several years of collecting technical and environmental baseline data on the Stibnite Gold District and purportedly understanding the legacy impacts from past mining activity, engaging with stakeholders, and developing an environmentally, socially and economically feasible path forward, Perpetua completed a preliminary feasibility study for the Stibnite Gold Project in 2014, led by Independent Qualified Persons at M3 Engineering & Technology Corp. ("M3"), which served as support for the Company's proposed plan of action for the Project.

60. Indeed, in September 2016, Perpetua initiated the NEPA permitting process when it submitted to the USFS a proposed plan of action for the Stibnite Gold Project outlined in the Company's Plan of Restoration and Operations (the "PRO").

61. The PRO provided a detailed description of each aspect of Perpetua's proposed plan of operations to conduct mining operations that produce gold, silver doré, and antimony concentrates. The proposed plan enumerated steps from construction through operation, which included open pits, ore transportation equipment, ore processing facilities, development rock storage facilities, a tailing storage facility, a water treatment facility, road construction, electrical transmission lines, and various other facilities needed to support mining activities. The proposed plan of operations also incorporated closure and reclamation activities, and mitigation efforts that may avoid, minimize, or compensate for adverse environmental effects caused by the SGP, and incorporated actions designed to mitigate legacy contamination at locations within the mine site.

62. On March 28, 2017, Perpetua announced that USFS had begun its analysis of the PRO and anticipated issuing an EIS in 2018 and a final ROD in the first quarter of 2019.

63. In June 2017, the USFS published a NOI to prepare an EIS to evaluate and disclose the potential environmental effects from approval of the PRO, initiating the 30-day public scoping period. Reaction to the Project design outlined in the PRO, however, was highly contentious, eliciting strong objections from environmental conservation groups and the local Indigenous communities, and hundreds of requests for additional information from the USFS.

64. Shortly thereafter, in September 2017, Perpetua informed the public that through the ongoing NEPA process, it had become "apparent" that "drafting multiple resource specific technical reports, reviewing and compiling the baseline information provided by [Perpetua] and its contractors, and providing additional information requested by the regulators will require more time than originally anticipated." As such, USFS was then advising that a draft EIS for public comment was expected in the third quarter of 2018 and a final ROD in the third quarter of 2019.

65. In January 2018, USFS issued a Scoping and Issues Summary Report for the PRO, identifying numerous issues raised during the public scoping process and developed a range of alternatives and design features that could be determined reasonable and necessary to meet USFS regulations for locatable minerals while meeting the Project purpose and need.

66. Then, in July 2018, Perpetua announced that USFS "now anticipates issuing a draft [EIS] for public comment in February 2019, with a Final EIS and Draft [ROD] by October 2019," and "Final ROD in March 2020." According to Perpetua, the schedule change "accommodate[d] the review and analysis of a considerable amount of additional information requested by the [USFS]." Perpetua reported that, to date, it had received 97 requests for additional information.

67. On October 1, 2018, Perpetua announced yet another delay in the permitting schedule with a draft EIS then expected in May 2019 and a final EIS and draft ROD in February 2020, allowing for a final ROD in May 2020. Again, it claimed the change was to accommodate for the review and analysis of additional information with 107 requests received to date.

68. Subsequently, on October 10, 2018, Perpetua announced that the Nez Perce Tribal Executive Committee had adopted a resolution formally opposing the Stibnite Gold Project. The Nez Perce Tribe is one of three tribes in the region consulted by USFS under the NEPA process. In the press release, the Company noted that the resolution was driven by "potential impacts on natural resources resulting from the redevelopment of the former Stibnite mining district and questions the benefits of the proposed restoration work that is an integral part of our Plan of Restoration and Operations," including "improving water quality and fish habitat" on site.

69. Following the Nez Perce Tribe's opposition, in January 2019, the Company announced yet another delay to the anticipated permitting schedule with a draft EIS then expected

in the third quarter of 2019, a final EIS and draft ROD in the second quarter of 2020, and final ROD in the third quarter of 2020. The January 2019 press release provided, in pertinent part, that:

> Regulators want to ensure they meet the regulatory requirements to support a robust and defensible Record of Decision. They are requesting additional data, evaluating the thoroughness of the environmental impact analysis, while ensuring alternative development scenarios are carefully considered. [Perpetua] has received 115 requests for additional information ('RFAI') and provided the requested information to all 115 RFAIs issued to date. The updated schedule reflects a number of adjustments to both the baseline analysis, water modelling and alternatives development processes in order to accommodate thorough and comprehensive evaluations of the information provided in response to RFAIs, as well as conduct additional analysis and evaluation of alternatives.

70. Continued evolution of the Project plan following a controversial start to the NEPA permitting process and more detailed environmental modeling and analysis resulted in the Company's amended preliminary feasibility study and technical report for the Stibnite Gold Project, led by M3, dated March 28, 2019.

71. Then, in May 2019, after purportedly considering agency and public scoping comments and agency evaluation criteria for the EIS, Perpetua submitted a Modified Plan of Restoration and Operations for the Project (the "ModPRO"), based on the more detailed feasibility analyses completed for the amended preliminary feasibility study, and the reevaluation of several planned components to further avoid and minimize environmental impacts.

72. Subsequently, the Company announced yet another delay in the permitting schedule with the anticipated release of a draft EIS in January 2020, a final EIS and draft ROD in the fourth quarter of 2020, and final ROD in the first quarter of 2021.

73. The draft EIS for the Stibnite Gold Project (the "DEIS") was finally released for a public comment period on August 20, 2020—more than two years after originally contemplated.

74. For this DEIS, Perpetua's plan of operations outlined in the PRO served as the basis for determining purpose and need of the proposed action. Accordingly, to develop a range of

reasonable alternatives as required under NEPA, Perpetua's proposed plan of operations outlined in the PRO, as supplemented by additional information and clarifications, was separated into components and subcomponents.

75. An iterative review by the USFS and cooperating agencies, evaluated public comments received during scoping to determine whether potential component and subcomponent options and alternatives to the proposed Stibnite Gold Project were reasonable alternatives or component options using the four basic screening criteria detailed above.

76. In addition to alternatives and component options suggested during scoping, the USFS, cooperating agencies, and Perpetua also completed an alternatives development and review process. This process incorporated a review of Perpetua's proposed plan of operations outlined in the PRO and included consideration of alternatives Perpetua evaluated prior to submission.

77. Informed by the NEPA process and supplemental information provided by Perpetua, the USFS and the cooperating agencies selected the following three action alternatives, in addition to the proposed action plan outlined in the PRO, for detailed analysis in the DEIS.

78. **Alternative 1** represented the proposed action submitted by Perpetua in the PRO.

79. **Alternative 2** represented the modified version outlined in the ModPRO, designed to provide additional avoidance and mitigation measures to address potential impact issues.

80. Importantly, the DEIS observed that Alternative 2 was, in practical effect, the proposed action for which Perpetua was then seeking federal approval, but because Perpetua had not submitted a revised plan of operations with all the components of Alternative 1, the description of Alternative 2 in the DEIS remained a derivative of Alternative 1 as detailed in the original plan of operations.

81. **Alternative 3** was developed to evaluate the extent to which an alternative location for the tailings storage facility ("TSF") and a development rock storage facility ("DRSF") would avoid or reduce potential adverse impacts, primarily to waters of the United States ("WOTUS") and federally listed fish species. Under Alternative 3, surface water management, access roads, and mine site facilities would be changed to accommodate relocation of the TSF and DRSF.

82. **Alternative 4** incorporated several independent component options developed by the USFS and cooperating agencies to evaluate the potential to reduce adverse effects concerning many of the significant issues identified during scoping. While the primary focus of Alternative 4 was consideration of using an existing route for mine access (the Yellow Pine Route) via Johnson Creek Road and Stibnite Road instead of the Burntlog Route identified under Alternative 1, other modifications to mine site facilities and off-site facilities were also proposed in Alternative 4.

83. The DEIS explained that some components of each action alternative are independent of each other, such as the location of off-site buildings, and can be included or replaced in any of the action alternatives. Other components, such as the number, size, or location of development rock storage facilities (DRSFs) or the location of the tailings storage facility (TSF), are interrelated. Relocation, modification, or elimination of an interrelated component could require changes to accommodate other necessary components to complete a given alternative.

84. The DEIS provided that the component options that comprise the action alternatives evaluated by the USFS and the cooperating agencies were focused on addressing one or more of the significant issues identified during the NEPA process. Specifically, the USFS, in coordination with the cooperating agencies, and informed by the NEPA scoping process, tribal consultation, and public comment, identified the following eight significant issues:

1. Surface Water and Groundwater – Construction and operation of mine infrastructure may impact water quality and quantity.

> 2. Sensitive Plant Species – Construction and operation of mine infrastructure may impact habitat for sensitive plant species.
>
> 3. Wetlands and Riparian Areas – Construction and operation of mine infrastructure may affect quantity of wetlands (e.g., acres), impact ecological function, and fragment wetland habitat.
>
> 4. Federally-listed fish species – Construction and operation of mine infrastructure may impact habitat for steelhead, salmon, and bull trout.
>
> 5. Traffic – Construction, operation, and reclamation may affect traffic volumes, types of vehicles, and patterns of use.
>
> 6. Public and Tribal Access – Construction and operation of mine infrastructure may impact public access to NFS lands, travel routes, and access to reserved Tribal rights.
>
> 7. Visual Quality – Construction and operation of mine infrastructure may impact scenic integrity and quality and may result in change of the Forest Plan(s) Visual Quality Objectives.
>
> 8. Idaho Inventoried Roadless Areas (IRAs) – Construction and operation of mine infrastructure in IRAs may affect biophysical and social values of IRAs.

85. The DEIS specifically indicated that "[i]f an alternative or component option would not have the potential to provide at least one environmental advantage as compared to the actions described in Alternative 1, it was eliminated from further study." It went on to provide that:

> It should be noted that the emphasis for alternatives development is what is a reasonable alternative rather than whether the proponent or applicant likes or is itself capable of carrying out a particular alternative. Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant (46 FR 18026).

86. Indeed, as part of the USFS's alternative development process, Perpetua was asked to (and did) provide evaluations of these action alternatives to assess their technical and economic feasibility; these efforts included preliminary engineering design and cost estimates.

87. Following the release of the DEIS, Perpetua publicly recognized that the agency-proposed action alternatives (*e.g.*, Alternative 3 and Alternative 4) "centered on fundamental changes to major mine features" and claimed that "analyses for these alternatives demonstrated

that they were technically feasible, but were far more costly, did not provide an environmental benefit, would cause delays in project implementation of at least two years, [and] would create greater risks to human health and safety." It went on to declare that "[d]espite this wealth of information, these agency-proposed [ ] alternatives [we]re included in the DEIS."

88. Notably, the DEIS did *not* identify an agency Preferred Alternative.

89. During the extended 75-day public comment period for the DEIS, roughly 10,000 public comments were submitted to the USFS. While some emphasized the Project's potential economic benefits and contribution to the restoration efforts in the region, many raised significant concerns about water quality, wildlife preservation, and public health, with conservation groups, in particular, arguing each action alternative analyzed in the DEIS inadequate for failing to properly and fully address the potential impacts of the Project.

90. Consequently, it was clear to Perpetua and its management that in order to sufficiently minimize the probable environmental impacts of the Project to the degree necessary to achieve public acceptance and support federal approval, it was going to require further Project modifications and design changes to the then-existing proposed plan of action for the SGP.

91. In December 2020, Perpetua submitted to the USFS a second modified proposed action for the Project referred to as the "Modified Plan of Restoration and Operations 2" or "2020 ModPRO2," representing refinements to the ModPRO, included as Alternative 2 in the DEIS, and replacing the ModPRO in further analysis and assessment by the USFS and cooperating agencies.

92. Around this same time, Perpetua also publicly released the results of an independent feasibility study and technical report, effective date December 22, 2020 and issue date January 27, 2021 (the "2020 Feasibility Study" or "2020 FS"), providing a comprehensive overview of the then-existing Project plan including certain operational improvements and plan modifications

designed to reduce environmental, social and economic impacts identified in the PRO, ModPRO or DEIS, as well as estimated capital and operating costs and an economic analysis.

**D. Perpetua's Release of the 2020 Feasibility Study for the Stibnite Gold Project**

93. At all relevant times, as a public company, Perpetua was subject to certain securities regulations imposing specific disclosure requirements on companies undertaking mineral exploration. These requirements include, *inter alia*, the preparation of preliminary feasibility (or pre-feasibility) studies and feasibility studies by independent experts evaluating the technical and economic viability of a mineral project that has advanced to a stage where a preferred mining method is established, and an effective method of mineral processing is determined.

94. Perpetua first announced the commencement of a feasibility study for the SGP on April 3, 2017, again to be led by M3, and in compliance with National Instrument 43-101, the Canadian Securities Administrators standards for reporting mineral properties.

95. Under National Instrument 43-101, the term "feasibility study" has the same meaning ascribed by the Canadian Institute of Mining, Metallurgy and Petroleum ("CIM") Definition Standards. Under CIM standards, a feasibility study is a comprehensive technical and economic study of the selected development option for a mineral project that includes appropriately detailed assessments of applicable modifying factors—including mining, processing, metallurgical, infrastructure, economic, marketing, legal, environmental, social and governmental factors—together with any other relevant operational factors and detailed financial analysis that are necessary to demonstrate, at the time of reporting, that extraction is reasonably justified (economically mineable). The demonstration of economic viability in a feasibility study requires estimation of after-tax annual cash flows and the project's Net-Present-Value ("NPV") and inclusion of all the parameters that have an economic effect on the project.

96. The confidence level of a feasibility study will be higher than that of a pre-feasibility study and must include sufficient detail such that the results of a feasibility study may reasonably serve as the basis for a final decision by a proponent or financial institution to proceed with, or finance, the development of the project.

97. When first announced in April 2017, Perpetua's target completion date for the Stibnite Gold Project's feasibility study was to "parallel[] the advancement of the regulatory process for mine development."

98. Indeed, prior to the Company's release of the SGP feasibility study, when announcing the latest update on the anticipated USFS permitting schedule for the Project, Perpetua would note, in pertinent part, that:

> The timing for completion of the feasibility study is tied to the completion of the Draft EIS since the feasibility study needs to reflect the design and layout of the Project as defined in the Draft EIS. While substantially all of the work related to mineral resource estimation, metallurgy, geotechnical, infrastructure (including road access, powerline, tunnel design) and other aspects of the Project needed to support a feasibility study is well advanced, finalization of the design and estimating of capital and operating costs and the actual feasibility study are awaiting decisions driven by the permitting process.

99. While Perpetua did ultimately decide to release the Project's feasibility study following the completion of the DEIS, as detailed above, the overwhelmingly negative response to the action alternatives analyzed in the released DEIS solidified that the design and layout of the Project plan as defined therein would not be the proposed action for which Perpetua was then seeking federal approval of.

100. As such, the analysis and modeling provided in the 2020 FS also incorporated certain operational improvements and Project modifications which the public would later learn had been submitted to the USFS for consideration in the NEPA process as the 2020 ModPRO2.

101. Accordingly, while the proposed plan of operations Perpetua was then effectively seeking approval of was still awaiting even an agency decision as to whether it would be advanced in the NEPA process for the Stibnite Gold Project, Perpetua determined that the design and layout of the Project as outlined in the 2020 ModPRO2 was certain enough for the changes made to be included in the technical and economic viability analysis of the Project provided in the 2020 FS.

102. Specifically, the 2020 Feasibility Study provided a comprehensive overview of the Stibnite Gold Project including information about the then-existing proposed Project plan's geology, mineralization, exploration potential, Mineral Resources, Mineral Reserves, mining method, process method, infrastructure, social and economic benefits, environmental protection, cleanup and repair of historical impacts, permitting, reclamation and closure concepts, estimated capital and operating costs and an economic analysis for the Project, as detailed therein.

103. In pertinent part, the 2020 Feasibility Study included an estimation of capital and operating costs for the then-existing Project plan, which was considered "essential to the evaluation of the economic viability of a prospective project."

104. According to the report, capital expenditures or capital costs ("CAPEX") for the SGP were estimated on the basis of the 2020 FS mine plan, plant design, estimates of materials and labor based on that design, analysis of the process flowsheet and predicted consumption of power and supplies, budgetary quotes for major equipment, labor requirements, and estimates from consultants and potential suppliers to the project.

105. The CAPEX estimate provided in the 2020 Feasibility Study included four components: (1) the initial CAPEX to design, permit, pre-strip, construct, and commission the mine, plant facilities, ancillary facilities, utilities, operations camp, and pre-production on and off site restoration and environmental mitigation; (2) the sustaining CAPEX for facilities expansions,

mining equipment replacements, expected replacements of process equipment and ongoing concurrent restoration and environmental mitigation activities during the operating period; (3) working capital to cover delays in the receipts from sales and payments for accounts payable and financial resources tied up in inventory, and (4) closure CAPEX to cover post operations reclamation and restoration and water treatment costs.

106. The 2020 FS supplied the following table summarizing CAPEX estimates for the then-envisioned Project plan:

**Table 1-8: Capital Cost Summary**

| Area | Detail | Initial CAPEX ($000s) | Sustaining CAPEX ($000s) | Closure CAPEX ($000s)[1] | Total CAPEX ($000s) |
|---|---|---|---|---|---|
| Direct Costs | Mine Costs | 84,019 | 118,968 | - | 202,987 |
| | Processing Plant | 433,464 | 49,041 | - | 482,505 |
| | On-Site Infrastructure | 190,910 | 83,892 | - | 274,802 |
| | Off-Site Infrastructure | 115,940 | - | - | 115,940 |
| Indirect Costs | | 232,684 | - | - | 232,684 |
| Owner's Costs, First Fills, & Light Vehicles | | 38,351 | - | - | 38,351 |
| Offsite Environmental Mitigation Costs | | 14,397 | - | - | 14,397 |
| Onsite Mitigation, Monitoring, and Closure Costs | | 3,474 | 23,484 | 98,052 | 125,010 |
| **Total CAPEX without Contingency** | | **1,113,239** | **275,385** | **98,052** | **1,486,677** |
| Contingency | | 149,708 | 20,354 | 1,244 | 171,306 |
| **Total CAPEX with Contingency** | | **1,262,948** | **295,739** | **99,296** | **1,657,982** |

*Notes:*
*(1) Closure assumes self-performed closure costs, which will differ for those assumed for financial assurance calculations required by regulators.*

107. Additionally, the 2020 FS described the economic analysis conducted. The first year of analysis began with the decision point of the Project, the completion of the EIS, and preliminary permit approval. Four cases were run in the economic model to present a range of economic outcomes using varying metal prices.

108. The following table was provided in the 2020 Feasibility Study showing the results of the then-envisioned Project plan's pre- and after-tax economic analysis:

Table 1-12: Pre- and After-Tax Economic Results by Case

| Parameter | Unit | Pre-tax Results | After-tax Results |
|---|---|---|---|
| **Case A ($1,350/oz Au, $16.00/oz Ag, $3.50/lb Sb)** | | | |
| $NPV_{0\%}$ | M$ | 1,637 | 1,434 |
| $NPV_{5\%}$ | M$ | 896 | 771 |
| Annual Average EBITDA | M$ | 223 | - |
| Annual Average After-Tax Free Cash Flow | M$ | - | 189 |
| IRR | % | 17.3 | 16.2 |
| Payback Period | Production Years | 3.4 | 3.4 |
| **Case B ($1,600/oz Au, $20.00/oz Ag, $3.50/lb Sb)** | | | |
| $NPV_{0\%}$ | M$ | 2,667 | 2,232 |
| $NPV_{5\%}$ | M$ | 1,599 | 1,320 |
| Annual Average EBITDA | M$ | 292 | - |
| Annual Average After-Tax Free Cash Flow | M$ | - | 242 |
| IRR | % | 24.3 | 22.3 |
| Payback Period | Production Years | 2.9 | 2.9 |
| **Case C ($1,850/oz Au, $24.00/oz Ag, $3.50/lb Sb)** | | | |
| $NPV_{0\%}$ | M$ | 3,697 | 3,026 |
| $NPV_{5\%}$ | M$ | 2,301 | 1,864 |
| Annual Average EBITDA | M$ | 360 | - |
| Annual Average After-Tax Free Cash Flow | M$ | - | 295 |
| IRR | % | 30.4 | 27.7 |
| Payback Period | Production Years | 2.4 | 2.5 |
| **Case D ($2,100/oz Au, $28.00/oz Ag, $3.50/lb Sb)** | | | |
| $NPV_{0\%}$ | M$ | 4,726 | 3,815 |
| $NPV_{5\%}$ | M$ | 3,002 | 2,404 |
| Annual Average EBITDA | M$ | 429 | - |
| Annual Average After-Tax Free Cash Flow | M$ | - | 348 |
| IRR | % | 35.9 | 32.4 |
| Payback Period | Production Years | 2.2 | 2.2 |
| **Case E ($2,350/oz Au, $32.00/oz Ag, $3.50/lb Sb)** | | | |
| $NPV_{0\%}$ | M$ | 5,755 | 4,603 |
| $NPV_{5\%}$ | M$ | 3,704 | 2,943 |
| Annual Average EBITDA | M$ | 498 | - |
| Annual Average After-Tax Free Cash Flow | M$ | - | 400 |
| IRR | % | 41.0 | 36.9 |
| Payback Period | Production Years | 1.9 | 1.9 |

109. Accordingly, as currently envisioned in the 2020 Feasibility Study, the Stibnite Gold Project was defined as an economically feasible, technically and environmentally sound Project that achieved redevelopment and restoration goals for the Stibnite Mining District.

110. Then, on July 1, 2021, Perpetua publicly announced the USFS's decision to advance the Company's second modified proposed plan of action, outlined in the 2020 ModPRO2,

in the NEPA process and update the permitting schedule to include the release of a supplement draft EIS in the first quarter of 2022, with a final EIS and draft ROD in the fourth quarter of 2022 and a final ROD in the first half of 2023.

111. The July 2021 press release stated, in pertinent part, that:

> The NEPA process is intended to ensure that federal agencies are informed of a proposed action's potential environmental impacts before making final decisions regarding the action. The rigorous scientific analysis during the preparation of the DEIS and the comments from the public and cooperating agencies provided during the extended 75-day public comment period brought forward concepts that could improve the environmental outcomes of the Project. Perpetua Resources listened to this feedback, evaluated the feasibility and potential benefits of these concepts, and submitted modifications of the proposed plan (Alternative 2 in the DEIS) to the USFS. The proposed improvements, which reduce the Project footprint and are predicted to improve water quality conditions at the site during and after Project operations, have been incorporated in Perpetua Resources' 2020 Feasibility Study. These refinements will now be analyzed further in the SDEIS.

112. As described in greater detail below, however, following the Company's submission of the 2020 ModPRO2, Perpetua further consulted with the USFS and cooperating agencies, evaluated updated data, and conducted additional analyses and technical studies "used to refine ModPRO2," leading to the identification of more ways to reduce potential environmental impacts and improve reclamation and restoration design of the Company's proposed plan of operations, resulting in Perpetua's submission of even more expansive plan refinements and design changes, carrying much higher anticipated capital costs than those accounted for in the 2020 FS.

### E. Significant Project Modifications and Decisive Design Changes Occurring After 2020 Materially Added to the Anticipated Capital Costs

113. On October 15, 2021, unbeknownst to the public, Perpetua submitted an updated version of the 2020 ModPRO2, referred to as the "2021 ModPRO2," or the "2021 MMP," further refining the proposed plan of action by incorporating a suite of additional operational improvements and Project modifications to further reduce potential environmental impacts identified in the DEIS. The 2021 MMP explicitly states that: "[t]his version of the ModPRO2

supersedes that document [*i.e.*, the 2020 ModPRO2] and should be considered as a final update to Perpetua Resources' proposed action, appropriate for analysis in forthcoming [EIS] documents."

114. Notably, while Perpetua publicly declared that the Project refinements advanced in the 2020 ModPRO2 "ha[d] been incorporated in Perpetua Resources' 2020 Feasibility Study," the 2021 ModPRO2 stated that the proposed plan of action outlined therein was merely "*aligned* with the project development approach in the SGP Feasibility Study" (emphasis added).

115. The 2021 ModPRO2 reported to include expansive operational improvements and Project modifications that: (1) further reduce potential environmental impacts; (2) address persistent potential environmental impacts not sufficiently reduced by Project refinements included in the ModPRO; (3) consider public and agency comments on the DEIS; and (4) align with the NEPA, and all applicable federal, state, and local regulations and permit requirements.

116. Data and reports prepared by and for Perpetua supporting the 2021 ModPRO2 project description were referenced as appropriate. Indeed, when discussing the "Updated Data and Analysis between the ModPRO and ModPRO2," the 2021 ModPRO2 provided that:

> To the degree practicable, the analyses conducted, and data collected through April 2020 were incorporated into the environmental impact analysis included in the DEIS. However, some studies and analyses results were not completed in time to be fully considered in the DEIS. It was anticipated that further refinements would be incorporated into the subsequent environmental analysis before a Record of Decision was signed. Refinements and updates to key technical studies completed since the DEIS used to refine ModPRO2 include:
>
> a. Updated geological and mineral resource modeling (M3 2021)
>
> b. Detailed mine planning, analysis of a smaller Hangar Flats pit, and resulting alternative development rock storage facility (DRSF) configurations (M3 2021)
>
> c. Aquifer testing in the Meadow Creek valley and subsequent hydrogeologic modeling changes with revised pit dewatering estimates ([Brown and Caldwell] BC 2020)

d. Augmented geochemical characterization of development rock and ore, and additional metallurgical testing to confirm geochemical characteristics of tailings (SRK Consulting, Inc. [SRK] 2021)

e. Updated site-wide geochemical modeling for life-of-mine and post-closure, including predictive modeling of mine features to evaluate potential surface water and groundwater quality impacts (SRK 2021)

f. Updated site-wide, life-of-mine water balance modeling (Perpetua Resources 2021c, in progress)

g. A detailed water management plan (BC 2021b)

h. Life-of-mine and post-closure water temperature modeling (BC 2021)

i. Updated air quality analysis (Air Sciences, Inc. [Air Sciences] [October] 2021)

j. Updated site-specific seismic hazard analysis (Golder 2021), resulting in minor improvements to TSF/buttress factors-of-safety

k. Updated tailings tonnage and consolidation modeling to match updated ore processing schedules and include more detailed metallurgical calculations accounting for gypsum formation (M3 2021)

117. Such technical studies and environmental models are developed as predictive tools for use in environmental evaluation and feasibility level engineering studies. The modeling process involves, among other things, development of predictive technical and economic feasibility models for the proposed action and alternatives to the proposed action to facilitate environmental analysis, evaluate alternate design scenarios, and design trade-offs, like economic costs for the developer.

118. As indicated by the 2021 ModPRO2, such technical studies and environmental models were utilized by Perpetua to identify Project modifications and design changes deemed capable of addressing persistent potential environmental impacts not sufficiently reduced by prior refinements to its proposed plan of operations but that were also considered practical or feasible from the technical and economic standpoint for the Company.

119. Notably, all but one of the key technical reports identified in the 2021 ModPRO2 as providing validation for the changes proposed therein were completed *after* the Company's submission of the 2020 ModPRO2 and *after* the effective date of the 2020 Feasibility Study.

120. The 2021 ModPRO2 went on to summarize the "Project refinements that define the [2021] ModPRO2" preceded by "a brief description of the observed condition or analysis that prompted the proposed changes to the SGP."

121. In pertinent part, the 2021 MMP identified "[g]eosynthetic covers on the [Tailings Storage Facility] TSF, TSF Buttress, Yellow Pine pit backfill, and Hangar Flats pit backfill" as a defining Project refinement, noting the "change/benefits" to the Project design, as follows:

> ModPRO2 incorporates synthetic covers over the full surface of the TSF and on the entire surface of the TSF Buttress, the Yellow Pine pit backfill, and the Hangar Flats pit backfill (changes in DRSF/backfill configurations are discussed later). Synthetic covers reduce infiltration, thus reducing interaction of water with development rock or tailings and reducing impacts on water quality. In the case of the Hangar Flats pit backfill, a synthetic cover also facilitates wetland construction, providing increased compensatory wetland mitigation.

122. When comparing alternatives analyzed in the DEIS and proposed action in the 2021 ModPRO2, the TSF component of the Project under the ModPRO included as follows:

- TSF located in Meadow Creek drainage.
- Tailings liner system as follows:
  - Underdrain of geotextile-wrapped gravel with perforated HDPE pipe as needed.
  - Prepared subgrade of compacted materials or minimum 12-inch buffer/liner bedding fill.
  - Secondary GCL (or equivalent).
- Liner: 60-mil HDPE AGRU MicroDrain® Liner as a combined secondary liner and leakage collection layer.
- 60-mil HDPE geomembrane primary liner.

123. In comparison, the TSF component under the 2021 ModPRO2 included as follows:

- TSF location the same as ModPRO (Alt 2)

- Tailings liner system as follows:
  - o Underdrain system, subgrade, and GCL the same as ModPRO (Alt 2).
  - o Geomembrane liner layer(s) above GCL.
- Liners to be 60-mil LLPE single-sided textured geomembrane primary liner, as in Alternative 1 [the PRO].
- Overliner drains on TSF floor to reduce hydraulic head on the liner system and reduce excess pore pressure in the tailings.

124. Perpetua explained that the addition of the secondary synthetic covers to the proposed plan of action as outlined in the 2021 ModPRO2 was prompted by the following observed condition or analysis:

> The DEIS effects analysis indicated that soil/rock covers without low permeability geosynthetic layers allowed water to infiltrate and interact with development rock or tailings, potentially affecting the quality of water which then would enter groundwater, seep, or otherwise discharge into surface water. The updated site-wide geochemical modeling report (SRK 2021) validated this analysis, and the protectiveness of the proposed geosynthetic covers.

125. Accordingly, the proposed plan of action submitted by Perpetua as the 2021 ModPRO2 now included secondary geosynthetic liners over the full surface of the TSF and on the entire surface of the TSF Buttress, the Yellow Pine pit backfill, and the Hangar Flats pit backfill, features not previously accounted for in the Project's cost expenditures prior to 2021 but deemed a necessary design tradeoff to help mitigate environmental impact as required for federal approval.

126. For context, according to the SDEIS, sourced from materials provided by Perpetua, the TSF and TSF Buttress would have a collective plan area of approximately 423 acres; the Yellow Pine pit backfill would have a plan area of approximately 180 acres; and the Hangar Flats pit backfill would have a plan area of 41 acres, for a total of 644 acres to be covered by the additional geosynthetic liners.

127. In 2021, such low permeability geosynthetic liners of the specified 60-mil thickness typically cost between $0.65 to $1.75 per square foot for raw materials – increased to roughly

$0.80 to $2.10 per square foot by 2024 largely due to crude oil price fluctuations and higher resin costs – with an extra added cost of $0.20 to $2.50 per square foot for installation, depending on the project's size, complexity, site preparation, and location.[1]

128. Thus, when Perpetua analyzed and ultimately determined to advance the addition of the specified secondary geosynthetic covers to the proposed plan of action for the Project in October 2021, we can estimate that these changes carried an anticipated added cost of $19,286,190 on the low end to $106,950,690 at the high end, accounting for a roughly 25% discount on raw materials typically afforded to projects with larger footprints like here.

129. Additionally, the 2021 ModPRO2 detailed Perpetua's refined plan to "restore appropriately designed meandering stream channels (Meadow Creek and tributaries) within a geosynthetic-lined stream and floodplain corridor across the top of the TSF," based on the modeling report entitled, *The Stream Design Report: Stibnite Gold Project*, prepared for Perpetua by Rio Applied Science and Engineering ("Rio ASE") in February 2021.

130. According to the ModPRO2, the identified refinements were made to "allow for the post-closure development of riparian habitat, convey water off the facility, and minimize potential interaction of surface water with the underlying tailings."

131. According to the draft *Conceptual Stream and Wetland Mitigation Plan*, prepared for Perpetua by Tetra Tech in November 2021, following the response to the action alternatives analyzed in the DEIS, Perpetua compiled a stream design team including specialists in engineering, geomorphology, fisheries biology, riparian ecology, and wetland ecology to refine the stream design concepts from the prior proposed plan of action. In pertinent part, this report indicated that, once the optimal stream plans were identified, "design quantities were calculated to ***quantify***

[1] https://www.bpmgeosynthetics.com/how-much-is-hdpe-geomembrane-price/; https://www.geosyntheticscn.com/what-is-geomembrane-cost-per-square-foot/

***construction costs*** as well as proposed habitat functional value using [watershed condition indicators] WCIs for comparison with baseline conditions (Rio ASE 2021a)" (emphasis added).

132. Accordingly, the proposed plan of action submitted by Perpetua as the 2021 ModPRO2 now included appropriately designed geosynthetic-lined stream channels across the top of the TSF, a feature not previously accounted for in the Project's cost expenditures prior to 2021 but deemed a necessary design tradeoff to help mitigate impact as required for federal approval.

133. In addition to the identified improvements to the TSF construction and operation, the 2021 ModPRO2 also provided for further refinement to the proposed plan of action's water treatment and disposal at closure including as follows:

> At closure, the closure water treatment plant would be constructed to accommodate treatment of water from the TSF which will include precipitation chemistry and the application of reverse osmosis membrane treatment. After mine closure and final reclamation of the TSF Buttress and pit backfill surfaces, contact water treatment will no longer be required; but process water treatment for the TSF [] will continue longer, through approximately year 40. The closure treatment plant would be located on the TSF Buttress as the TSF would ultimately be the only remaining water source requiring treatment. Treatment would be continued as needed on private land.

134. Comparatively, the 2020 FS stated only that the then-envisioned Project plan (*e.g.*, the proposed plan of action outlined in the 2020 ModPRO2) provided "[a]s an emergency measure, package reverse osmosis units *could* be brought online to treat excess water" (emphasis added).

135. Constructing a post-closure industrial precipitation chemistry and reverse osmosis membrane water treatment plant for a mine typically requires a capital expenditure of roughly $5 to $30+ million, largely depending on capacity or flow rate (*e.g.*, gallons to be treated).[2]

136. Accordingly, the proposed plan of action for the Project submitted by Perpetua as the 2021 ModPRO2 now included the construction of a closure water treatment plant, a feature

[2] https://www.vincervalve.com/water-treatment-plant-cost/; https://hellawater.com/cost-of-building-plants-for-water-treatment-factors-and-ranges/

not previously accounted for in the Project's capital expenditures prior to 2021 but deemed a necessary design tradeoff to help mitigate environmental impact as required for federal approval.

137. As detailed below, when the Company later publicly disclosed its capital cost estimate for the Project plan outlined in the 2021 ModPRO2, it attributed an additional $88 million over its 2020 FS estimates "due to higher offsite infrastructure, mainly driven by the water treatment plant addition of reverse osmosis for polishing and improvements to the Tailings Storage Facility to add a redundant secondary liner and leak collection and recovery system."

138. The 2021 ModPRO2 went on to describe several operational changes including, *inter alia*, expanding and changing the sequencing of the TSF Buttress (formerly referred to as the Hangar Flats development rock storage facility ("DRSF")) and backfilling Hangar Flats pit to the approximate pre-mining valley bottom elevation to the elimination of the Fiddle DRSF entirely. Such refinements were made to address public comments related to the reduction of overall Project footprint and provide accordant reductions in impacts to wetlands, water quality, vegetation resources, and wildlife and fisheries habitat.

139. The 2021 ModPRO2 also proposed additional environmental protection measures ("EPMs") to address stream temperature, including wider riparian planting widths on restored and enhanced stream reaches, increased proportion of taller and denser vegetation such as spruce trees, and creation of Stibnite Lake, a feature similar in size to the present Yellow Pine pit lake, within the restored Yellow Pine pit backfill, in addition to, further refined plans to rehabilitate, restore, and enhance upland wildlife habitats. The 2021 MMP noted that "[p]rotection of wildlife and habitat begins during construction, continues throughout mine operations, and into closure."

140. As detailed above, such Project refinements and design changes were identified and validated by the analysis in the technical studies and environmental models prepared for Perpetua

in 2021. The Company's advancement of the identified modifications in the 2021 ModPRO2 indicates that it viewed these changes as capable of addressing persistent potential environmental impacts not sufficiently reduced by prior refinements to its proposed plan of operations and were considered practical or feasible from the technical and economic standpoint for the Company.

141. As detailed below, when the Company later publicly disclosed its capital cost estimate for the Project plan outlined in the 2021 ModPRO2, it attributed an additional $260 million over its 2020 FS estimates to "indirect cost related to overall project execution, including increases mainly driven by higher operational readiness costs to support transition from project to operations" and $39 million to "higher mining costs."

142. Further, as detailed below, these costly design changes, advanced in the 2021 ModPRO2 as the proposed action for which Perpetua was then seeking federal approval, were formally adopted by the USFS on October 28, 2022 as the only agency-proposed action alternative (the Johnson Creek Route Alternative) analyzed in the SDEIS incorporated the same mine plan as Perpetua's proposed plan action and they received resounding public support during the public comment period closed January 10, 2023, solidifying their inclusion in the SGP implementation.

### F. Perpetua Publicly Reaffirmed the 2020 FS Mine Plan, CAPEX Estimate and Economic Analyses as Sound Basis for an Investment Decision or to Support Financing Despite Known Costly Changes Advanced in the 2021 ModPRO2

143. On January 3, 2022, having determined that it no longer qualified as a "foreign private issuer" as such term is defined in Rule 405 under the Securities Act of 1933, Perpetua filed a Current Report on Form 8-K with the SEC providing its inaugural Technical Report Summary (the "2022 TRS" or "TRS"), dated December 31, 2021, in accordance with the mining property disclosure requirements specified under Item 1301 of Regulation S-K.

144. Pursuant to Item 1302 of Regulation S-K (17 CFR § 229.1302), a registrant's disclosure of exploration results, mineral resources, or mineral reserves, as required by §§

229.1303 and 229.1304, must be based on and accurately reflect information and supporting documentation prepared by a qualified person, as defined in § 229.1300.

145. Rather than disclose the known costly Project modifications and affirmative design changes made to the proposed plan of operations for which Perpetua was then seeking approval of (*e.g.*, the 2021 ModPRO2), the Company opted for the disclosure provided by the 2022 TRS to be classified at a Preliminary Feasibility Study level, allowing it to rely on the analysis and economic modeling provided in the 2020 Feasibility Study to demonstrate economic potential but at much lower levels of accuracy or detail and lower contingency levels.

146. In addition to the information required to be included in a technical report summary that reports the results of an initial assessment, a technical report summary that includes cash flow analysis based on the results of a preliminary feasibility or feasibility study must include detailed disclosure in the following general categories: (i) site infrastructure; (ii) mine design and planning; (iii) processing plant; (iv) environmental compliance and permitting; (v) capital costs; (vi) operating costs; (vii) economic analysis; and (viii) other relevant factors. 17 CFR § 229.1302(d).

147. The details on disclosure required for each of these categories vary depending on the level of results which they are based on. For example, for site infrastructure, an initial assessment without cash flow analysis must "[e]stablish whether or not access to power and site is possible." The qualified person responsible for making this initial assessment is allowed to "assume infrastructure location, plant area required, type of power supply, site access roads, and camp/town site, if required." But if cash flow analysis is included and based on the results of a preliminary feasibility study, the technical report summary must provide detailed disclosure of the "required access roads, infrastructure location, and plant area," and of the "[s]ource of all utilities (power, water, etc.) required for development and production *defined with initial designs suitable*

*for cost estimates*" (emphasis added). Comparatively, if based on the results of a feasibility study, it must include detailed disclosure of the same but defined with "finalized" designs.

148. Likewise, the initial assessment without cash flow analysis must provide "[a]ppropriate assessments of other reasonably assumed technical and economic factors necessary to demonstrate reasonable prospects for economic extraction." But if cash flow analysis is included and based on the results of a preliminary feasibility study, the technical report summary must provide "*[r]easonable assumptions,* based on appropriate testing, on the modifying factors sufficient to demonstrate that extraction is economically viable" (emphasis added). Comparatively, if based on the results of a feasibility study, it must provide "[d]etailed assessments of modifying factors necessary to demonstrate that extraction is economically viable."

149. Indeed, the Current Report provided, in pertinent part, that "[t]he TRS summarizes, in accordance with the mining property disclosure rules specified in Subpart 1300, the Company's 2020 Feasibility Study Technical Report, effective date December 22, 2020 and issue date January 27, 2021 (the '2020 FS'), which was completed under Canadian Securities Administrators National Instrument 43-101 guidelines ('NI 43-101'), with the following notable differences between the 2020 FS and the TRS:"

- The TRS Mineral Resource estimates were developed based on a gold price of $1,500/oz versus the $1,250/oz gold price assumed for the 2020 FS. The change in gold price results from higher trailing average gold prices at the date of preparation for the respective reports.
- The ***Measured*** Mineral Resources in the 2020 FS were reclassified to ***Indicated*** Mineral Resources in the TRS due to differences in Subpart 1300 versus NI 43-101 Mineral Resources classification guidelines.
- The ***Proven*** Mineral Reserves from the 2020 FS were reclassified as ***Probable*** Mineral Reserves for the TRS resulting from the reclassification of the Measured Mineral Resources to Indicated Mineral Resources due to differences in Subpart 1300 versus NI 43-101 Mineral Resources classification guidelines.

- The TRS is classified as a Preliminary Feasibility level study whereas the 2020 FS was classified as a Feasibility level study. This change was driven by the Subpart 1300 requirement that a compliant Feasibility level TRS include a capital cost contingency allowance no greater than 10%, whereas the initial capital cost estimate for the 2020 FS included a more conservative allowance at approximately 15%.

(Emphases added.)

150. It went on to note that "all other technical analyses, design information, capital and operating cost information, economic analyses, permitting and legal assumptions, conclusions and recommendations are consistent between the TRS and the 2020 FS."

151. Like CIM standards, pursuant to Item 1300 of Regulation S-K promulgated by the SEC (17 C.F.R. § 229.1300), "[t]he confidence level in the results of a feasibility study is higher than the confidence level in the results of a pre-feasibility study" because a feasibility study is "more comprehensive, and with a higher degree of accuracy, than a pre-feasibility study. It must contain mining, infrastructure, and process designs completed with sufficient rigor to serve as the basis for an investment decision or to support project financing."

152. Then, on June 8, 2022, Perpetua filed a Current Report on Form 8-K/A amending the January 3, 2022 Current Report to reflect the following revisions to the TRS, amended as of June 6, 2022: (i) addition of Appendix A "Detailed Annual Cash Flow Forecast"; (ii) addition of a new footnote (1) to Tables 1-4, 12-9 and 12-10 to include additional information regarding the metallurgical recovery factor and the specific point of reference with respect to the mineral reserves; and (iii) certain other corresponding references. Otherwise, it did not modify or update the information, analyses, assumptions, conclusions or recommendations presented in the TRS.

153. Importantly, Item 1302 of Regulation S-K only requires the registrant to file an updated technical report summary when there is a material change in the exploration results, mineral resources or mineral reserves from the last technical report summary filed for the property.

Such developments typically treated as material include a change in exploration results that significantly alters the exploration target's potential, an annual 10% change in mineral resources or mineral reserves (excluding production) or a cumulative 30% change (excluding production).

### G. The USFS Adopted the 2021 ModPRO2 Mine Plan for the Only Remaining Agency-Proposed Action Alternative and Identified Perpetua's Proposed Plan as the "Preferred Alternative"

154. On October 28, 2022, the USFS released for public comment the supplemental draft EIS for the Stibnite Gold Project (the "SDEIS"). For this SDEIS, Perpetua's proposed plan of operations outlined in the 2021 ModPRO2 was considered to be the Proposed Action.

155. As previously explained, the design and layout of the Project plan outlined in the 2021 ModPRO2 replaced or superseded all of Perpetua's prior iterations of the proposed plan of operations (*i.e.*, the design and layout of the Project plan outlined in the PRO, ModPRO, and 2020 ModPRO2), thus, eliminating the previous Company-proposed action alternatives (*e.g.*, Alterative 1 and Alternative 2) from further consideration under the NEPA process.

156. Further, in consideration of the 2021 ModPRO2 Project plan, the USFS determined that the previous agency-proposed action alternative, Alternative 3, should be eliminated from further consideration, and Alternative 4 be revised to include the same mine plan as the 2021 MMP. The USFS, therefore, selected just one modified agency-proposed action alternative (the Johnson Creek Route Alternative), in addition to the proposed action plan outlined in the 2021 ModPRO2, for detailed analysis in the SDEIS.

157. The SDIES explained that mining portion of the Johnson Creek Route Alternative would be the same as under the 2021 MMP. It specifically identified the following key mine components that would be common to the two action alternatives analyzed therein:

- Mine pit locations, areal extents, and mining and backfilling methods
- Transportation on existing and proposed roads

- Pit dewatering, surface water management, and water treatment
- Ore processing
- Lime generation
- Tailings storage facility (TSF) construction and operation methods
- TSF Buttress construction methods
- Water supply needs and uses
- Management of mine impacted water and stormwater runoff
- Stibnite Gold Logistics Facility (SGLF)
- A road maintenance facility
- Surface and underground exploration
- Worker housing facility

158. Therefore, the primary focus of the Johnson Creek Route Alternative was consideration of using an existing route, with improvements, for mine access during operations and reclamation instead of a route that under the 2021 ModPRO2 required new road construction in and through Inventoried Roadless Areas ("IRAs").

159. For access, the 2021 ModPRO2 would utilize Warm Lake Road, Johnson Creek Road, and Stibnite Road during construction of the proposed Burntlog Route. Then, once constructed, the Burntlog Route would be the primary access route during operations and reclamation of the Project. Thus, the Johnson Creek Route Alternative was developed to evaluate potential reductions in impacts to various resources caused by the Burntlog Route.

160. The SDEIS explained that the Johnson Creek Route Alternative would require extensive upgrades to both Johnson Creek Road and Stibnite Road. As a result, the construction schedule for upgrading the roads and construction of the Project would increase from 3 years under the 2021 ModPRO2 to 5 years under the Johnson Creek Route Alternative.

161. When comparing the social and economic impacts of the two action alternatives, the SDEIS provided, in pertinent part:

> Compared to the 2021 MMP, the Johnson Creek Route Alternative would have substantial increased construction and O&M costs. However, due to its longer construction period (five years instead of three years) and the operating phase's extended duration, the Johnson Creek Route Alternative's resulting socioeconomic impacts (i.e., employment, income, population, housing, public services, and government revenue impacts) would be expected to be marginally higher than those identified under the 2021 MMP.

162. The SDEIS explained that in 2019, as part of the agency's alternatives development and review process for the DEIS, Perpetua estimated the net additional construction cost for the Johnson Creek Route to total $62.5 million. At that time, Perpetua also estimated that the overall net cost effect of the Johnson Creek Route could reduce the SGP's value by up to $174 million due to the combined capital, operating (i.e., longer haul routes and increased roadway O&M), and financial costs (i.e., resulting from the extended construction period and delayed operations).

163. Following the USFS's review of the environmental impacts as discussed in the SDEIS, the USFS identified the 2021 ModPRO2 as their "Preferred Alternative" for the SGP. As provided in the SDEIS, this decision was reached because the 2021 ModPRO2 alternative:

- Incorporates water management and closure activities to reduce the duration of long-term water treatment requirements.
- Incorporates measures to manage stream temperatures.
- Reduces the potential for impacts associated with access, transportation, and hazardous materials on Johnson Creek and the East Fork SFSR downstream of the Operations Area Boundary.

164. Ultimately, the USFS concluded that the agency Preferred Alternative (*e.g.*, the 2021 ModPRO2) would reasonably accomplish the purpose and need for the federal action, while giving consideration to environmental, economic, and technical factors.

165. Accordingly, while identification by the USFS of the 2021 ModPRO2 as the agency "Preferred Alternative" did not represent a final decision, the only action alternatives for the USFS to select from when developing the Final Environmental Impact Statement (FEIS) included the 2021 ModPRO2 or the Johnson Creek Route Alternative which utilized the same 2021 MMP mine plan and included the more expensive and time-consuming access route.

166. Unlike the negative public response to the action alternatives analyzed in the DEIS, which prompted Perpetua's further refinement to the proposed plan of operations and ultimate submission of the 2021 ModPRO2, and requiring the agency's issuance of a supplemental EIS, the SDEIS – analyzing only two action alternatives each encompassing the 2021 ModPRO2 mine plan – was met with overwhelming public support.

167. When the extended 75-day public comment period for the SDEIS closed on January 10, 2023, more than 18,000 comments had been submitted to the USFS. The following day, Perpetua issued a press release announcing the comment period closure and noting strong public support for the Project. In pertinent part, the Company's January 11, 2023 press release purported that there were "more than 15,000 letters submitted in support of the Project" concluding, "[t]he high level of participation in the comment period shows the interest in Perpetua Resources' improved Modified Mine Plan, which the USFS identified as the Preferred Alternative because of its improved water quality, reduction in water temperature and ability to mitigate transportation impacts by utilizing the Burntlog access route to site."

168. The positive public response to the SDEIS, and more specifically, the Company's only remaining proposed plan of action for the Stibnite Gold Project, also selected as USFS's Preferred Alternative, solidified Perpetua's commitment to advancing the Project plan outlined the 2021 ModPRO2.

### H. Perpetua Engaged in Construction Readiness Activities that Supported the 2021 ModPRO2 Project Plan

169. In addition to the costly Project modifications and design changes analyzed in advance of the Company's submission of the 2021 ModPRO2, following Perpetua's receipt of tens of millions of dollars pursuant to a Technology Investment Agreement ("TIA") with the Department of Defense ("DOD") under Title III of the Defense Production Act ("DPA"), executed on December 16, 2022, Perpetua engaged in qualifying activities to advance the construction readiness of the Company's then-existing Project plan in parallel with the permitting process.

170. Specifically, in December 2022, Perpetua was awarded a TIA of up to $24.8 million under Title III of the DPA. On July 25, 2023, the terms of the TIA were finalized with the DOD, establishing the full not-to-exceed amount of $24.8 million. The DPA funding allowed the Company to advance the construction readiness of the Stibnite Gold Project while it continued through the ongoing NEPA permitting process, led by the USFS.

171. Under the funding agreement, Perpetua was able to request reimbursement for certain costs incurred over 24 months related to environmental baseline data monitoring, environmental and technical studies and other activities related to advancing Perpetua's construction readiness and permitting process for the Stibnite Gold Project.

172. During a "Special Call" held on March 2, 2023, Laurel Sayer, Perpetua's then-President, CEO and Director, was asked "what exactly more work is involved to get to a final permit" following the recent closure of the public comment period for the SDEIS identifying the Company's proposed plan as the "Preferred Alternative", to which she responded, in pertinent part:

> So there's a big difference between study work that goes into an EIS versus follow-up analysis and requests for additional information. The follow-up work we anticipate related to NEPA is mostly desktop work. Going back through models and work that previously has been completed and answering any remaining questions from regulators.

> And then there's the work related to the ancillary permits, like drilling and setting up water monitoring wells to meet those requirements. This is work that we had planned for this year and some of which has already started. ***And then there's the detailed engineering, which the funding through the Defense Production Act provides for. These include detailed designs for roads and powerlines that we are now able to pull forward and ensure that we're ready to begin construction once we get permitted***.

(Emphasis added.)

173. During the same call, Defendant Largent was asked the follow-up question of "[w]hat does the construction period look like," specifically "[w]hat tasks will be done during the period from approval to production," to which she responded by discussing the activities that Perpetua was then able to pull forward from the construction phase prior to receiving a final NEPA permit with the funding under the TIA providing. In pertinent part, Defendant Largent stated:

> We have a known flow sheet and mine plan that's in the process of getting final approval. So to answer the question around if you assume final permits about a year from now, then we'd be looking to start building and constructing the summer of '24.
>
> And so there's work that actually has to take place prior to that, like final detailed engineering design work, and [ not -- some ] of the funding through the Defense Production Act, what's so cool about it is we would have held off on spending those dollars until we had permits in hands, given we're a junior company and historically have had to look at the equity markets to help fund the project.
>
> What they've done through this funding is said, 'You know what, we want you to be construction ready once you receive those permits, so we're going to start funding that work now.' ***So we're actually getting to bring forward that detailed engineering work for year 1 of construction. Year 1 of construction is really focused around building the road and powerline to site to then unlock the next sort of 1.5 years to 2 years of construction work to build the on-site infrastructure and get the processing plant up and running***.
>
> ***So big picture, it's a 2.5- to 3-year construction time frame. But to get ready for that, we have to start all the final detailed engineering work for each of those chunks of construction, which we get to do now with this DPA funding.*** So that's a big chunk of work.

(Emphases added.)

174. As such, throughout 2023, Perpetua advanced certain reimbursable construction readiness activities in parallel with the permitting process. As of December 31, 2023, the Company provided the following update on recent construction readiness activities advanced:

- Appointed mining veteran Jonathan Cherry as new President and CEO
- Appointed Vice President of Projects to lead the Stibnite Gold Project;
- Completed project execution planning and scheduling;
- Continued construction manager general contractor contract negotiations with Ames Construction, while advancing constructability reviews, value engineering studies, and detailed engineering for the Burntlog Route, the Company's proposed access route, with Ames and the road design consultants,
- Continued power line detailed scoping and engineering with Idaho Power, who has now engaged Kiewit, and identified long-lead items required for power line construction; and,
- Issued a Request for Proposal for Basic and Value Engineering

175. During the year ended December 31, 2023, the Company was reimbursed $14,369,180 for certain costs incurred under the TIA.

176. Construction planning is the process of defining how a project will be executed, what work needs to happen, in what order, by whom, with what resources, and within what constraints. A construction plan typically encompasses scope definition, cost estimation and budget development, resource allocation, defined scheduling method, procurement strategy, and risk management. Construction planning is an ongoing discipline that spans the entire construction project lifecycle, from pre-construction or project initiation through closeout, and the sequencing of the construction project planning matters.

177. Notably, in the lifecycle of construction planning, project execution planning and scheduling comes fourth in the sequence following (i) pre-construction site assessment or project initiation; (ii) design and scope development; and (iii) procurement planning.

178. Pertinent here, procurement planning involves identifying long-lead items to ensure that the project construction schedule is performed in a timely and cost-effective manner. Long lead items are materials or equipment that require months to years from order to on-site delivery.

179. A precursor to identifying long lead items is finalizing the basis of design for the project allowing for the formation of a material takeoff ("MTO"). A MTO is a comprehensive list of all raw materials, components, and their quantities needed to build a project which is derived directly from the construction plans.

180. With a finalized design and MTO, project teams can flag equipment or materials that historically take longer to procure or that fall into a constrained market category like, for example, critical electrical equipment. Some examples of common long lead equipment or items in the construction industry include structural steel fabrications and complex electrical equipment.

181. Construction scheduling is a critical process in any development project that involves detailed planning and coordination of multiple moving parts and project elements. It is an essential element of construction project management that ensures projects are completed on time, according to standards, and within budget.

182. Specifically, construction scheduling is the formation of the plan that the project team will execute, involving the planning, coordination, and timing of necessary tasks and activities, according to the developed design and scope of a project. That project team consists of multiple parties, including owners, architects, designers, general contractors, subcontractors, and suppliers. All must agree to a schedule they will carry out across the lifecycle of construction.

183. A construction schedule is where the work items to be executed on a particular project are written down. As such, a construction schedule typically defines (i) what activities and tasks need to happen, (ii) when or how long those activities should take, as well as the sequence

or workflow of the identified activities, and (iii) who is required to complete the job, including the equipment and materials they will need to do so.

184. Accordingly, as of the year ended of December 31, 2023, Defendants had actual knowledge of the anticipated additional capital costs associated with the Project's powerlines as a result of the Idaho Power Company's ("IPCo") 2021 requirement of using steel poles versus wood (timber) poles for all new transmission lines constructed in the region and the Company's related construction readiness activities completed during 2023.

185. Indeed, as part of IPCo's 2021 Wildfire Mitigation Plan ("WMP"), IPCo revised its transmission construction standards to require the utilization of steel poles and structures for new line construction built to 138 kV and above, in an attempt to minimize wildfire damage and improve transmission line resiliency.

186. At all relevant times, all transmission lines to be constructed for the Project were to be built to 138-kV service with a typical structure height between 45 to 80 feet tall.

187. In pertinent part, the 2020 FS indicated that for then-Project plan:

> Grid power was selected as the preferred primary power supply for the Project based on its low operating cost, low unit prices, and Idaho Power Company's existing clean energy portfolio. To provide the necessary power, the existing grid network would need to be upgraded to support the 50 to 60-megawatt (MW) load. This includes upgrading approximately 63 mi of existing powerlines to 138 kV, and approximately 9 miles of new 138 kV line. Additionally, new or upgraded 138 kV substations at Lake Fork, Cascade, Scott Valley, Warm Lake, Thunderbolt Drop, Johnson Creek, and Stibnite, as well as measures to strengthen the voltages on the IPCo system, are required. The 138-kV line would be routed to the Project's main electrical substation where transformers would step the voltage down to the distribution voltage of 34.5 kV.

188. With regards to the Project's "Power Transmission," the 2021 ModPRO2 indicated that: "improvements to the transmission line are the same as DEIS Alternative 2 [*i.e.*, the ModPRO] except for the addition of 3 miles of underground distribution power from the Johnson Creek

substation south to Wapiti Meadows, on-site voltage changes from 24.5 kV to 34.5 kV, and the increase in electrical power from 50 megawatts to 60 megawatts required to run the SGP."

189. Accordingly, as of IPCo's 2021 revised transmission construction standards, any plan of action for the Project would require steel poles, as opposed to the previously contemplated timber poles, for the approximately 63 miles of existing powerlines to be upgraded to 138 kV and the approximately 9 miles of new 138 kV line, an added capital expenditure not previously accounted for in the 2020 Feasibility Study figures.

190. In 2021, the purchase price for a standard timber (wood) utility pole, within the specifications outlined for the Project, typically ranged from $450 to $900 per pole, depending on the height, class, and wood species. In contrast, steel electrical poles have historically carried much higher upfront material costs, starting at around $2,000 to over $4,000 per pole for equivalents.

191. Further, as part of the Company's TIA-sponsored construction readiness activities, Perpetua reported that, in the second quarter of 2023, it had begun "power line detailed scoping and engineering with Idaho Power." In the third quarter of 2023, Perpetua reported that, through IPCo, Kiewit Corporation had been formally engaged to manage the sourcing and procurement of materials necessary to meet the Project specifications.

192. By the end of the fiscal year 2023, Perpetua purported that through its "[c]ontinued power line detailed scoping and engineering with Idaho Power" and the now engaged Kiewit, it had "identified long-lead items required for power line construction."

193. To declare long-lead items "identified" means that the project teams responsible for sourcing such critical materials have obtained preliminary bids or budgetary quotes from key manufacturers and/or strategic vendors to ensure timelines and costs for the overall project development are well-managed and procurement is synced with other project components.

194. Accordingly, as of the end of 2023, Defendants had actual knowledge of the anticipated initial capital costs associated with the development of the then-existing Project plan's transmission lines, including the necessary change to steel poles, as the design specifications for the Project plan had already been finalized, a MTO had been established, and it was in possession of preliminary bids or budgetary quotes from key manufacturers and/or strategic vendors.

195. Indeed, Perpetua explicitly declared its intentions to use the net proceeds from its November 2024 Shelf Offering (discussed in detail below) "for down payments on long lead time materials," indicating it was already in possession of quotes for procurement of critical items.

196. As detailed below, when Perpetua later publicly disclosed its capital cost estimates for the Project plan outlined in the 2021 ModPRO2, it attributed an additional $162 million over its 2020 FS estimates to "power line cost increase, mainly driven by electrical poles design changed from timber poles to steel poles…."

197. That same day, February 13, 2025, Perpetua also revealed that had entered into an agreement with IPCo to begin procurement of the identified long-lead items "required to increase the electrical capacity to the plant" (like steel poles). The Company explained that "[t]his is an important step to ensure parts are available for installation under a future construction agreement." Under the terms of the agreement, Perpetua was responsible for paying all costs incurred by IPCo as they procure the previously identified long-lead equipment from vendors which, according to Perpetua, had been estimated to cost $90.2 million.

198. Perpetua paid an initial payment of $18.8 million upon execution of the agreement, with the remaining payments expected to be made quarterly through 2027. Under the terms of the agreement, all contractual commitments of $1.0 million or greater were required to be approved by Perpetua prior to IPCo entering a binding contract with a vendor.

199. Likewise, as the year ended December 31, 2023, Defendants had actual knowledge of the anticipated additional capital costs associated with the Company's "decision to buy-and-build instead of lease the oxygen plant" for the Stibnite Gold Project as a result of the "[c]ompleted project execution planning and scheduling" advanced as part of the construction readiness activities reimbursable under the TIA.

200. The 2020 FS Project plan provided that: "A cryogenic air separation unit (ASU) is planned to provide the supply of oxygen required in the pressure oxidation process []. The plant would be supplied and managed by an oxygen supply vendor in an 'over-the-fence' agreement. Site grading, concrete, and construction support would be provided by the [Engineering, Procurement, and Construction Management] EPCM contractors." As such, the initial capital cost estimates provided in the 2020 Feasibility Study did not include any expenditure for the purchase or construction of an oxygen plant.

201. Included in the 2020 Feasibility Study, however, was also a list of detailed recommendations and work programs developed to move the project through to a construction decision. Under the local discipline category of "Project optimization and Basic Engineering" was recommendation 15 ("R15") which read: "Consider undertaking a study to further evaluate the economics of leasing and/or contracting out certain equipment and infrastructure such as: oxygen plant, lime plant, truck fleet, worker housing facility, water treatment plant, evaporators, and other miscellaneous construction equipment including gensets."

202. During the Question-and-Answer portion of the Company's "Special Call" held on October 24, 2023, an attendee named Dan Horn inquired about Perpetua's previously proposed facilities to be leased for the Project asking, in pertinent part: "can you tell me is it the intent or strategy of Perpetua to purchase or lease these facilities?"

203. To which, Gene Bosley, a Senior Engineer at Perpetua responded:

> I think our basis, just again, our feasibility study basis and the feasibility study now is a number of years old as you also probably know, our basis was purchase, but that is open, that is an open question at this point as to whether it's purchase or lease. We had to have A basis, right, for the feasibility study. You've got to pick something and that was what made sense at the time, but that was pre-COVID, pre a lot of things in 2020. And so we will -- that is one of the open questions that we are in the process of revisiting.

204. Accordingly, these comments confirm that, as of October 2023, Perpetua was "in the process of revisiting" the economics of leasing and/or contracting out versus buying certain equipment and infrastructure such as, *inter alia*, an oxygen plant – an analysis that would require Perpetua to know the then-current budget assumptions for either option to make a final decision.

205. Moreover, Perpetua's declaration of "project execution planning and scheduling" for the Stibnite Gold Project complete as of December 31, 2023, indicates that an affirmative construction decision had been made as what work needs to happen, in what order, by whom, with what resources, and within what constraints.

206. As detailed below, when Perpetua later publicly disclosed its capital cost estimate for the Project plan, it attributed an additional $131 million over its 2020 FS estimates to "the decision to buy-and-build instead of lease the oxygen plant."

**I. Securing Financing to Develop the Project Placed Perpetua in a Dilemma**

207. While Perpetua had accomplished several significant milestones in 2023 as it progressed towards the next phase for the Stibnite Gold Project, including its advancement of key construction readiness activities and work on several ancillary permits, it was still waiting for a final NEPA decision to officially commence the construction phase of the Project.

208. On January 1, 2024, the USFS released an updated schedule for the Project. Following this update, Perpetua told investors that the USFS had confirmed that cooperating agency review of the Final EIS was nearing completion and that the agency was focused on

progressing both the Final EIS and a Draft ROD towards final consultations and reviews in Washington D.C. Based on the updated schedule, Perpetua anticipated that the USFS would publish a Final EIS and a Draft ROD for the Stibnite Gold Project in the second quarter of 2024 and a Final ROD in the fourth quarter of 2024.

209. During a "Special Call" held on February 27, 2024, Dale Kerner, Perpetua's Permitting Manager, provided an overview of the history of the Company's NEPA permitting process to present day declaring, in relevant part, that:

> And where we are right now is the Forest Service and the cooperating agencies are conducting the biological assessment on the preferred alternative. Again, this is the Burnt Log Route, using the Burnt Log Route as primary access and our project on site as improved through some of the measures that I mentioned earlier. So once we get through the biological assessment and the biological opinion and that final EIS comes out with the Draft ROD, we're very much looking forward to that, there will be a period following that of public objection and resolution. And then finally the Final ROD will come out.

210. Accordingly, these statements further indicate that, by the start of the Class Period, the USFS and the cooperating agencies were focused on efforts and analyses designed to support a robust and defensible Record of Decision identifying the Project plan outlined in the 2021 ModPRO2 as the approved action plan.

211. At this time, the Company vowed to continue advancing its construction readiness activities and work on securing several remaining ancillary permits in parallel with the NEPA process, however, it was running out of the much-needed capital to continue its operations.

212. As of the fiscal year ended December 31, 2023 ("FY23"), Perpetua had an accumulated deficit of approximately $580.7 million, cash and cash equivalents totaling approximately $3.2 million and net negative working capital of approximately $0.9 million.

213. And while the DOD awarded Perpetua an additional $34.6 million under the existing TIA in February 2024, when reporting its financial results for FY23 on March 24, 2024,

again prepared on a "going concern" basis, the Company indicated that unless additional financing was secured before the fourth quarter of 2024, it would no longer be able to meet its ongoing obligations or progress critical permitting efforts.

214. Indeed, during that same February 27, 2024 Special Call, Mr. Kerner's comments regarding Perpetua's ongoing permitting efforts denoted how bleak its financial condition was at that time. Specifically, during his prepared remarks, Mr. Kerner declared, "we are committed to getting these permits, doing what we need to get them and complying with them all throughout the life of the mine, irrespective of whether it's us who are operating it or somebody else, these things hold true for anybody who's conducting operations, although we do plan for it to be us."

215. Then, on April 8, 2024, the Company announced that it received a non-binding and conditional Letter of Interest from the Export-Import Bank of the United States ("EXIM") for potential debt financing of up to $1.8 billion through EXIM's "Make More in America" and "China and Transformational Exports Program" ("CTEP") initiatives.

216. Specifically, Perpetua quoted the Letter of Interest as stating: "We are pleased to extend this Letter of Interest in support of the proposed capital funding plan by Perpetua Resources Idaho Inc. for the Stibnite-Gold Project. Based on the preliminary information submitted regarding expected U.S. exports and U.S. jobs supported by this project, EXIM may be able to consider potential financing of up to $1,800,000,000.00 of the project's costs with a repayment tenor of 15 years under EXIM's Make More in America initiative."

217. The Letter of Interest indicated the transaction may also be eligible for special consideration under Section 402 of EXIM's 2019 reauthorization (P.L. 116-94), which directs EXIM to take steps to mitigate the competitive impact of export support provided by the People's

Republic of China and other covered countries for opportunities such as this one under EXIM's CTEP initiative.

218. When Perpetua first announced its receipt of the Letter of Interest, it told investors that the Company expected to submit a formal application to EXIM in 2024. Upon receipt of an application for financing, EXIM will conduct the due diligence necessary to determine if a final commitment may be issued. Any final commitment would be dependent on meeting EXIM's underwriting criteria, authorization process, finalization and satisfaction of terms and conditions.

219. Additionally, the Company explained that to receive a final commitment (and thus the much-needed financing to develop the Project), the Stibnite Gold Project must comply with EXIM policies as well as program, legal and eligibility requirements, including completion of the ongoing NEPA process. In other words, Perpetua did not need final approval from USFS to submit a formal application to EXIM, the NEPA process just needed to be complete to receive the funds.

220. Analysts and investors alike treated this news as the achievement Perpetua management claimed it to be, valuing the Company on this basis. For example, that same day, Mike Kozak of Cantor Fitzgerald issued a report calling the "bottom line" of this announcement a "positive" highlighting that "[a]ccording to PPTA, potential financing of up to $1.8 BB could fund 'a substantial portion' of the Stibnite [Gold] [P]roject[.]"

221. On April 9, 2024, Richard Michael Neihuser of Roth Capital Partners issued a report maintaining its "Buy" rating for Perpetua and increasing its target price to $10.00 per share (from $7.25) following the Company's announced indication of debt financing under EXIM. The report, in pertinent part, that:

> The amount was derived from a formula estimating the project's potential to create jobs. … The Stibnite Gold Project's 2020 Feasibility Study projected total capex with contingency of ~$1.658 billion. EXIM is expected to complete its due diligence in 12 months. This should include updating metal price assumptions and

> cost estimates. The potential for financing through the EXIM significantly reduces the financing risk associated with the project, increasing PPTA's bargaining position with potential strategic investors and partners.

222. Submission of a formal application to EXIM, however, would require Perpetua to provide an updated feasibility level analysis of the cost estimates and cash flow model for the then-existing Project plan, placing it in a significantly precarious situation at the start of the Class Period.

223. The Letter of Interest is merely an indication of EXIM's willingness to consider financing a given export transaction based on a limited review of the transaction. Indeed, EXIM has declared its commitment to processing a Letter of Interest application within seven (7) business days to give the applicant a preliminary idea whether or not EXIM can provide financing.

224. A formal application requires the applicant (Perpetua) to provide the project's cost estimates and future cash flows for assessment by EXIM. As explained above, a feasibility level study is necessary for a financial institution (like EXIM) to proceed with, or finance, the development of the project.

225. Accordingly, Perpetua found itself in a quintessential catch-22 situation. The Company needed the financing from EXIM to fund the development of the Project but in order to apply for this much-needed capital it would require Perpetua to publicly disclose the material added costs and significantly diminished Net Present Value of the then-existing Project plan which, in turn, would inevitably have an adverse impact on the Company's market value at a time when it could not stand to lose investor support.

226. Ultimately, Perpetua and its top management opted to take advantage of the positive public receipt of its announced Letter of Interest supporting the potential access to a substantial portion of the Company's maintained CAPEX estimates provided in the 2020 Feasibility Study to access the capital necessary to sustain its operations through the preparation of a formal application and until the NEPA permitting process was complete.

### J. Defendants Publicly Relied on the Cost Estimates and Projected Valuation of a Cheaper, Eliminated Project Plan to Support the Then-Existing Project's Capital Needs and Economic Feasibility

227. Despite the significant known added costs due to expansive Project modifications and necessary design changes, throughout the Class Period, Defendants continued to publicly rely on the stale 2020 Feasibility Study figures (reaffirmed by the 2022 TRS) to tout the economic viability of the materially different then-existing Project plan, including an unchanged Net Present Value benefit and anticipated capital needs, while also minimizing the Company's financing risk.

228. For example, on April 17, 2024 (the first day of the Class Period), Perpetua held a "Special Call" to update its investors on the progress for the Stibnite Gold Project and introduce Defendant Cherry as the Company's new CEO who was selected to take Perpetua into the next phase of development. Specifically, Laurel Sayer claimed that with the Project's "record of decision [ ] now within reach" it was "time to welcome our next leader … whose proven experience is – will help guide the construction readiness, the financing and the development process."

229. During Defendant Cherry's prepared remarks, he declared "our investment thesis is stronger than ever. We plan to develop one of the largest low-cost and long-life gold projects in the U.S. I've studied and looked at the mine plan at depth before joining the company about a month ago, and it looks really good to me." He went on to detail the Project's "excellent economics … based on [the Company's] 2020 feasibility study."

230. In pertinent part, Defendant Cherry declared "[o]ur production profile, low cost and robust cash flow [NPV], combined with our current valuation present a very compelling opportunity for new investors." To support this statement, he followed up by providing, "[u]sing our base $1,600 per ounce gold price, the NPV has -- the project has an NPV of greater than $1.3 billion using a 5% discount rate. We have good leverage to higher gold prices where the NPV increases to approximately $2.4 billion at a $2,100 gold price."

231. During the Question-and-Answer portion of the call, Defendant Largent responded to direct inquiries about "things that are included in [Perpetua's] capital costs from [the] 2020 feasibility study", whether it was planning to update the 2020 FS, and whether there were any changes to account for like inflation-related trends, declaring that, while "[i]t was a 2020 number and the 2020 number was $1.3 billion of capital … our project is so great from an economics perspective, that even if you assume a 10% change in CapEx or a 20% change, … [i]t's about a $100 million decrease in NPV. But again, we ran our base model at $1,600 gold prices, and we're encroaching on $2,400 gold prices today. So we know it's not 1.3, but we also know the project can sustain movements in the capital."

232. She went on to conclude that the Company had "no plans on updating our feasibility study or technical report", claiming "the project has been well studied[;] [w]e're confident in the plan", and explained that the only work they were progressing through 2024 would be to "look at financial model updates to support project financing."

233. For context, most economists and policymakers believe a low and stable rate of inflation is beneficial for the economy. In fact, the Federal Open Market Committee seeks to achieve inflation that averages 2% over time. In 2020, the average U.S. inflation rate was relatively low at 1.2%, mainly attributed to the onset of the COVID-19 pandemic. However, factors linked to the pandemic later pushed inflation to higher rates in 2021, with an average 12-month rate of 4.7%, before hitting record highs in 2022, with an average 12-month rate of 8%. By 2023, the U.S. inflation rate saw a steady decline throughout the year, with an average 12-month rate of 4.1%. Indeed, by December 2023, the U.S. inflation rate was down to 3.4%. The U.S. inflation rate continued its decline throughout 2024, with an average 12-month rate of 2.9%.[3]

---

[3] *See* https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202412.pdf.

234. Throughout the Class Period, Defendants continued to publicly rely on the 2020 FS CAPEX estimates when reporting Perpetua's then-anticipated "long-term liquidity requirements" and when describing the prospect of potentially higher capital cost estimates and associated financing risks, again attributed any possible changes from the 2020 Feasibility Study to be "based on significant inflation and increased financing costs" while conspicuously failing to disclose the material added costs associated with the then-existing Project plan.

235. Defendants' Class Period statements gave investors the impression of a state of affairs that differed in a material way from the one that actually existed. As detailed above, Defendants knew the only then-existing action plans for the SGP included expansive (and costly) design changes and Project modifications analyzed and added to the proposed mine plan *after* the 2020 Feasibility Study, and as a result, they knew or recklessly disregarded that the estimated initial capital costs to develop the Project would not only be higher because of inflation and increased financing costs, but would be materially greater because the affirmative design changes made in 2021, with such costly changes adopted by the USFS in 2022, and thus, knew or recklessly disregarded that the then-current total value of the Project's expected future cash flows (*e.g.*, Net Present Value) was materially lower due to the significantly higher anticipated initial capital costs for the then-existing Project plan of action.

236. As a result of Defendants' constant promotion of the stale 2020 Feasibility Study cost estimates and its outdated cash flow model, investors were left in the dark as to the true nature of the then-existing Project plan's economic viability, the Company's diminished current valuation, and its associated financing risks.

237. Notably, while the SDEIS indicated that it was prepared in response to a "revised Plan of Restoration and Operations (Plan) for the SGP," specifically that a "further modified Plan

was initially submitted by [Perpetua] in December 2020 with a revised submittal in October of 2021", following its release, the Company continued to publicly reference only the December 2020 submission when discussing and defining the "Modified Mine Plan", sowing further confusion as to the reliability of the 2020 FS figures.

238. As detailed above, when the Company announced the USFS's decision to advance the 2020 ModPRO2 in the NEPA process, it publicly declared that the proposed improvements outlined therein had been incorporated in Perpetua's 2020 Feasibility Study. Conversely, the expansive Project modifications and design changes submitted in the 2021 ModPRO2, had not.

239. Indeed, the only reference to "2021" in combination with the "Modified Mine Plan" in Perpetua's public filings occurred when the Company reported that, after several additional permitting schedule delays by the USFS, a Final EIS and Draft ROD for the Stibnite Gold Project had been published on the USFS's project website.

240. Specifically, on September 6, 2024, Perpetua issued a press release, filed with the SEC of a Form 8-K Current Report, reporting that, "[t]he FEIS analyzes the potential environmental effects of the mining operation of the Project as proposed by the Company through a general plan of operations. The DROD outlines the USFS's decision to authorize the 2021 Modified Mine Plan and to approve a special use authorization for transmission line upgrades and installation of a new power transmission line with supporting infrastructure."

241. The publication of the DROD commenced a 45-day pre-decisional objection period in which those who had participated in a prior formal public comment period for the Project would have an opportunity to have their unresolved concerns reviewed before the USFS issued a final ROD. The objection period was then followed by another 45-day resolution period prior to the

publication of the final ROD. Based on the USFS schedule published in July 2024, Perpetua told investors the final ROD was anticipated by the end of 2024.

242. With the publication of the FEIS and DROD and a final ROD expected this year, the Company also announced that it had engaged RBC Capital Markets and Endeavour Financial to assist with the evaluation of potential strategic and financing opportunities and to support the Company's EXIM application process.

243. On January 6, 2025 – six years after originally contemplated – Perpetua announced that the USFS had issued a Final ROD authorizing Perpetua's mine plan for the Stibnite Gold Project. The Company went on to declare: "[t]his crucial permitting milestone comes after 8 years of thorough investigation, interagency analysis, consultation, and extensive public feedback on the proposed mine plan of operations. With receipt of the Final ROD, Perpetua Resources is focused on advancing the Project towards a construction decision, including finalizing the remaining federal and state permits and securing project financing." Importantly, the "Selected Alternative" was the plan of action laid out in the 2021 ModPRO2 submitted by Perpetua.

## K. The Truth Emerges

244. As set forth below, Defendants' fraud triggered a substantial, statistically significant decline in the price of Perpetua's common stock that was causally connected to the facts that were misrepresented and/or concealed during the Class Period. The true nature of Perpetua's financial condition and business prospects was revealed on February 13, 2025.

245. On February 13, 2025, after the market closed, Perpetua issued a press release, filed as Current Report on Form 8-K with SEC, announcing the release of its "2024 Financial Update ('Financial Update')" providing an updated cash flow model and cost estimates for the Project.

246. In pertinent part, the Financial Update indicated a $1.4 billion after-tax Net Present Value (NPV) 5% and 15.4% after-tax Internal Rate of Return (IRR) at consensus prices of $2,100/oz for gold, $10.00/lb for antimony, and $27.00/oz for silver, and a $3.7 billion after-tax NPV 5% and 27% after-tax IRR at current spot prices of $2,900/oz for gold, $21.00/lb for antimony, and $31.50/oz for silver. Notably, this represented a $1 billion reduction in the Project's NPV when compared to the "approximately $2.4 billion at a $2,100 gold price" touted by Defendants during the Class Period.

247. Additionally, the Financial Update was revealed that initial capital cost estimates for the then-existing Project plan (the same plan submitted as the 2021 ModPRO2) had increased from $1,262.9 million in the 2020 Feasibility Study to $2,214.8 million, net of $33.6 million of pre-production revenue, mainly driven by:

- $352 million related to cost inflation.
- $260 million in indirect cost related to overall project execution, including increases mainly driven by higher operational readiness costs to support transition from project to operations and mine ramp up prior to commercial production ($84 million), higher primary and temporary camp costs ($58 million), and a larger owners team ($27 million).
- $162 million in power line cost increase, mainly driven by electrical poles design changed from timber poles to steel poles and the addition of two Static Synchronous Compensators (STATCOMs) to the design of the main substation.
- $131 million due to the decision to buy-and-build instead of lease the oxygen plant. This resulted in a capital increase but reduced operating costs and resulted in a net-present-value benefit.
- $88 million due to higher offsite infrastructure, mainly driven by the water treatment plant addition of reverse osmosis for polishing and improvements to the Tailings Storage Facility to add a redundant secondary liner and leak collection and recovery system.
- $39 million due to higher mining costs.
- Offset by $46 million in savings driven by adjustments to certain infrastructure designs and pre-production revenue of $33.6 million using consensus pricing.

248. The chart below depicts the Company's capital expense estimates, by category component and phase of the Project, provided in the 2020 FS and the Financial Update:

| CAPEX Component | | Initial | | Sustaining | | Closure | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | | Phase of Stibnite Gold Project (US$M) | | | | | | | |
| | | Original | Update | Original | Update | Original | Update | Original | Update |
| Direct Costs | Mine Costs | 84.0 | 183.6 | 119.0 | 215.4 | -- | -- | 203.0 | 399.0 |
| | Processing Plant | 433.5 | 643.7 | 49.0 | 88.1 | -- | -- | 482.5 | 731.8 |
| | On-Site Infrastructure | 190.9 | 336.3 | 83.9 | 287.8 | -- | -- | 274.8 | 624.1 |
| | Off-Site Infrastructure | 115.9 | 295.5 | -- | 0.4 | -- | -- | 115.9 | 295.9 |
| Indirect Costs | | 232.7 | 348.8 | -- | -- | -- | -- | 232.7 | 348.8 |
| Mitigation, Monitoring and Closure Costs | | 17.9 | 11.5 | 23.5 | 106.0 | 98.1 | 118.1 | | 235.5 |
| Owner's Costs | | 38.4 | 227.9 | -- | -- | -- | -- | 38.4 | 227.9 |
| **Total CAPEX without Contingency** | | **1,113.2** | **2,047.4** | **275.4** | **697.7** | **98.1** | **118.1** | **1,486.7** | **2,863.1** |
| Contingency & Sales Tax | | 149.7 | 201.1 | 20.4 | 25.8 | 1.2 | -- | 171.3 | 226.9 |
| **Total CAPEX with Contingency** | | **1,262.9** | **2,248.5** | **295.7** | **723.5** | **99.3** | **118.1** | **1,658.0** | **3,090.0** |
| Pre-Production Revenue | | -- | (33.6) | -- | -- | -- | -- | -- | (33.6) |
| **NET CAPEX** | | **--** | **2,214.8** | **--** | **723.5** | **--** | **118.1** | **--** | **3,056.4** |

249. Importantly, the Financial Update was a key milestone to support Perpetua in formalizing its loan application process in connection with the EXIM $1.8 billion Letter of Interest received in April 2024. It is intended to be read as a supplemental financial update to the Company's feasibility level technical report titled "Stibnite Gold Project, Feasibility Study Technical Report, Valley County, Idaho" dated effective December 22, 2020 and issued January 27, 2021 (*i.e.*, the 2020 Feasibility Study).

250. Put another way, Perpetua did not release the Financial Update at this time because the NEPA process had recently completed or because it did not previously have access to the underlying anticipated capital expenditures. Indeed, Perpetua's press release explained that the Financial Update was prepared by the Company and was based, in part, on the basic engineering

work completed to date using the fourth quarter of 2024 as a base date for cost estimates. As detailed above, such engineering work was substantially completed during the fiscal year 2023.

251. Investors and analysts reacted immediately to Perpetua's revelation. The price of Perpetua stock declined dramatically. From a closing market price of $11.97 per share on February 13, 2025, Perpetua's stock price fell to $9.29 per share on February 14, 2025, a decline of about 22.39% in the span of a single trading day.

252. A number of well-known analysts who had been following Perpetua predicted negative reactions from the market in response to the Financial Update. For example, analysts with the National Bank of Canada, Financial Markets, Research Division issued a report highlighting "the substantially higher capex figure" and "lower-than-expected NPV [] largely due to the sizable capex increase." Referring to the Company's announcement of an NPV (5%) of $3.7 billion at spot prices, the analysts reported their current discounted cash flow for the project "yields an NPV (5%) of US $4.1 bln, resulting in today's update proving ~11% below our current estimates." The report went on to note that the capex increase surpassed their own expectations as well stating, "[i]nitial capital is forecasted to be US $2,215 mln, which comes in +14% above our estimate of US $1,950 mln. The company previously received a US $1.8 bln letter of interest from the U.S. EXIM, which we expect to fund a large portion of the capex bill, with the remainder likely funded by an equity raise." The analysts concluded, "[o]verall, we expect the market to react negatively to the substantially higher capex figure than the prior estimate from the 2021 technical report and messaged range from management on how to consider the impact of inflation since then."

253. Similarly, Roth also highlighted the increased costs, stating:

> Most importantly, the Update revised initial capital costs (CAPEX) to $2.22 billion, up from $1.26 billion in the amended 2020 feasibility study … Spot metal prices offset a $352 million increase due to cost inflation but did not offset total CAPEX increases. Other increases included $260 million in indirect costs, $162 million for

> upgrading electrical poles to steel, $131 million to acquire an oxygen plant (rather than lease), $88 million for improvements to water treatment plant and tailings storage facilities, and $39 million for higher mining costs … the updated CAPEX in relation to Update economics may be less-than-robust for conventional projects.

254. The fact that these analysts, and others, discussed Perpetua's significant capital expenditure increase and lowered NPV benefit suggests the public placed significant weight on Defendants' Class Period affirmations of the Company's prior cost estimates and dismissal of any significant impact on the Project's economic benefit due to mitigating changes, such as inflation, and confirms that such statements were material.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

*April 17, 2024*

255. On April 17, 2024, Perpetua conducted a "Special Call" to update its investors on the progress for the Stibnite Gold Project and introduce Defendant Cherry as the Company's new CEO who was selected to take Perpetua into the next phase of development as the NEPA process was nearing completion.

256. During his prepared remarks, Defendant Cherry declared "our investment thesis is stronger than ever. We plan to develop one of the largest low-cost and long-life gold projects in the U.S." He went on to detail the Project's "excellent economics … based on [the Company's] 2020 feasibility study" stating, in pertinent part:

> The goal leveraged to NPV. Our production profile, low cost and robust cash flow, combined with our current valuation present a very compelling opportunity for new investors. ***Using our base $1,600 per ounce gold price, the NPV has -- the project has an NPV of greater than $1.3 billion using a 5% discount rate. We have good leverage to higher gold prices where the NPV increases to approximately $2.4 billion at a $2,100 gold price***. And based on our current market cap, we're trading at nearly the widest discount to NAV despite achieving significant milestones and having a clear path forward.[4]

[4] Unless otherwise indicated, all emphasis in quoted material is added.

257. The statements identified in ¶256 above were materially false and misleading when made because they gave investors the impression of a state of affairs that differed in a material way from the one that actually existed. As detailed above, at the time these statements were made, Defendant Cherry knew the only then-existing action plans for the Stibnite Gold Project included expansive (and costly) Project modifications and design changes that were not accounted for in the 2020 Feasibility Study cost estimates and cash flow model. As a result, he knew or recklessly disregarded that the then-current total value of the Project's expected future cash flows (*e.g.*, Net Present Value) would be materially lower due to the significantly higher anticipated initial capital costs for the then-existing Project plan. Consequently, even if Defendant Cherry did not know the exact costs for the Project, he possessed information making it unreasonable and misleading to rely on the outdated figures from the 2020 Feasibility Study.

258. During the Question-and-Answer portion of the call, Defendant Largent fielded direct questions related to the Project's CAPEX estimates:

> <Q: Chris Fogg, Manager of Investor Relations> We've had a number of questions here about capital costs for the projects and inflation-related questions. I'll try to group those together. This one might be a good one for you, Jess [Largent]. So could you talk through what goes into -- what are some of the things that are included in our capital costs from our 2020 feasibility study? Are we planning to update that? And what does the timing look like on that? And just any general inflation trends that we're seeing?
>
> <A: Defendant Largent> ***Sure. So the 2020 feasibility study, the good news with the timeline we've been under is that we've had plenty of time to study this project and do the engineering, and we're quite confident in the feasibility study itself in terms of the mine plan laid out and how -- and what we're getting permitted. It was a 2020 number and the 2020 number was $1.3 billion of capital. That included a decent contingency, but we all know we're not in 2020 times anymore.***
>
> That said, for all the reasons Jon [Cherry] talked to earlier, our low-cost project. We believe on the operating cost side, we've got some insulation, right? So the driver of our low cost is access to hydropower, clean, low-cost hydropower. Low strip ratio. Again, this is an abandoned brownfield site, and we will be able to access the ore very early. And then the antimony byproduct credit. So just to touch on that.

> First, in our feasibility study, we assumed $3.50 per pound antimony prices. They've been trading in the $5 to $6 per pound range now for well over a year, given global supply and demand fundamentals around antimony. So lots of upside on the antimony byproduct credit from where we were in that study from an operating cost perspective. Now if you step back and look at the capital, in that $1.3 billion, about $0.5 billion is the autoclave, so that's a big chunk of it in terms of the driver of why the number is what it is.
>
> But even if ***-- our project is so great from an economics perspective, that even if you assume a 10% change in CapEx or a 20% change, you can run your numbers there. It's about a $100 million decrease in NPV. But again, we ran our base model at $1,600 gold prices, and we're encroaching on $2,400 gold prices today. So we know it's not 1.3, but we also know the project can sustain movements in the capital***.
>
> And so in terms of what we're doing, part of the work this year is we're advancing basic engineering as we get ready for that construction decision next year and running a financial model update. So that's work we're progressing through 2024. ***But again, the project has been well studied. We're confident in the plan. So we have no plans on updating our feasibility study or technical report, but we will look at financial model updates to support project financing***. Hopefully, I captured all those questions, Chris.

259. The statements identified in ¶258 above were materially false and misleading when made because they gave investors the impression of a state of affairs that differed in a material way from the one that actually existed. As detailed above, at the time these statements were made, Defendant Largent knew the only then-existing action plans for the Stibnite Gold Project included expansive (and costly) Project modifications and design changes that were not accounted for in the 2020 Feasibility Study cost estimates and cash flow model. As a result, she knew or recklessly disregarded that the then-current anticipated initial capital costs to develop the then-existing Project plan would be materially higher than the mere 10% to 20% change attributed to inflation, and thus, the then-current total value of the Project's expected future cash flows (*e.g.*, Net Present Value) would be materially lower. Consequently, Defendant Largent's statements were materially

misleading even if she did not know exactly how much the Project would eventually cost when ultimately completed.

260. During the same call, Defendant Largent responded to a question about the Company's plans for financing the Project:

> <Q: Chris Fogg, Manager of Investor Relations> Question … is about project financing and reads, how do you expect to finance the project? So Jon [Cherry] touched on this, but Jess [Largent], maybe you could get into a little more details on how we're thinking about that.
>
> <A: Defendant Largent> Sure thing, and hi, everyone. Thanks for joining. Really, the good news for our project is that we have many options and we plan to pursue the best deal for our shareholders. And we are going to be laser-focused on putting together the most value-accretive and non-dilutive options possible. Our first priority is going to be pursuing the EX[IM] claim that Jon [Cherry] mentioned earlier.
>
> Just last week, we announced an indication on the debt side from U.S. [ EXIM ] and to provide a little bit of context on that [ EXIM ] financing. ***The letter of interest was for up to $1.8 billion debt financing*** with an up to 15-year repayment tenure under the Make More in America initiative and the China and Transformational exports program. Just for a little more background on those, Make More in America was designed to strengthen U.S. exports and American jobs. So Perpetua qualifies for Make More in America.
>
> It's a requirement to export products, in our case, gold, and then create American jobs. So, on average, over the 15-year life, we're going to create 550 to 650 jobs, and those jobs we will create when developing and operating the Stibnite Gold Project to support the up to $1.8 billion number based on the program's funding formula.
>
> We also received notice that we could be eligible under [ CTEP ], which was designed to help equal the playing field for American production and manufacturing to be more competitive with China. So CTEP applicants must have direct China competition, and about 50% of the global supply of the antimony is dominated by China or be part of 10 transformational export areas in antimony is actually used in semiconductors and clean energy, which are both part of those transformational explore areas.
>
> What's most exciting is that under that CTEP program, they are able to be more flexible and offer benefits beyond the Make More in America initiative, including reduced fees, extended repayment tenors and other exceptions. So later this year, we plan to submit our formal application under this program, ***and CTEP can***

***provide up to 85% of debt funding for project capital costs, which really opens up multiple pathways for our full financing package.***

And then for the remainder of the funding, we have numerous options, and we're keeping the doors open on all of them, so we can pull together the best package for our shareholders. So if we look at some of those tools in our tool belt, we have -- obviously, as our stock continues to re-rate as we advance through permitting, we could look at raising a portion through equity if it was accretive to our shareholders.

We also expect there to be increasing interest from the mining industry in general as we continue to derisk the project and it could make sense to bring on a partner at the right time and right price, and there's other potential funding sources like royalties, offtake agreements and other things like that. But again, we're very unique in that we have multiple options and the whole of government approach is really supporting our path there.

261. The above statements in ¶260 were materially false and misleading when made because they gave investors the impression of a state of affairs that differed in a material way from the one that actually existed. As detailed above, at the time these statements were made, Defendant Largent knew that the anticipated initial capital costs to develop the then-existing Project plan would be materially greater than the initial capital costs estimated for the cheaper, eliminated 2020 FS mine plan, and as a result, she knew or recklessly disregarded that Perpetua's then-existing liquidity needs and associated risk of failing to secure sufficient financing to cover the Project's capital expenditures, were significantly greater than those portrayed to investors.

*May 10, 2024*

262. On May 10, 2024, Perpetua filed its quarterly report for the period ended March 31, 2024 on a Form 10-Q with the SEC signed by Defendants Cherry and Largent ("1Q24 10-Q").

263. When discussing the Company's "Liquidity and Capital Resources" as of March 31, 2024, the 1Q24 10-Q provided, in pertinent part:

The Company's latest liquidity forecast after giving effect to the silver royalty payment indicates that available cash resources for expenses not eligible for reimbursement under the DPA funding are expected to be exhausted in the fourth quarter of 2024. Absent additional financing, the Company would no longer be able to meet its ongoing obligations or progress critical permitting efforts. The Company

> continues to explore various funding opportunities, which may include the issuance of additional equity, new debt, or project specific debt; government funding; and/or other financing opportunities.
>
> ****
>
> …***Our long-term liquidity requirements will require project financing to fund the capital costs to develop the Project, which was estimated to be approximately $1,263 million as of the third quarter of 2020 according to the TRS***.

264. The above statements in ¶263 were materially false and misleading when made because they gave investors the impression of a state of affairs that differed in a material way from the one that actually existed. As detailed above, at the time these statements were made, Defendants knew that the anticipated initial capital costs to develop the then-existing Project plan would be materially greater than the initial capital costs estimated for the cheaper, eliminated 2020 FS mine plan, and as a result, they knew or recklessly disregarded that Perpetua's long-term liquidity requirements, including securing sufficient financing to cover the Project's capital expenditures, were significantly greater than those portrayed to investors.

*May 16, 2024*

265. On May 16, 2024, Perpetua held its Annual General Meeting of Shareholders (the "2024 Annual Meeting"). During the 2024 Annual Meeting, Defendant Cherry provided some brief remarks related to the Stibnite Gold Project stating, in pertinent part:

> Our production profile, low cost and robust cash flows, combined with our current valuation, present a compelling opportunity for new investors. ***Using our base $1,600 per ounce gold price, the project has an NPV of greater than $1.3 billion using a 5% discount rate. We have good leverage to higher gold prices where the NPV increases to approximately $2.4 billion at $2,100 per ounce gold.*** Based on our current market cap, we are trading nearly the widest discount to NAV despite achieving significant milestones and having a clear path forward.

266. The statements identified in ¶265 above were materially false and misleading when made because they gave investors the impression of a state of affairs that differed in a material way from the one that actually existed. As detailed above, at the time these statements were made,

Defendant Cherry knew the only then-existing action plans for the Stibnite Gold Project included expansive (and costly) Project modifications and design changes that were not accounted for in the 2020 Feasibility Study cost estimates and cash flow model. As a result, he knew or recklessly disregarded that the then-current total value of the Project's expected future cash flows (*e.g.*, Net Present Value) would be materially lower due to the significantly higher anticipated initial capital costs for the then-existing Project plan.

*<u>August 9, 2024</u>*

267. On August 9, 2024, Perpetua filed its quarterly report for the period ended June 30, 2024 on a Form 10-Q with the SEC signed by Defendants Cherry and Largent ("2Q24 10-Q").

268. When discussing the Company's "Liquidity and Capital Resources" as of June 30, 2024, the 2Q24 10-Q provided, in pertinent part:

> The Company's latest liquidity forecast indicates that available cash resources for expenses not eligible for reimbursement under the DPA funding are expected to be exhausted in the fourth quarter of 2024. Absent additional financing, the Company would no longer be able to meet its ongoing obligations or progress critical permitting efforts. The Company continues to explore various funding opportunities, which may include the issuance of additional equity, new debt, or project specific debt; government funding; and/or other financing opportunities.
>
> ****
>
> …***Our long-term liquidity requirements will require project financing to fund the capital costs to develop the Project, which was estimated to be approximately $1,263 million as of the third quarter of 2020 according to the TRS***.

269. The above statements in ¶268 were materially false and misleading when made because they gave investors the impression of a state of affairs that differed in a material way from the one that actually existed. As detailed above, at the time these statements were made, Defendants knew that the anticipated initial capital costs to develop the then-existing Project plan would be materially greater than the initial capital costs estimated for the cheaper, eliminated 2020 FS mine plan, and as a result, they knew or recklessly disregarded that Perpetua's long-term

liquidity requirements, including securing sufficient financing to cover the Project's capital expenditures, were significantly greater than those portrayed to investors.

*November 13, 2024*

270. On November 13, 2024, Perpetua filed its quarterly report for the period ended September 30, 2024 on a Form 10-Q with the SEC signed by Defendants Cherry and Largent ("3Q24 10-Q").

271. When discussing the Company's "Liquidity and Capital Resources" as of September 30, 2024, the 3Q24 10-Q provided, in pertinent part:

> The Company's latest liquidity forecast indicates that available cash resources for expenses not eligible for reimbursement under the DPA funding are expected to be exhausted in the second quarter of 2025. Absent additional financing, the Company would no longer be able to meet its ongoing obligations or progress critical permitting efforts. The Company continues to explore various strategic and funding opportunities, which may include the issuance of additional equity, new debt, or project specific debt; government funding; and/or other financing or strategic opportunities. The Company has engaged RBC Capital Markets and Endeavour Financial to assist with the evaluation of potential strategic and financing opportunities and to support the Company's application process in connection with the U.S. EXIM $1.8 billion Letter of Interest received in April 2024. Any such financing or strategic transaction, or any funding commitment from U.S. EXIM, will be subject to due diligence and other conditions. There can be no assurance of the amount, timing or nature of any such financing or strategic transaction, if any.
>
> ****
>
> …***Our long-term liquidity requirements will require project financing to fund the capital costs to develop the Project, which was estimated to be approximately $1,263 million as of the third quarter of 2020 according to the TRS***.

272. The above statements in ¶271 were materially false and misleading when made because they gave investors the impression of a state of affairs that differed in a material way from the one that actually existed. As detailed above, at the time these statements were made, Defendants knew that the anticipated initial capital costs to develop the then-existing Project plan would be materially greater than the initial capital costs estimated for the cheaper, eliminated 2020

FS mine plan, and as a result, they knew or recklessly disregarded that Perpetua's long-term liquidity requirements, including securing sufficient financing to cover the Project's capital expenditures, were significantly greater than those portrayed to investors.

<u>*November 20, 2024*</u>

273. On November 20, 2024, pursuant to Rule 424(b)(5), Perpetua filed with the SEC a prospectus supplement as part of a previously filed shelf registration statement on Form S-3 (File No. 333-266071). The prospectus supplement misleadingly characterized certain financing risks associated with the Project, including the prospect of higher capital cost estimates, as potential risks, which "may" change materially from the 2020 Feasibility Study capital cost estimates, conspicuously failing to disclose the actual events and trends or uncertainties that had already manifested, stating, in pertinent part, as follows:

> We have limited financial resources. We will need external financing to develop and construct the Project and to complete the permitting process. Although the Company's current capital resources and liquidity include funding awarded under the Technology Investment Agreement ('TIA') pursuant to Title III of the Defense Production Act ('DPA'), such funding is available only for the specified costs related to permitting, early restoration activities and advancing construction readiness and is not available to fund certain corporate expenses, including under the Settlement Agreement. The Company's latest liquidity forecast indicates that available cash resources for expenses not eligible for reimbursement under the DPA funding are expected to be exhausted in the second quarter of 2025. Due to payment obligations under the Settlement Agreement and other corporate expenses, we do not expect the Company will have sufficient assets to discharge its liabilities as they become due for at least 12 months from the date hereof. Absent additional financing, the Company would no longer be able to meet its ongoing obligations or progress critical permitting efforts. The Company continues to explore various strategic and funding opportunities, which may include the issuance of additional equity, new debt, or project specific debt; government funding; and/or other financing or strategic opportunities. There can be no assurance of the amount, timing or nature of any such financing or strategic transaction, if any.
>
> In addition, ***according to the technical report summary as of December 31, 2020, the total initial capital cost estimate for the Project was approximately $1,263 million. Based on significant inflation and increased financing costs since 2020, we expect the actual cost estimates to be higher than the 2020 estimate. These***

> ***cost estimates may change materially*** and our failure to obtain sufficient financing could result in the delay or indefinite postponement of exploration, permitting, development, construction, or production at the Project. The cost and terms of such financing may significantly reduce the expected benefits from development of the Project and/or render such development uneconomic. There can be no assurance that additional capital or other types of financing will be available when needed or that, if available, the terms of such financing will be favorable. Our failure to obtain financing could have a material adverse effect on our growth strategy and results of operations and financial condition.

274. The above statements in ¶273 were materially false and misleading when made because they gave investors the impression of a state of affairs that differed in a material way from the one that actually existed. As detailed above, at the time these statements were made, Defendants knew that the risk of the initial capital cost estimates to develop the then-existing Project plan would be materially greater than the 2020 estimate had already materialized due to the expansive (and costly) Project modifications and design changes submitted by Perpetua in 2021 and adopted by the USFS in 2022, and they knew that the change would be significantly greater than any increase related to inflation or increased financing costs. As a result, Defendants knew or recklessly disregarded that Perpetua's long-term liquidity requirements, including securing sufficient financing to cover the Project's capital expenditures, were significantly greater than those portrayed to investors.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

275. Numerous facts alleged above and summarized below collectively support a strong inference that the Defendants knew or, at minimum, were deliberately reckless in not knowing the true and omitted facts. When viewed holistically, these allegations establish a strong inference that each of the Defendants knew, or were severely reckless in not knowing, that each of the alleged misrepresentations and omissions would be, and were, false and misleading to a reasonable investor at the time they were made.

### A. The Individual Defendants Had Access to Material Adverse Information

276. Defendants Cherry and Largent acted with the requisite state of mind in that they knew and/or had access to material adverse information that contradicted the materially false and misleading statements alleged herein, at the time these public statements were made.

277. As executive officers and Directors of Perpetua, Defendants Cherry and Largent had access to non-public information about the Company's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers, employees, consultants, auditors, independent contractors, and regulatory agencies, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

278. For example, during the fiscal year ended December 31, 2024, Perpetua held six (6) meetings of the Board of Directors (including one meeting of independent directors only) of which Defendants Cherry and Largent were in attendance for all five (5) applicable Board meetings. The Company also held five (5) Technical Committee meetings (including one meeting of independent directors only) during the fiscal year 2024 of which Defendants Cherry and Largent were in attendance for all four (4) applicable Technical Committee meetings.

279. According the Perpetua, the Technical Committee reviews environmental, occupational health, safety and sustainable development reports of the Company; oversees the Company's environmental and safety performance; the technical activities of the Company including permitting, studies, projects, operations and exploration; and monitors and reviews current and future regulatory issues relating to the environment, health, safety and sustainable development (including other sustainability matters such as those relating to the environment, permitting and Indigenous relations) and makes recommendations on significant matters to the

Board of Directors. It also (i) oversees the establishment and implementation of the Company's strategies, policies and programs with respect to the Stibnite Gold Project and exploration; (ii) oversees the establishment and implementation of the Company's strategies, policies and programs with respect to sustainability matters; and (iii) reviews proposed operational and sustainability objectives for inclusion in the Company's incentive compensation programs, making recommendations to the Compensation Committee on such corporate objectives and monitoring performance against such objectives throughout the year.

280. In their positions at Perpetua, at all relevant times, Defendants Cherry and Largent had access to various technical studies, updated analyses, monitoring and mitigation plans, and other reports submitted to USFS in connection with the 2021 ModPRO2, forming the basis for the expansive Project modifications and design changes not accounted for in the 2020 Feasibility Study. Such detailed information outlining the current Project design and the Company's modified plan of execution resulting in the 75% increase in projected capital costs for the Project was not available to the investing public at the time of Defendants' materially false and misleading statements as alleged herein. Defendants' willingness to provide contradictory information to different parties gives rise to a strong inference of scienter.

281. Moreover, as detailed in Section IV.H. *supra*, by the end of fiscal year 2023, Perpetua had advanced several construction readiness activities associated with the Project plan outlined in the 2021 ModPRO2 including, *inter alia*, completing the project execution planning and scheduling for the overall Project plan, identifying long-lead items related to the powerlines, and advancing constructability reviews, value engineering studies, and detailed engineering for the Burntlog Route – the access route advanced under Perpetua's proposed action plan.

282. A construction execution plan typically encompasses scope definition, cost estimation and budget development, resource allocation, defined scheduling method, procurement strategy, and risk management, according to the development project design. A construction schedule is where the work items to be executed on a particular project are written down. And to declare long-lead items "identified" means that the project teams responsible for sourcing such critical materials have obtained preliminary bids or budgetary quotes from key manufacturers and/or strategic vendors to ensure timelines and costs for the overall project development are well-managed and procurement is synced with other project components.

283. Additionally, on April 25, 2024, analysts at Cantor Fitzgerald issued a report following a "two-day in-person non-deal roadshow" with "Perpetua Resources' management team" noting "key takeaways" to include, *inter alia*, the following:

- In the 2020 Feasibility Study (FS), initial CAPEX was estimated at $1.3 BB. PPTA will update this number prior to formally applying for EXIM project financing.
- After PPTA files an application with EXIM, targeted for Q3/24, EXIM will then undertake a due diligence process likely spanning 3-12 months. EXIM does not need to wait for the ROD at the project to move forward with processing PPTA's application for funding.
- PPTA has 'weekly' calls with DOD and 'daily' correspondence with USFS.

284. Moreover, Perpetua has a relatively small staff and it "depends on key personnel for critical management decisions and industry contacts." As of December 31, 2023, the Company had 33 full-time employees and 2 part-time employees, with 32 employees directly related to the mineral development activities of the Stibnite Gold Project, and the remaining 3 focused on executive management, investor relations and administrative support of the Company. As of December 31, 2024, the Company had 36 full-time employees and 1 part-time employee, with 34 employees directly related to the mineral development activities of the Stibnite Gold Project, and the remaining 3 focused on executive management, investor relations and administrative support.

285. Accordingly, Defendants Cherry and Largent, by virtue of their high-level positions within Perpetua, were directly involved in the day-to-day operations and management of the Company at the highest levels and were privy to material confidential information. Because of their possession of such material information, these Defendants knew, or recklessly disregarded, that the adverse facts specified herein were misrepresented and/or concealed from the investing public during the Class Period.

286. Furthermore, Perpetua's business plan is "solely dependent" on the success of the Stibnite Gold Project. The Company's only material mineral property is the interest that it holds in the Project. Since its inception in 2011, the SGP has been Perpetua's exclusive development project. As such, at all relevant times, Perpetua and its management's sole "focus [wa]s to explore, evaluate and potentially redevelop three of the deposits known as the Hangar Flats Deposit, West End Deposit and Yellow Pine Deposit, all of which are located within the Stibnite Gold Project as well as reprocess certain historical tailings located on the Project … in conjunction with a major restoration program designed to address legacy impacts related to historical mining activities in the Project area."

287. Given the significance of the Stibnite Gold Project, it is appropriate to presume that the Individual Defendants were apprised of, had access to, or had actual knowledge of all material information related to Perpetua's business, operations, financial condition, and future prospects during the Class Period, including the material adverse information that was materially misrepresented and/or concealed from the investing public.

### B. The Individual Defendants Held Themselves Out as Knowledgeable

288. The Individual Defendants knew investors and analysts were acutely interested in the Company's projected capital costs for the Project, the financing needed to develop the Project, and any design changes or other intervening events during the permitting process that might impact

the economic viability of the then-existing Project plan when compared to the 2020 Feasibility Study's economic model and capital expenditure estimates because they were repeatedly asked about and/or volunteered information about such key business metrics and operations leading up to and throughout the Class Period.

289. The Individual Defendants consistently spoke to these subjects with authority, indicating that they either had actual knowledge of the relevant subject matters discussed (and thus the material adverse information omitted) or were reckless to the likelihood of misleading investors by speaking with authority as to those subjects about which they were uninformed. Indeed, throughout the Class Period, each Individual Defendant strongly asserted that they had complete visibility into the operations of the Project permitting process, construction readiness activities, and advancement to development, including plan designs, detailed engineering work, and other relevant materials, which the Defendants each claimed to have personally reviewed.

290. For example, in addition to the statements identified in Section V, *supra*, during a "Special Call" held on December 12, 2022, to provide investors with an update on the Project following USFS's release of the SDEIS, Defendant Largent stated, in pertinent part, that:

> We are excited that the Forest Service has released our Supplemental Draft EIS in October and identified our modified project design as the preferred alternative. This signals strong momentum for the project, and we couldn't be more proud of the work we've done over the last 6 years to refine our project based on stakeholder feedback.
>
> …
>
> We have always known that if modern mineral redevelopment were going to happen at Stibnite, we would need to design a project that addresses the abandoned environmental legacies and brings value to our communities. And over the last 12 years, we've been diligently moving this vision forward.
>
> So now I'll provide a quick overview on how our project has been refined and developed through the NEPA permitting process. Our project design includes reconnecting fish migration routes that have been blocked for 80 years and picking up reprocessing and safely storing legacy tailings and waste to help improve water

> quality. We also designed the project with community feedback on everything from site access routes to doing our part to reduce light pollution.
>
> We submitted our plan of operations and restoration to the Forest Service in 2016, kicking off the NEPA review process. We are now in our sixth year of a joint review process under NEPA.
>
> …
>
> After all of this time, we can honestly say the process has improved the environmental and social aspects of our project. The Draft EIS in 2020 had over 10,000 comments from key stakeholders. We listened and we made modifications to our project, all geared at improving the environmental outcomes. Some of these changes included reducing the Hanger Flip -- Hanger Flats pit by 70% and completely backfilling it. We added geosynthetic covers to pits, backfills, the tailings storage facility buttress and the tailings storage facility to improve water quality. And we replaced a lake feature to cool water and recover more bull trout habitat. Our modified plan has been identified as the preferred alternative in the Supplemental Draft EIS, which includes the Burntlog Route. And then there's an alternative access route using existing roads to travel to Stibnite.
>
> The U.S. Forest Service states that our modified mine plan meets the purpose and need required under the regulatory framework and is expected to improve water quality, eliminate the need for permanent water treatment, improve water temperature, and our modified plan offers the safest route for people and the environment.

291. Similarly, during the 2024 Annual Meeting, Defendant Cherry briefly discussed the next steps of the permitting process for the Stibnite Gold Project stating, in pertinent part, that "[a] significant milestone was reached when the Supplemental Draft Environmental Impact Statement was released for public comment in October of 2022. Importantly, our proposed mine plan was identified as the preferred alternative, which is a term used by agencies to let the public know which action they are leaning towards selecting as final."

292. During a "Special Call" held on March 2, 2023, to provide investors with an update on the Stibnite Gold Project, Defendant Largent responded to questions about the next steps in preparing for Project implementation:

> <Chris Fogg, Manager of Investor Relations> And this next one, I'm going to combine 2 of these questions. It's both related to the details of the process from

> here. So the first part … is what exactly more work is involved to get to a final permit? What exactly is involved from here in terms of sampling and study work?
>
> And then the second part is related to the period after if we get the permit. So this one reads, 'It appears that final approval may be received in approximately 1 year, and production will start in 2027. What tasks will be done during the period from approval to production?'…
>
> <Defendant Largent> … [T]he good news is, given the amount of time we've had getting feedback on the project, perfecting the project and doing all of the environmental and engineering work, we do have a solid feasibility study out. We have a known flow sheet and mine plan that's in the process of getting final approval. So to answer the question around if you assume final permits about a year from now, then we'd be looking to start building and constructing the summer of '24.
>
> And so there's work that actually has to take place prior to that, like final detailed engineering design work, and [ not -- some ] of the funding through the Defense Production Act, what's so cool about it is we would have held off on spending those dollars until we had permits in hands, given we're a junior company and historically have had to look at the equity markets to help fund the project.
>
> What they've done through this funding is said, 'You know what, we want you to be construction ready once you receive those permits, so we're going to start funding that work now.' So we're actually getting to bring forward that detailed engineering work for year 1 of construction. Year 1 of construction is really focused around building the road and power line to site to then unlock the next sort of 1.5 years to 2 years of construction work to build the on-site infrastructure and get the processing plant up and running.
>
> So big picture, it's a 2.5- to 3-year construction time frame. But to get ready for that, we have to start all the final detailed engineering work for each of those chunks of construction, which we get to do now with this DPA funding. So that's a big chunk of work.
>
> Then we also touched on in the presentation, we'll start to look to get project financing set up, reaching out to lenders and the traditional debt groups that help with project financing to make sure we're financed to actually build and spend those dollars over the 3 years. So lots of work coming our way. A really exciting time to know we're on the downhill side of permitting, and now we're getting to start to be prepared to construct this project that we're all quite proud of.

293. During the April 17, 2024 Special Call, Defendant Cherry explained during his prepared remarks that his "background is in permitting, financing and building mines. I've been doing that in the U.S. for the last 34 years and very confident in the path forward for this project. …

I've studied and looked at the mine plan at depth before joining the company about a month ago, and it looks really good to me."

294. During the same call, Defendant Cherry was asked: "[w]hat got you so excited about that project and why did you join?" To which he responded, in pertinent part:

> [A]s I looked at Perpetua and kind of got into more of the details, dove into the feasibility study and just kind of looked at what was going on, I got more and more excited about it. Basically, it's a great project with great economics and the gold obviously drives the economics for this project.
>
> And again, with my background as an environmental engineer, the mine plan and design where you can design a mine, conduct your business and then clean up historic brownfield and legacy issues as part of your mine plan and incorporated in your mine plan, [indiscernible] company is doing things right, going to the right direction. But to be honest with you, it's really the antimony angle on this. The fact that this project will have the antimony as byproduct. It will be the only antimony producer in the U.S. and, very importantly, the ongoing support from the Department of Defense, putting multimillions of dollars into this project for engineering and permitting and evaluation of creating that antimony product.
>
> That told me that this is a really important project for the U.S., and it really kind of demonstrated that whole government approach and then knowing that the [EI]XM was kind of in the works a little bit, that -- just really, I'm excited about it. This is a really good project. It's kind of on the door step for big success here.

295. Such statements of authority were intended to (and did) indicate to investors and analysts that the Individual Defendants were plugged into the details of these topics related to the design, economics, and funding of the Project, its permitting process and pathway to Project implementation and related risks, and the Company's continued reliance on the 2020 Feasibility Study. Either they were knowledgeable of such subject matters and should have disclosed the adverse information concealed during the Class Period, or they were reckless in holding themselves out as knowledgeable without having reasonably investigated such topics discussed.

**C. The Project's Economic Viability was Integral to Perpetua's Access to Capital**

296. Perpetua's need for working capital and, in turn, the need to maintain a successful image with investors provided Defendants with motive and opportunity to commit the fraud

alleged herein. Given Perpetua's precarious financial position as a development-stage mining company heavily dependent on equity markets to fund the Project and with no other means of generating revenue, this motive surpassed any ordinary or generic corporate motive to raise funds.

297. With no ongoing mining operations, Perpetua has primarily funded its operations through the proceeds from the Company's initial public offering and additional capital raises including private placements, follow-on, shelf, and at-the-market offerings.

298. On May 12, 2023, the Company entered into a Controlled Equity Offering Sales Agreement ("Sales Agreement") with Cantor Fitzgerald & Co. as sales agent for an at-the-market program for the sale of Perpetua's common stock having an aggregate offering price of up to $20,000,000 (the "ATM Offering").[5] Sales under the Sales Agreement were subject to certain conditions, including market conditions.

299. That same day, May 12, 2023, the Company issued its quarterly report for the period ended March 31, 2023, which was prepared on a "going concern" basis, indicating that Perpetua's latest liquidity forecast showed that available cash resources were expected to be exhausted in the first quarter of 2024 without additional financing secured.

300. On August 11, 2023, the Company issued its quarterly report for the period ended June 30, 2023, again prepared on a "going concern" basis, maintaining that "the need for additional funding to further support the development of our planned operations, raise substantial doubt regarding our ability to continue as a going concern for a period of one year after the date that these unaudited condensed consolidated financial statements are issued." And on November 9,

---

[5] At-the-market offerings are agreements by an issuer to sell at its discretion a certain number or dollar amount of shares each day to a sales firm at a slight discount to market price. The sales firm then resells the shares into the market. At-the-market offerings allow the issuer to "quickly raise capital by selling newly issued shares into the natural trading flow of the market, without having to market … the offering." *See* https://www.mayerbrown.com/-/media/files/perspectives-events/publications/2020/06/wtd--atm-offerings.pdf.

2023, the Company issued its quarterly report for the period ended September 30, 2023, again prepared on a "going concern" basis, maintaining the need for additional funding to continue.

301. As of September 30, 2023, all $20 million remained available under the ATM Offering. Between October 27, and December 31, 2023, Perpetua sold 894,882 common shares, under the Sales Agreement, in exchange for net proceeds of approximately $2.1 million.

302. As of the fiscal year ended December 31, 2023 ("FY23"), Perpetua had an accumulated deficit of approximately $580.7 million, cash and cash equivalents totaling approximately $3.2 million and net negative working capital of approximately $0.9 million.

303. When reporting its financial results for FY23 on March 24, 2024, again prepared on a "going concern" basis, the Company indicated that unless additional financing was secured before the fourth quarter of 2024, it would no longer be able to meet its ongoing obligations or progress critical permitting efforts.

304. Perpetua took advantage of the positive receipt of its announced Letter of Interest and the potential access to a substantial portion of the Company's maintained CAPEX estimates provided in the 2020 Feasibility Study to access capital necessary to sustain its operations through the preparation of a formal application and until the NEPA permitting process was complete.

305. Indeed, during the nine months ended September 30, 2024, Perpetua sold 1,834,104 common shares, through the ATM Offering, in exchange for net proceeds of roughly $10.4 million.

306. Then, on November 18, 2024, Perpetua entered into an underwriting agreement with BMO Capital Markets Corp., as representative of several other underwriters named therein, for a shelf offering providing for the sale by the Company of 3,439,465 of its common shares to

the underwriters at a price of $10.17 per share.[6] The Shelf Offering closed on November 20, 2024, with the Company receiving net proceeds of approximately $33.2 million. Perpetua reported that such proceeds were, or would be, used for down payments on long lead time materials, detailed engineering for the Project, and general corporate purposes.

307. At no point during these ATM Offerings or Shelf Offering did Defendants disclose the material added costs for the then-existing Project plan for the Stibnite Gold Project, leading to a significantly lower NPV benefit and increased financing risks.

308. Due to the proceeds raised through the Company's ATM Offerings and its Shelf Offering, Perpetua raised enough cash to extend its cash runway, necessary to meet its ongoing obligations and advance construction readiness activities, through to the third quarter of 2025. Without these aggressive capital raises, Perpetua would not have been able to sustain its operations.

**D. Defendants Released the Updated Project Figures Only When They Were Forced to Do So to Secure Much-Needed Financing to Develop the Project**

309. Despite Defendants' knowledge and/or access to material adverse information, including technical reports and modeling completed in advance of the Company's submission of the 2021 ModPRO2 in October 2021, and detailed engineering work, project execution plans, including updated financial models, and a construction schedule, completed during fiscal year 2023, for the 2021 ModPRO2 Project plan, they only revealed the updated cash flow model and cost estimates for the same Project plan when they were forced to do so as part of a supplemental feasibility level technical report completed to support a formal application to secure the much-needed financing to develop the Stibnite Gold Project.

---

[6] Shelf offerings allow an issuer to register multiple securities with the SEC for future sale at its discretion, without needing to register each offering separately. This allows the issuer to "access the capital markets quickly when necessary or when market conditions are optimal." *See* https://www.mayerbrown.com/-/media/files/perspectives-events/publications/2020/07/whats-the-deal--shelf-registrations-statements--shelf-takedowns.pdf.

310. As detailed above in Section IV.D., a feasibility level technical report is necessary to support a final decision by a proponent or financial institution to proceed with, or finance, the development of a project. To adequately demonstrate the economic viability of a mining project (like SGP) for which funding is sought, the feasibility study must include the estimated capital and operating costs and an economic analysis of future cash flow calculated based on the existing mine design and plan of operations for the prospective project.

311. Because the design and proposed plan of operations for the Stibnite Gold Project, outlined in the 2021 ModPRO2 and adopted by USFS in the October 2022 SDEIS, was so materially different from the mine plan analyzed in the 2020 Feasibility Study, Defendants knew a supplemental feasibility level economic analysis of the Project would be necessary to support any final decision to finance the development of the Stibnite Gold Project.

312. Critically, Perpetua did not need to wait for final approval from USFS to supplement its feasibility level technical report for the Project. As detailed above, feasibility level studies evaluate the technical and economic viability of a mineral project that has advanced to a stage where a *preferred* mining method is established, and an effective method of mineral processing is determined. Following Perpetua's own professed reasons for the timing of the 2020 Feasibility Study, the 2021 ModPRO2 mine plan and proposed plan of operations for the Stibnite Gold Project had certainly advanced to the appropriate stage as of the October 2022 SDEIS.

313. Moreover, as detailed in Section IV.I. *supra*, while EXIM required completion of the NEPA process before issuing a final commitment, there was no requirement for Perpetua to wait until final approval to submit a formal application nor did EXIM need to wait for the Final ROD to move forward with processing Perpetua's application for funding or to engage in its due diligence review. As reflected in ¶283 *supra*, Defendants initially told investors and analysts that

they planned to update the Project's financial figures and submit a formal application in the third quarter of 2024. Yet, they ultimately waited until *after* the positive news of final approval to release the Project's updated financials in advance of Perpetua's submission of its formal application.

314. Roughly three months later, on May 23, 2025, Perpetua announced that it had submitted its formal application to EXIM for potential debt financing of up to $2.0 billion. According to the Company, the increase in the application amount to $2.0 billion from the $1.8 billion Letter of Interest reflected the increase in the estimates provided in the Financial Update.

315. By June 12, 2025, Perpetua reported that EXIM had initiated its due diligence review of the Company's application. Then, on September 8, 2025, Perpetua announced that it had received a preliminary, non-binding indicative financing term sheet from EXIM as part of a Preliminary Project Letter conveying EXIM's initial due diligence findings to the Company on its application for $2 billion in debt financing from EXIM for the Stibnite Gold Project.

316. Perpetua continued to work with EXIM to advance the Project through the next stages of EXIM's due diligence and loan application process, and on May 21, 2026, the Company announced that the board of EXIM had unanimously approved a $2.9 billion senior secured long-term loan to support the development of the Project.

**E. The Individual Defendants Falsely Certified Perpetua's Quarterly Reports**

317. As Perpetua's CEO and CFO, Defendants Cherry and Largent, respectively, signed each of the Company's quarterly reports filed with the SEC during the Class Period, including those containing the false and misleading statements identified above.

318. Included as Exhibits 31 and 32 to the Form 10-Qs filed with the SEC, during the Class Period, were management certifications, pursuant to Rule 13a-14 and 15d-14 of the Exchange Act ("Exchange Act Certification") and Section 906 of the Sarbanes-Oxley Act of 2002,

18 U.S.C § 1350 ("SOX Certification"), signed by Defendants Cherry and Largent. Such certifications are required by Congress and the SEC "to facilitate full disclosure and ensure the accuracy of financial reports by requiring corporate executives' personal stamp of approval." 149 Cong. Rec. S5325, S5329 (daily ed. Apr. 11, 2003).

319. In each applicable instance, Defendant Cherry and Largent certified, *inter alia*, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." In each applicable instance, these certifications were knowingly false. As detailed above, members of Perpetua's executive leadership received reports from Independent Qualified Persons providing appropriately detailed assessments of each applicable modifying mine design and other operational factors and related financial analysis necessary to determine economic feasibility for the Stibnite Gold Project. Defendant Cherry and Largent each received these reports through the internal disclosure controls each Defendant certified in the above-referenced certifications. Thus, Cherry and Largent knew or recklessly disregarded the falsity of the alleged statements in the Company's SEC filings but certified their accuracy notwithstanding.

* * * * *

320. Given the facts alleged herein, including the actual access that Defendants had to the truth of the Company's business operations and financial prospects of the then-existing Project plan, and the critical importance of the Stibnite Gold Project's economic viability for the Company's overall health, it would be absurd to believe that the Defendants did not know of (i) the undisclosed added costs resulting from the expansive Project modifications and design changes submitted in 2021 and adopted by the USFS in 2022, and (ii) the truth regarding the Company's then-anticipated long-term liquidity requirements and the associated risk of securing sufficient

funding to develop the Project – a key financial metric for a development-stage mining company with no other means of generating revenue.

## VII. LOSS CAUSATION

321. The market for Perpetua's securities was open, well-developed, and efficient at all relevant times. Relying upon the integrity of the market and market information related to the Company, Plaintiffs and other members of the Class purchased or otherwise acquired Perpetua securities during the Class Period and were damaged thereby.

322. As detailed herein, Defendants made materially false and misleading statements and engaged in a course of conduct that artificially inflated the price of Perpetua's securities and operated as a fraud or deceit on Class Period purchasers and acquirers of Perpetua securities by materially misleading the investing public. Later, when Defendants' prior misrepresentations and omissions and fraudulent conduct became apparent to the market, the price of Perpetua's securities materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases and/or acquisitions of Perpetua securities during the Class Period, Plaintiffs and other Class members suffered losses compensable under the federal securities laws.

323. On February 13, 2025, Defendants released a Financial Update for the Stibnite Gold Project revealing that projected capital expenditures had nearly doubled since previously reported in the 2020 Feasibility Study, resulting in a $1 billion decrease in the NPV benefit for the Project.

324. The revelations made in the Financial Update are in direct contrast to Defendants' prior misrepresentations and omissions alleged herein. In those publications, Defendants continued to rely on the economic model and capital cost estimates provided in the 2020 Feasibility Study, touting the current valuation of the Project and associated financing risks based on these metrics, while also minimizing any potential for increased costs to inflation and financing costs for the

Stibnite Gold Project. For example, the Financial Update revealed significantly higher initial capital costs, increasing the Company's prior estimates by more than 75%, well beyond the 10% to 20% increase that management had suggested at the start of the Class Period.

325. The market reacted immediately to these revelations. The price of Perpetua's common stock fell precipitously from a closing market price of $11.97 per share on February 13, 2025, to a closing market price of $9.29 per share on February 14, 2025, a decline of about 22.39% in the span of a single trading day.

326. The timing and magnitude of the decline in Perpetua's stock price following the Financial Update negate any inference that the loss suffered by Plaintiffs and other members of the Class was caused by market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent or deceptive conduct.

## VIII. CLASS ACTION ALLEGATIONS

327. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Perpetua securities during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are Perpetua, its current and former officers and directors, each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the foregoing individuals and/or entities have or had a controlling interest.

328. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Perpetua's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may

be identified from records maintained by Perpetua or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 1, 2024, there were 66.73 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

329. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws complained of herein.

330. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

331. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business, operations and management of Perpetua;

(c) whether the Individual Defendants acted as control persons of Perpetua;

(d) whether Defendants acted knowingly or with deliberate recklessness;

(e) whether the price of Perpetua securities during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

332. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

333. At all relevant times, the market for Perpetua's securities was an efficient market for the following reasons, among others:

(a) Perpetua's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) Perpetua communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Perpetua was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Perpetua was reflected in and incorporated into the Company's stock price during the Class Period.

334. As a result of the foregoing, the market for Perpetua's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in Perpetua's stock price. Under these circumstances, all purchasers and acquirers of Perpetua securities during the Class Period suffered similar injury through their purchase or otherwise acquisition of Perpetua securities at artificially inflated prices. As such, Plaintiffs and the other members of the Class are entitled to a presumption of reliance under the fraud-on-the market doctrine established by the United States Supreme Court in *Basic v. Levinson*, 485 U.S. 224 (1998).

335. Furthermore, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## <u>COUNT I</u>

*For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5*
(*Against all Defendants*)

336. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

337. During the Class Period, Defendants knowingly or recklessly made various untrue statements of material facts and omitted to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading. Such statements were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Perpetua's securities; and (iii) cause Plaintiffs and other Class members to purchase or otherwise acquire Perpetua securities at artificially inflated prices. In furtherance of this unlawful course of conduct, Defendants, and each of them, took the actions set forth herein.

338. Pursuant to the above course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Perpetua's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

339. By virtue of their day-to-day responsibilities, participation in the senior management of Perpetua, and positions held at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to each Defendant. At all relevant times, Defendants had access to information contradicting their public statements to investors. Their misrepresentations and omissions were committed willfully or with reckless disregard for the truth.

340. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers

and/or directors of the Company, the Individual Defendants had knowledge of the details of Perpetua's internal affairs.

341. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Perpetua's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, press releases and public statements, the market price of Perpetua's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Perpetua's securities at artificially inflated prices and relied upon the price of the security, the integrity of the market for the security and/or upon statements disseminated by Defendants and were damaged thereby.

342. During the Class Period, Perpetua's securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Perpetua's securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and

the Class, the true value of Perpetua's securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Perpetua's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and other members of the Class.

343. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and/or sales of Perpetua's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

344. By reason of the conduct alleged herein, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. This action was filed within two years of discovery of fraud or deceit and within five years of each Plaintiff's purchases or acquisitions of Perpetua securities giving rise to the cause of action.

## COUNT II

*For Violations of Section 20(a) of the Exchange Act*
(*Against the Individual Defendants*)

345. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein. This Count is asserted against each Individual Defendant and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

346. During the Class Period, the Individual Defendants controlled the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the material adverse non-public information misrepresented and/or omitted from Perpetua's statements and had access to truthful information contradicting their public statements to investors.

347. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control over the general operations of the Company and possessed the power to control the contents of the various reports, press releases and public filings which Perpetua disseminated in the marketplace during the Class Period, including those containing the misrepresentations and/or omissions alleged herein. Throughout the Class Period, the Individual Defendants had the power to direct the actions of Perpetua and exercised their said power and authority to cause Perpetua to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Perpetua's securities.

348. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the primary violations committed by the Company. This action was filed within two years of discovery of fraud or deceit and within five years of each Plaintiff's purchases or acquisitions of Perpetua securities giving rise to the cause of action.

## IX. NO STATUTORTY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

349. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with capital expenditure projections for the Stibnite Gold Project while at the same time failing to maintain adequate forecasting processes or otherwise failing to disclose additional expenses contemplated over time. For example, Defendants provided the public with statements relating to the potential impact of inflation that failed to account for additional, undisclosed expenses and cost increases stemming from direct decisions made by Perpetua and its management

concerning the Project and/or failed to adequately disclose the fact that the Company at the current time did not have adequate forecasting processes to assess the cost increases.

350. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

351. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Perpetua who knew that the "forward-looking statement" was false. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

352. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## X. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XI. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: July 24, 2026

Respectfully submitted,

MOONEY WIELAND WARREN

By: *Jaren Wieland*

Jaren Wieland, ISB 8265
512 W. Idaho Street, Suite 103
Boise, Idaho 83702
Tel.: (208) 401-9219
Jaren.wieland.service@mooneywieland.com

*Liaison Counsel for Plaintiff Carl Douglas Neale*

-and-

LEVI & KORSINSKY, LLP
Adam M. Apton
(*pro hac vice* application forthcoming)
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Co-Lead Counsel for Plaintiffs and the Class*

-and-

POMERANTZ LLP
Michael Grunfeld

(admitted *pro hac vice*)
Rupita Chakraborty
(admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
mgrunfeld@pomlaw.com
rchakraborty@pomlaw.com

*Co-Lead Counsel for Plaintiffs and the Class*

-and-

RAMSDEN, MARFICE, EALY & DE SMET, LLP
Marcus E. Johnson, ISB 10350
700 Northwest Blvd.
P.O. Box 1336
Coeur d'Alene, ID 83816-1336
Tel.: (208) 664-5818
Facsimile: (208) 664-5884
mjohnson@rmedlaw.com

*Liaison Counsel for Plaintiff David Wallentine*

-and-

THE SCHALL LAW FIRM
Brian Schall
(*pro hac vice* application forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Plaintiff David Wallentine*

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, July 24, 2026, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Narisa Abhasakun
Benjamin Warren Pope
KING & SPALDING
nabhasakun@kslaw.com
wpope@kslaw.com

Attorneys for Perpetua Resources Corp.

Jeffrey S. Beelaert
Preston N. Carter
Morgan D. Goodin
GIVENS PURSLEY LLP
jbeelaert@givenspursley.com
prestoncarter@givenspursley.com
morgangoodin@givenspursley.com

Attorneys for Perpetua Resources Corp.

Jaren Wieland

Jaren Wieland